UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MICHAEL GRAHAM, | ) | |
| Plaintiff, | ) | |
| | ) | ECF |
| v. | ) | Civil Action No. 05-01340 (JR) |
| | ) | |
| THE ARCHITECT OF THE CAPITOL, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

### BACKGROUND AND INITIAL PROTECTED ACTIVITY

1. Plaintiff began his employment with the Architect of the Capitol ("AOC") as a Laborer, Wage Grade 3, in 1975. Exhibit ("Ex.") 1; Plaintiff's ("Pl.'s") Deposition Transcript ("Dep. Tr.") 35:15-17, 25, January 18, 2006. Plaintiff was promoted to Electrical Helper, Wage Grade 5, in March of 1986. *Id*. 36:3-9. He was then promoted to Electrical Worker, Wage Grade 8, in July of 1989. *Id*., 36:12-13. The AOC promoted Plaintiff in October of 1993, to Electrician which is a Wage Grade 10 position. *Id*. 37:4-6, 38:7-10.

2. Stephen Stewart was a Wage Grade 10 Electrician from October 11, 1988, until approximately April of 2001. Ex. 2, Stewart Dep. Tr. 6:20-7:9, May 25, 2006. Before being promoted to Day Shift Assistant Supervisor in the Electric Shop, Mr. Stewart filed an informal complaint with the Equal Employment Opportunity ("EEO") office concerning the manner in which some of the men in the electrician shop, specifically the African American men, were being treated. *Id.* 6:18-7:1, 123:7-22, 125:8-126:4. Mr. Graham did not know of this complaint. *Id*. 126:1-8, 126:21-127:3.

3. When the informal complaint did not lead to an improvement in the way African American men in the shop were being treated, Mr. Stewart went back to the EEO office and made a formal complaint to Ex. 3, Edwin Lopez. *See* Ex. 2, Stewart Dep. Tr. 126:1-5; Lopez Dep. Tr. 45:14-19, May 24, 2006. Plaintiff was with Mr. Stewart when he made the formal complaint. *See* Ex. 2, Stewart Dep. Tr. 127:4-6; Ex. 1, Pl.'s Dep. Tr. 84:9-16, 86:4-9, 145:4-7, 20-23; Ex. 3, Lopez Dep. Tr. 45:14-19. Plaintiff also made a formal complaint. Ex. 1, Pl.'s Dep. Tr. 84:9-13, 146:13-16; Ex. 3, Lopez Dep. Tr. 45:11-19. The formal complaints were made in 1997 while both Mr. Stewart and Plaintiff were Wage Grade 10 employees. *See* Ex. 1, Pl.'s Dep. Tr. 182:14-18.

4. Plaintiff appreciated Mr. Stewart's concern and sensitivity, and still considers them to have a good relationship. Ex. 1, Pl.'s Dep. Tr. 87:21-25, 89:3-7.

5. Plaintiff initiated the EEO process in November 2001 and filed a formal complaint of employment discrimination against the AOC in December of 2002. Ex. 4, 2001 Office of Compliance Request for Counseling Form; Complaint ("Comp.") ¶ 9. That action was settled in June of 2003. Comp. ¶ 10.

6. Mr. Stewart became the General Supervisor[1] of the House Office Building Electric Shop Division around November of 2002. Ex. 2, Stewart Dep. Tr. 6:6-14. He promoted Plaintiff to Electrician Leader during the day shift on May 16, 2004, and Plaintiff has remained in that position ever since. Ex. 1; Pl.'s Dep. Tr. 39:17-40:7, 42:19-22.

7. In August 2004, Plaintiff applied for a promotion to midnight shift Assistant Supervisor.

---

[1] The terms "supervisor" and "foreman" are used interchangeably at the House Superintendent's Office.

He was not selected for the position. Comp. ¶¶ 15, 19; Ex. 1, Pl.'s Dep. Tr. 57:15-19; 59:7-12. He claims that he was not selected because of his race and the fact that he had filed a previous discrimination complaint against the AOC. Comp. ¶ 22.

NON-SELECTION FOR THE MIDNIGHT SHIFT ASSISTANT SUPERVISOR

The Application Process

8. Generally, AOC vacancy announcements are created when a manager submits a request for a personnel action to Human Resources to recruit for a position. Ex. 5, Rebecca Tiscione ("R. Tiscione") Dep. Tr. 39:6-8, April 5, 2006. The manager and a Human Resources specialist then go over the position description and develop the KSAO's (knowledge, skills, abilities, and other) for the position. *Id. at* 41:7-10. The degree of input by a manager varies such that some have significant input and others do not have any at all. *Id.* at Tr. 41:10-14.

9. The decision to fill the vacancy created when the previous assistant Supervisor of the Midnight Shift left the position was automatic. Ex. 2, Stewart Dep. Tr. 35:19-36:13, 38:8-13. Human Resources developed the vacancy announcement and used a previously formulated position description for the midnight shift assistant supervisor position at issue. Ex. 6, Aitcheson Dep. Tr. 19:5-20, April 6, 2006; Ex. 2 Stewart Dep. Tr. 31:18-32:3.

10. Vacancy announcements are posted on AVUE, a computerized application system, and applicants submit their applications electronically. Ex. 5, R. Tiscione Dep. Tr. 48:2-4; Ex. 1, Pl.'s Dep. Tr. 57:20-58:1. As part of the application process, applicants complete a self-assessment as to their level of expertise and experience in specific areas listed in

        the application.  See Rebecca Tiscione Dep. Tr. 48:9-12.

11. Plaintiff submitted an application for the Midnight Shift Assistant Supervisor position using AVUE on August 19, 2004.  Comp. ¶ 15; Ex. 1, Pl.'s Dep. Tr. 57:15-19; 59:7-12; Ex. 7, Pl.'s Application.

12. Once an application is submitted, Human Resource specialists have the responsibility to review applications to ensure that the applicant's self-assessment is supported by their work experience.  Human Resource Specialists may adjust a response if it is not supported by the supplied experience.  Ex. 5, R. Tiscione Dep. Tr. 49:4-7, 57:8-12.  Any changes made to an applicant's answers by a Human Resources specialist are documented in the system, *id*. 49:14-18, as is any action taken by the applicant such that AVUE cannot lose information once it is inputted to the system.  *Id*. 55:4-56:4.  No such adjustments were made to Plaintiff's application for the midnight shift assistant supervisor.  *Id*. 61:14-18.

13. A referral list or certificate of eligibles is then issued to the selecting official to determine who, if anyone, to interview.  *Id.* 49:18-20, 74:2-8; Ex. 8, Frank Tiscione ("F. Tiscione") Dep. Tr. 10:17-22, April 5, 2006.  Human Resources requires that, if any candidates are interviewed, at least three candidates from the referral certificate must be interviewed.  Ex.5, R. Tiscione Dep. Tr. 64:18-21, Ex. 6, Aitcheson Dep. Tr. 48:16-19.

14. Human Resources designates the selecting official.  Ex. 6, Aitcheson Dep. Tr. 9:9-12, 116:11-17.  Stephen Stewart was the selecting official for the midnight shift assistant supervisor selection process at issue.  Ex. 5, R. Tiscione Dep. Tr. 73:4-19.  Mr. Stewart and Peter Aitcheson, Assistant Superintendent of the House Office Buildings, decided

        not to interview any outside candidates because there were enough in-house candidates and they wanted to shorten the interview process. Ex. 6, Aitcheson Dep. Tr. 6:2-7, 45:11-21, 48:19-49:2; Ex. 2, Stewart Dep. Tr. 48:18-49:5.

15.     There were six in-house candidates and the top three, based on their applications, were selected for interviews. Ex. 6, Aitcheson Dep. Tr. 49:7-50:2. Plaintiff, Dave Smith, and Phil Ruppercht were interviewed for the midnight shift assistant supervisor position on or about September 2, 2004. *Id.* Aitcheson Dep. Tr. 45:8-10; Ex. 9, Interviewees List. These three candidates were most likely selected for interviews because Plaintiff was an Electrician Leader, Mr. Smith was probably one of the best fire alarm technicians, and Mr. Rupprecht had his master's electrician's license and was doing fire alarm work on the midnight shift. Ex. 6, Aitcheson Dep. Tr. 50:15-51:7.

B.   <u>The Interview Process</u>

16.     If candidates are chosen for interviews, an interview panel is created which is usually comprised of a selecting official, two other interview panelists, and a neutral observer. Ex. 8, F. Tiscione Dep. Tr. 11:1-10.

17.     It is the practice and preference to have the supervisor sit in on the interview panel when making a selection for an assistant supervisor. Ex. 6, Aitcheson Dep. Tr. 13:17-14:1,17:16-18:5; Ex. 2, Stewart Dep. Tr. 11:6-14. Mr. Stewart has been on every interview panel for an assistant supervisor or higher grade in the electric shop since he became the general supervisor because he has a say and needs to know who is promoted to these positions. Ex. 2, Stewart Dep. Tr. 10:4-21; Ex. 6, Aitcheson Dep. Tr. 41:12-15. Mr. Stewart participated on the interview panel for the selection at issue. Ex. 2, Stewart

Dep. Tr. 40:4-9.

18. Mr. Aitcheson has participated in over 30, probably over 50, selection panels since becoming the Assistant Superintendent of the House Office Buildings in 2001. Ex. 6, Aitcheson Dep. Tr. 6:2-7, 8:7-15. Mr. Aitcheson participated on the interview panel for the selection at issue. *Id.* at 18:18-22.

19. No one from the electrician shop was available to be the third panelist. *Id.*, at 43:17-44:5. Mr. Aitcheson contacted Greg Green, Supervisor in the Building Engineering Division, and Mr. Green told Kenny Masters, an assistant supervisor in the Building Engineering Division, that he was going to be on the selection panel. *Id.* at 44:3-10; Ex. Masters Dep. Tr. 6:1-15, 26:1-15, April 6, 2006.

20. Since becoming an assistant supervisor six or seven years ago, Mr. Masters had been on two interview panels prior to participating in the selection at issue. *Id.* at 6:1-8, 13:6-16, 14:10-15:20. One of the interview panels was for a position in Mr. Master's division and the other was not. *Id.* 17:2-6.

21. For a supervisory position interview, a supervisor from one division can participate on the interview panel for a supervisory position in another division. Ex. 8, F. Tiscione Dep. Tr. 19:3-5; Ex. 2, Stewart Dep. Tr. 14:18-21. The only requirement is that the interview panel member has to be at or above the grade of the position for which the interviews are conducted. Ex. 6, Aitcheson Dep. Tr. 43:8-10.

22. The interview questions were drafted by Mr. Aitcheson based on his knowledge of the job. Ex. 6, Aitcheson Dep. Tr. 44:14-15, 54:2-5; Ex, 2, Stewart Dep. Tr. 54:7-11; Ex. 10, Masters Dep. Tr. 29:14-15. Some fire alarm questions from previous interviews for fire

alarm technicians were mixed in with management questions because Mr. Aitcheson believed the knowledge of fire alarm systems to be a key requirement for the midnight shift Assistant Supervisor position. Ex. 6, Aitcheson Dep. Tr. 44:16-22; 59:10-60:2. As a result, questions two, four, six, nine, ten, eleven and fourteen were supervisory-related questions while questions seven, eight, twelve, thirteen, sixteen, seventeen and eighteen were fire alarm-related questions. Id. at 58:12-22. Questions five and nineteen were basic electrical work questions. *Id.* at 59:3-9.

23. Questions about fire alarm equipment, installation, and maintenance were asked when Kevin Banks interviewed for the Midnight Shift Supervisor position in 2003 and Mr. Banks believes they were asked when he was interviewed for an assistant supervisor position in 2002. Ex. 11, Banks Dep. Tr. 9:6-8, 12:10-16, 41:1-4, 42:2-6, May 25, 2006. Mr. Banks was hired for both positions. *Id.* at 9:6-8, 41:10-12.

24. The bulk of employees on the midnight shift are fire alarm technicians and there is a focus on doing fire alarm work during the midnight shift because it is the optimal time during which work can be done on the fire alarm system. Ex. 6, Aitcheson Dep. Tr. 28:17-18, 29:3-7, 59:18-21; Ex. 2, Stewart Dep. Tr. 92:2-9. For the midnight shift, 50 percent of the electricians' time, 95 percent of the Davis-Bacon, temporary, electricians' time, and 85 percent of the full-time fire alarm technicians time is spent working on fire alarms. Ex. 11, Banks Dep. Tr. 108:4-109:14. Fire alarm work done during the midnight shifts includes work on projects to expand and test the fire alarm system. Ex.6, Aitcheson Dep. Tr. 29:8-22.

25. An experienced electrician could perform fire alarm work at the component level or work

that is related to field devices such as smoke detectors, strobes, and beam detectors. *Id.* at 36:1-10. A fire alarm technician should do the work when it involves the fire alarm panel or printed circuit boards that perform a certain function. *Id.*, at 36:10-17.

26. The basic fire alarm work done by the electrical division is to take out zones when other divisions need to do work. Ex. 1 Pl.'s Dep. Tr. 71:5-14.

27. Plaintiff has never spoken to any of the previous midnight shift supervisors about what they did on a nightly basis. *Id.* at 52:11-17.

28. Mr. Aitcheson was the only one to pose the questions during the interviews. Ex. 6 Aitcheson Dep. Tr. 64:15-19. He did not give any instructions to the interview panelists prior to conducting the interviews. *Id.* at 65:7-9. Mr. Aitcheson provided the interview questions to the other panelists upon arriving for the interviews. Ex. 10, Masters Dep. Tr. 29:2-9; Ex. 2, Stewart Dep. Tr. 54:7-15.

29. Each panelist took his own notes of the responses that the candidates gave to the interview questions during the interview. Ex. 10, Masters 34:4-10. The panelists did not compare their notes or discuss the interviews with each other after they were finished. *Id.* at 34:11-35:9; Ex. 2, Stewart Dep. Tr. 90:8-9.

30. Generally, Mr. Aitcheson reminds the impartial observer about their role in the interview process. Ex. 6 Aitcheson Dep. Tr. 65:9-12. The duty of the impartial observer is to ensure that the interview process is conducted fairly and consistently. Ex. 8, F. Tiscione Dep. Tr. 11:9-11, 15:6-8; Ex. 1, Pl.'s Dep. Tr. 77:21-25. The neutral observer in the selection process at issue was Ann Whitman. Ex. 9; Ex. 1, Pl.'s Dep. Tr. 77:3-17. Ms.

C. The Selection Process

31. After the interview process, Mr. Aitcheson gave each of the interview panelists a rating form and they scored the candidates separately. Ex. 6, Aitcheson Dep. Tr. 65:14-22; Ex. 2, Stewart Dep. Tr. 86:21-87:3; Ex. 10, Masters Dep. Tr. 34:11-35:10, 36:10-19. The interview panelists did not have any conversations about how they were scoring the candidates. Ex. 6, Aitcheson Dep. Tr. 66:1-4.

32. Mr. Aitcheson instructed the panelists to score applicants on a scale of one to five, with a score of five considered the highest possible ranking. *Id.* at 66:5-9; Ex. 10 Masters Dep. Tr. 36:20-37:1. Each applicant was rated in four separate categories for a total of 20 possible points. Exs. 12, 13, and 14, Scoring Matrixes for Aitcheson, Stewart and Masters, respectively. The four categories were "Knowledge & ability to plan, layout & install elec. installation using tools & materials of elec. trade," "Ability to use & review building plans & blueprints," "Ability to supervise & assign work and to follow through w/several work assignments at same time," and "Ability to recommend personnel actions, schedule leave, maintain work orders & schedule work, provide tech advice & on job training." *Id*. No factors were to be weighed more heavily than any other factors. Ex. 6, Aitcheson Dep. Tr. 66:10-12; Ex. 10, Masters Dep. Tr. 63:20-64:1.

33. Mr. Masters did request the answers to some of the questions after the interviews. Ex. 6, Aitcheson Dep. Tr. 62:12-63:1; Ex. 10, Masters Dep. Tr. 31:4-7. Mr. Stewart knew the answer to each of the interview questions. Ex. 2, Stewart Dep. Tr. 56:1-5. Mr. Aitcheson also knew the answer to each of the interview questions because it was not the first time that he had asked them. Ex. 6, Aitcheson Dep. Tr. 63:7-10. Mr. Stewart and

9

       Mr. Aitcheson answered Mr. Masters' questions. *Id.* at 63:2-3, 11-16.

34. Plaintiff believed that he had done "average" at answering questions during his interview. Ex. 1, Pl.'s Dep. Tr. 108:4-9. He also admits that there are periods during the day where he is able to walk away from a project to attend to his other needs, and that he has, indeed, walked away from projects to go see friends in a different building. *Id.* at 121:8-14, 122:7-15; Ex. 2, Stewart Dep. Tr. 95:5-22.

35. Mr. Aitcheson gave Plaintiff a score of 14, Mr. Rupprecht a score of 16, and Mr. Smith a score of 18. Ex. 12.

36. The interview panel members reconvened after each had independently scored the candidates to tell each other how they scored. Ex. 6 Aitcheson Dep. Tr. 66:19-67:5; 79:5-13; Ex. 2, Stewart Dep. Tr. 87:2-12. Mr. Smith was the top choice for Messers. Aitcheson and Stewart while Mr. Masters rated Phil Rupprecht as his top choice. Ex. 6, Aitcheson Dep. Tr. 68:4-11. None of the panel members considered Plaintiff to be the best qualified applicant for the position. Exs. 12, 13, and 14. All of the panel members considered Plaintiff to be the least qualified applicant for the position. *Id.*

37. After members of an interview panel make a determination on who they want to select, the documents that were used for the questions and rating forms are given to a concurring official. Ex. 8, F. Tiscione Dep. Tr. 15:12-16. Once the concurring official is comfortable that the procedures implemented in making the selection were consistently used, he or she concurs on the selection and Human Resources makes an offer to that individual. *Id. at* 8:19-10:13, 15:12-20.

38. Frank Tiscione was the concurring official in the selection of the Midnight Shift

Assistant Supervisor and concurred on the selection of Mr. Smith. Ex. 6, Aitcheson Dep. Tr. 79:20-22; Ex. 8, F. Tiscione Dep. Tr. 8:16-18, 23:11-14.

39. Plaintiff stated he was drawing a blank when asked for the basis of his claims that the AOC discriminates against African Americans and that the selection process was being manipulated to discriminate against African Americans. Ex.1, Pl.'s Dep. Tr. 164:4-16.

40. With the exception of the alleged discriminatory and retaliatory non-selection at issue, the Plaintiff acknowledges that neither Mr. Stewart, Mr. Aitcheson, Mr. Masters, Mr. Tiscione, nor Alan Hantman, the Architect of the Capitol, have ever taken any overtly discriminatory actions against him. Ex. 15, Pl.'s Responses to Defendant's First Interrogatories ("Interrog."), Interrogs. 1 and 3.

Respectfully submitted,
/s/

KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney
/s/

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney
/s/

MERCEDEH MOMENI
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C. 20530
(202) 305-4851