Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
MICHAEL GRAHAM,                 :
        Plaintiff,              :
vs.                             : Case No. 1:05CV01340
THE ARCHITECT OF THE CAPITOL,   :
        Defendant.              :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Wednesday, January 18, 2006

Deposition of:

            MICHAEL GRAHAM,

the Plaintiff, called for examination by counsel for the Defendant, pursuant to notice and agreement as to time and place, at 501 Third Street, N.W., Washington, D.C., before Deborah Rinaldo, RPR, Notary Public in and for the District of Columbia.

Page 2

APPEARANCES:

    On Behalf of the Plaintiff:

        LESLIE D. ALDERMAN, III, ESQUIRE
        Alderman & Devorsetz, PLLC
        The Blake Building
        1025 Connecticut Avenue, N.W.
        Suite 1000
        Washington, D.C. 20036
        (202) 969-8220

    On Behalf of the Defendant:

        MERCEDEH MOMENI, ESQUIRE
        Assistant United States Attorney's Office
        501 Third Street, N.W.
        4th Floor
        Washington, D.C. 20530
        (202) 305-4857

    ALSO PRESENT:
        STEVE STEWART

GOVERNMENT EXHIBIT 1

Page 3

                    I N D E X

WITNESS:            EXAMINATION:                PAGE:
Michael Graham      Direct - Ms. Momeni         4
                    Cross - Mr. Alderman        190
                    Redirect - Ms. Momeni       193

                    E X H I B I T S

EXHIBIT NO:     DESCRIPTION:                    PAGE:
No. 1           Avue Job Application            61
No. 2           Notice of Mediation             140
No. 3           Handwritten Organization Chart  144
No. 4           Plaintiff's Complaint           149

Page 4

            P R O C E E D I N G S
                    (10:10 a.m.
Whereupon,
        MICHAEL GRAHAM,
was called as a witness and after having been first duly sworn, was examined and testified as follows:)
            DIRECT EXAMINATION
    BY MS. MOMENI:
    Q. Good morning, Mr. Graham. We met off the record, but let me introduce myself again on the record. My name is Mercedeh Momeni. I'm an Assistant United States Attorney for the District of Columbia and I represent the Architect of the Capitol in this case. Let me just ask you to give us your full name, please, for the record.
    A. Michael Leroy Graham.
    Q. And what is your address, please?
    A. 4423 Derry Road, that's Upper Marlboro, Maryland, 20772.
    Q. And what is your date of birth?
    A. 7/12/54.
    Q. Sir, have you ever been deposed before?
    A. Been deposed?
    Q. Yes. Have you ever sat in a room like this and had your testimony taken?
    A. Not that I can remember.

Page 33

1 years I paid for myself.
2    Q. At no other time has the Architect offered you
3 assistance in perhaps getting a master electrician certificate
4 or anything of that nature?
5    A. Let me clarify "offer." Because offer, has somebody
6 approached me and say, Would you like to take this, this and
7 that? No. But if it's just a general posting on the board
8 where Steve would come out and post a class that's available
9 to the electrical division on the board, then, yes.
10    Q. How about during the course of your last litigation,
11 dealing with that case in 2000 we were talking about earlier?
12    A. No.
13    Q. You have no recollection of it or you are sure that
14 no one offered it to you?
15    A. I don't have any recollection of it. I don't
16 remember.
17    Q. If someone was to offer it to you, would you accept
18 it?
19    A. Probably at this stage of the game, I probably would
20 not.
21    Q. Would you have in 2002?
22    A. I probably would have, yes, back in 2002.
23    Q. Or 2003?
24    A. Yes. I would give it a lot more consideration than
25 I am now.

Page 34

1    Q. Why wouldn't you take it now?
2    A. Well, I've only got about three years before
3 retirement. Unless I was thinking of some other reason that
4 that would help me out or if I was going in business for
5 myself, then, yes, because you need a license to be able to
6 pull permits. But at this stage, as far as my career with the
7 federal government, no.
8    Q. You told me you graduated from high school in 1973.
9 What did you do after, sir? Immediately after graduation from
10 high school?
11    A. Came to Washington, D.C.
12    Q. What did you do when you came to Washington?
13    A. Searched for a job.
14    Q. Was that in 1973, immediately after?
15    A. Immediately after.
16    Q. And did you get a job?
17    A. Yes, I did.
18    Q. What kind of job did you get?
19    A. It's been so long ago I don't remember what the
20 first job was. But I remember two or three other jobs that I
21 had early on in the city.
22    Q. When did you first begin working with the Architect
23 of the Capitol?
24    A. 1975.
25    Q. So you had some jobs between '73 and '75?

Page 35

1    A. Several.
2    Q. Were you ever asked to leave from any of those jobs?
3    A. No, I was not.
4    Q. Were you terminated in any of those jobs?
5    A. No, I was not.
6    Q. Had you had discipline in any of those jobs?
7    A. No, I was not.
8    Q. So it sounds to me you say there were several jobs
9 that you had. Were you going from job to job or were you
10 working several jobs at the same time?
11    A. They were for better incomes. So all the proper
12 things that you should do, give your employer two-week notice
13 or whatever it was they want. If I left one job and went to
14 another, that was the reason why.
15    Q. Tell me, sir, when you joined the Architect of the
16 Capitol in 1975, what position did you hold?
17    A. Laborer.
18    Q. What were your general duties?
19    A. There was a lot of duties, because it could change
20 at any given time or something that they wanted you to do,
21 depends on what was going on with the Architect or with
22 Congress. But for the most part, it was clean the bathrooms,
23 scrub the floors, run the scrubber, that type of thing.
24    Q. And how long did you hold that position?
25    A. For ten years.

Page 36

1    Q. So sometime in or about 1985 you were promoted?
2    A. Yes.
3    Q. What was the next position you held, please?
4    A. Electrical helper.
5    Q. What were your duties then?
6    A. Pretty much to assist the mechanic that -- whoever I
7 was assigned with.
8    Q. How long did you hold that position, approximately?
9    A. Probably four years.
10    Q. Were you promoted thereafter, I guess?
11    A. Yes.
12    Q. What was your next position?
13    A. Electrical worker.
14    Q. Electrical worker rather than helper?
15    A. Right.
16    Q. How were your duties different?
17    A. Well, helper you pretty much assist, run errands, go
18 get what the mechanic needs or whatever. Electrical worker,
19 you are getting more involved in actually doing the electrical
20 work.
21    Q. Do you recall whether you took the apprenticeship
22 program we talked about, whether you were completing that
23 program in between these two jobs or sometime thereabout?
24    A. I'm thinking. Without saying absolutely certain
25 this is when I started taking this class, I think it was maybe

Page 37

1 one or two years into the electrical division.
2    Q. How long were you an electrical worker?
3    A. Approximately four years.
4    Q. By my calculations that puts us into about 1993.
5 What position did you get promoted to next?
6    A. Electrician.
7    Q. What were your duties then?
8    A. A full-fledged mechanic.
9    Q. Full-fledged mechanic?
10   A. Yes. Where I'm now supposed to be able to do the
11 electrical work, which is grade 5 or 8, where they send the
12 electrical helper out with me and we can do the project.
13   Q. How long did you hold that position, please?
14   A. The electrical worker?
15   Q. Yes.
16   A. I'm going to say approximately four years, but don't
17 hold me to that because I'm just off memory. I would have to
18 actually look at actually when those promotions was.
19   Q. Do you think taking that class helped your chances
20 of getting promoted or that the apprenticeship program we
21 discussed earlier?
22   A. Not really. It didn't hurt, but from a 5 to a 8,
23 pretty standard traditional on-job training, the same way from
24 a 5 to a 8, which is the electrical worker. Pretty much the
25 same thing. The obstacle is from 8 to a 10. So if I have to

Page 38

1 say that my schooling helped me there between 8 and
2 full-fledged mechanic, that was my greatest benefit of my
3 electrical training.
4    Q. So you think it did help you to get the electrician
5 job?
6    A. Yes.
7    Q. And that's the 10 you're talking about?
8    A. Yes.
9    Q. The grade 10?
10   A. The grade 10, yes.
11   Q. Just so that the record is clear. Okay. And who
12 was your supervisor when you were an electrician?
13   A. We had so many foreman changes. I think it was
14 Harold Quaid.
15   Q. And is he the official that decided you would get
16 the promotion, do you recall?
17   A. Yes.
18   Q. What was Mr. Quaid's race?
19   A. He was white.
20   Q. Please, can you describe your duties as a
21 full-fledged mechanic, I guess, as you put it. As an
22 electrician, what did you do?
23   A. I'll tell you right off the bat, I'm not going to
24 remember everything that's on my position description.
25   Q. But generally, on a day-to-day --

Page 39

1    A. Generally, running lighting circuits, installing
2 lights, receptacles, setting panels, installing services,
3 electrical services, working on cafeteria equipment, coffee
4 pots, whatever, electrically. Our division did all that.
5    Q. And did you -- you said you had helpers, an
6 electrical helper I think you said. Did you have any helpers
7 working with you at the time?
8    A. Depending on how -- depending on what I was assigned
9 to do. Some jobs they assign, you didn't need anybody but
10 you. Some jobs they would assign you, you and one other
11 person.
12       Because of the safety of it, it was always a thing
13 where they like to work you in pairs. So most of the time it
14 was you and another person, unless you were on a project. If
15 you are on a project, that's more massive. You may have half
16 the shop on it, which might consist of six, eight to ten guys.
17   Q. I understand. And the next position that you held
18 with the Architect of the Capitol?
19   A. From electrician to present.
20   Q. Which is?
21   A. Electrical leader.
22   Q. I'm sorry?
23   A. Electrical leader.
24   Q. Electrical leader is your position?
25   A. Um-hum.

Page 40

1    Q. What year did you get that promotion?
2    A. I can give you approximately.
3    Q. Sure.
4    A. Maybe a year, year and a half ago.
5    Q. So we're in 2006. You are talking about mid-2004 or
6 2005ish?
7    A. Yes.
8    Q. Let's take a couple minutes to talk about your
9 duties as an electrician leader. Is that what you told me?
10   A. Yes.
11   Q. Tell me what you do.
12   A. You want me to tell you what I do or what I'm
13 supposed to be doing?
14   Q. How about what you are supposed to be doing first.
15   A. Well, what I'm supposed to be doing, from my PD,
16 which is my position description, I'm supposed to be the lead
17 man if we're put on a project in terms of completion date,
18 reporting the progress to my supervisor as to how it's going,
19 if we're going to make that date. If we're not, he needs to
20 know. If he needs to make some adjustment to take away some
21 employees or add them. So it's kind of a relationship that he
22 and I are supposed to have in terms of discussing what's going
23 on with the project so he knows the status of what's going on.
24   Q. I'm sorry. Let me interrupt you if I may. Who is
25 your immediate supervisor?

Page 41

1   A. George Hammett.
2   Q. Go on. What else are you supposed to be doing?
3   A. In terms of in the absence of Steve Stewart, George
4 Hammett or Bill Sanders, who is the assistant foreman, then
5 I'm supposed to be in charge. Now, I don't have the authority
6 to, let's say, sign a leave slip or to say that you can be off
7 or something like that. But I can take that slip and report
8 it to them when they return.
9       I'm supposed to be able to keep leave. All the
10 things that they do, see that everybody gets paid and see that
11 this -- so that was another part of it.
12   Q. Is there anything in your position description that
13 talks about -- well, you are called a leader, right? So how
14 do you lead? Who do you lead? Compound question. Take the
15 first part first.
16   A. Well, you lead by example. If you are on a project,
17 you are seeing that it gets done, but they are also watching
18 what you are doing. So lead in terms of the way I'm used on
19 the job is to look at the prints or discuss with my foreman
20 what our mission is or what our objective is for that
21 particular project. And so I lead from that standpoint.
22   Q. And who is -- I guess, you are sort of a team leader
23 it sounds like to me; am I correct?
24   A. Right.
25   Q. And how many staff do you have on your team?

Page 42

1   A. I don't have a staff on my team. On the day shift,
2 approximately, I think it's about 13 guys. And we have three,
3 four buildings that we take care of. For the most part, two
4 people go to each building each day.
5   Q. So there's you and two people?
6   A. No. That little core group is left to do projects,
7 unless it's a massive group and then they'll pull guys from
8 other buildings and put them on the project.
9   Q. So you could potentially be leading all 13?
10   A. One guy or seven guys.
11   Q. I see. What happens to the remainder? You said
12 there are 13 people on the team.
13   A. Well, most times you always have a person or maybe
14 two in the building to respond to the calls that's in that
15 particular building, because our main objective is to serve
16 Congress. So you can't put everybody on a project and then
17 you tell the congressmen -- you know, just let them go.
18 That's the primary reason why we're there.
19   Q. And this is during the day shift?
20   A. This is during the day shift.
21   Q. Sir, who gave you that promotion?
22   A. Steve Stewart.
23   Q. So that's what you are supposed to be doing, I
24 think. You said that's your job description. So what is it
25 that you do on a daily basis?

Page 43

1   A. I'm treated as all the other grade 10s. With some
2 exception on some days. But for general purposes, I'm
3 assigned things just like they are, go relamp the garage or go
4 by and check on this particular job or I need you to go do
5 this job.
6       Sometimes I'm by myself. Sometimes they, depending
7 on what the job is, they may assign somebody to go with me.
8 So it's not -- it's kind of played by ear from day-to-day.
9   Q. And I'm not following you. Is this good or bad that
10 you are treated the same as the rest of the grade 10s?
11   A. Well, that's bad.
12   Q. Why is that, sir?
13   A. Well, it's bad in the sense that if I'm treated like
14 all the other grade 10s, and my work duties, I'm doing pretty
15 much of the grade 10s, and I'm not performing 50 percent of
16 what I'm supposed to be doing, then when it comes time for
17 promotion or when we apply, my application is not going to
18 look any different from the other grade 10s.
19       That's the first thing in the back of my mind.
20 Because I'm not able to put down -- I'm not going to lie. So
21 I'm not able to put down that -- maybe I've done it once or
22 twice, but on a consistent basis to where I'm familiarized
23 with it, just as I am electrician, to go out and just do my
24 job, because I'm real familiarized.
25       When I'm put in 50 percent of my other duties, I'm

Page 44

1 not familiarized with it. I'm not familiarized with it
2 because I don't have the liberty of signing on the computer,
3 like my predecessors have done, to be able to go and pull down
4 leave slips and do all that. I'm not comfortable with that.
5   Q. You are talking about the administrative functions
6 of your job?
7   A. I'm talking about the administrative functions. So
8 therefore, if we go to apply for a position that's on the
9 board, my application is not going to look any different from
10 my other colleagues.
11   Q. That are not work leaders?
12   A. That are not work leaders. And it should.
13   Q. And what do you attribute that to?
14   A. I'm thinking how to answer that. The only
15 difference I see is race.
16   Q. Between you and whom?
17   A. Ken Kaldenbach who is the foreman leader and George
18 Hammett. They are both white.
19   Q. Are you saying that they were both permitted to
20 perform administrative functions and --
21   A. Oh, I was there.
22   Q. And you are not?
23   A. Yes, they did.
24   Q. And when you say, "I was there," what do you mean?
25   A. Me and Ken Kaldenbach were on the same shift. So we

Page 49

1 password and Linda?
2  A. Corbus.
3  Q. She failed to get you a password, how come you
4 didn't let Mr. Stewart know?
5  A. Because Mr. Stewart would have known when I had
6 to use his password.
7  Q. But my question to you is something else. Why
8 didn't you raise this complaint, if it's something that's
9 important to you, with Mr. Stewart?
10  A. Because I would become a menace if I went into their
11 office and complained or asked about every time something was
12 not done or the way something affected me or when my white
13 counterpart was allowed to do something and I'm not. I would
14 be in there probably every week or every other week.
15  Q. Who is your white counterpart?
16  A. The leaders. My predecessors.
17  Q. Your predecessors. Not your current counterparts?
18  A. Right. If I went in and said, I'm not doing this, I
19 would be in -- I can't recall any job where one of those
20 leaders was assigned to a job to go out and relamp the garage
21 and given a helper. Now, a helper, mind you, has no
22 experience. So who is to do the work? You think he don't
23 know this? So it's things like that that I would be in your
24 office, What's going on?
25   So I don't take that approach. My approach is, and

Page 50

1 I'm not saying it's right, I come in and do my job. If you
2 assign me to it, I go do it. And if it's bothering me to the
3 point, then I will go in and say something.
4  Q. Sir, it's bothered you enough to bring a complaint.
5 So I'm asking you, why you didn't see Mr. Stewart?
6   MR. ALDERMAN: I think it's asked and answered. At
7 this point, it's argumentative. He's given you his response.
8   BY MS. MOMENI:
9  Q. How would you describe your relationship with
10 Mr. Stewart?
11  A. Good.
12  Q. Would you agree with me that he as an open door
13 policy, that you can go in and see him when you need to talk
14 with him?
15  A. Yes.
16  Q. Any other way that you are treated differently than
17 your predecessors of previous work leaders?
18  A. Not that I can think of at this point.
19  Q. Let's talk about the job in question. And when I
20 say the job in question, sir, let's make sure that we both
21 understand that we're talking about the midnight shift
22 assistant supervisor position for which you applied in 2004.
23   I think that's vacancy announcement WS-2805-08, HOB
24 2004 173; is that correct? Forget the numbers. The vacancy
25 announcement, would you agree, that's a midnight assistant

Page 51

1 supervisor position?
2  A. Yes.
3  Q. I just wanted to put that on the record so that when
4 we deal with papers later we all know where we're going.
5  A. Okay.
6  Q. First, tell me how did you hear about the job, the
7 opening?
8  A. Coworkers.
9  Q. Do you remember who told you?
10  A. No, I don't.
11  Q. Which coworkers?
12  A. It's just general conversation. Over coffee, you
13 are talking in the morning, somebody mentioned that it was
14 online. And then I think a day or two later it was posted on
15 the board.
16  Q. And was this the first time you had applied for an
17 assistant supervisor position?
18  A. No.
19  Q. Well, let's take this one step at a time. What was
20 your understanding of the requirements necessary for someone
21 to fill that spot?
22  A. I don't have all those requirements on the top of my
23 head. But I would think it would have been the same for
24 whether it was evening shift, midnight or day shift.
25  Q. Were you familiar at all with what the midnight

Page 52

1 shift supervisors did?
2  A. Yes. The same as day shift supervisor does.
3  Q. And how did you acquire that understanding?
4  A. Well, you manage people against the work.
5  Q. Do you know if they specialized in any one
6 particular area or they spent a significant portion of their
7 time in one particular area?
8  A. I don't think there is no specialty. However, on
9 the day shift we may do more of one function than say,
10 midnight and vice versa. But in terms of specialty, no.
11  Q. Had you spoken with any of the previous midnight
12 shift supervisors to understand what they did on a nightly
13 basis?
14  A. Have I spoken to any of the supervisors? Was that
15 your question?
16  Q. About what they did on a regular basis?
17  A. No.
18  Q. So you based your understanding on what they did on
19 what?
20  A. On what I saw and discussing with the employees who
21 actually do the work.
22  Q. On the midnight shift?
23  A. On the midnight shift.
24  Q. You spoke with employees on the midnight shift?
25  A. Yes.

Page 57

1 that they told you they do on the midnight shift?
2    A. Just as I've already explained to you, Davis-Bacon
3 was basically working on fire alarm. We had two other guys,
4 Dave Smith and Tony who came from CMD, which is the
5 construction management division, who basically, for most of
6 their time, just did projects. Something that was assigned
7 for them to do, that's what they did.
8         You had a couple of other employees, Sean Cox was
9 one of them, who are permanent employees who sometimes worked
10 with them, sometimes did other things.
11       MS. MOMENI: We've been going for about an hour and
12 a half now. Is this a good time for a break?
13       (A recess was taken.)
14       BY MS. MOMENI:
15    Q. Mr. Graham, you filled out an application for the
16 midnight shift assistant supervisor position, you recall?
17    A. Yes.
18    Q. And did you do that on Avue?
19    A. Yes.
20    Q. And can you tell us what Avue is, for the record, if
21 you know?
22    A. Avue is this computerized system by which you
23 basically just filling out an application and taking them down
24 to the employment office, they prefer you to do it through
25 this computerized system that you can go online or whatever,

Page 58

1 and fill out your application and submit it.
2    Q. Do you know if the human resources office keeps you
3 appraised of where you are in the process through that system
4 as well or by e-mail?
5    A. The only thing that I've ever received, they would
6 tell you where you made the cert or not. They would send you
7 an e-mail.
8       (Graham Deposition Exhibit Number 1 was marked
9 for identification.)
10       BY MS. MOMENI:
11    Q. Mr. Graham, I'm putting a document in front of you
12 marked Defense Exhibit 1 for identification. Is this a
13 document you have seen before?
14    A. Yes.
15    Q. And can you identify it for the record, please.
16    A. This is the position for assistant supervisor for
17 night shift.
18    Q. And whose name is that on the top where it says
19 name?
20    A. Michael Graham.
21    Q. So this is the application that you filled out, sir?
22 Take a minute to look at it if you need to.
23    A. Yes.
24    Q. Actually, it looks like next to the last page was
25 kind of cut into half and I apologize for that. I think it's

Page 59

1 a total of seven pages and pages five and six look like they
2 were cut off by the machine. Let me see if we have an
3 original we can work from. Do you see that?
4    A. Yeah.
5    Q. Pages 5 and 6 were somehow combined into one page.
6 We can fix that at break, if necessary. Why don't we continue
7 using this particular document, sir. It reads that you
8 submitted this document on 8/19/2004; is that correct? See in
9 the middle about there?
10    A. Yes.
11    Q. Is that correct, sir?
12    A. That's correct.
13    Q. I assume you filled out this application after you
14 had your conversation with the midnight shift employees that
15 we discussed earlier?
16       MR. ALDERMAN: Objection. The evidence isn't on
17 record.
18       THE WITNESS: After?
19       MS. MOMENI: Let's clarify. So noted, Counsel.
20       BY MS. MOMENI:
21    Q. You told me that you had had discussions with
22 midnight shift employees, Mr. Tolson, Mr. Moore and Mr. Cox
23 and some others, correct?
24    A. Um-hum.
25    Q. Is that a yes?

Page 60

1    A. Yes. I'm sorry.
2    Q. No need to apologize. I do it as well. Do you
3 recall whether you filled this application out before you
4 spoke with them or after?
5    A. The names that I gave you and some of the people
6 that I spoke to, just general talking, it's not a compressed
7 time frame. Mr. Gordon Tolson has only been on probably less
8 than a year. Sean Cox was probably on for a couple of years.
9 He's back on day shift. Some of the other employees, probably
10 it's a wide range, let's say from the last ten years.
11    Q. Let me ask the question another way. Had you had a
12 chance to discuss what goes on in the midnight shift before
13 you filled out your application -- you submitted your
14 application?
15    A. Only Sean Cox.
16    Q. And how long had Mr. Cox been on that shift before
17 your conversation?
18    A. Probably, I'm thinking a couple of years. I'm
19 guessing and I shouldn't guess. But I'm just saying that --
20    Q. Approximately?
21    A. Approximately, yes.
22    Q. You told me this was not the first time you had
23 applied for an assistant supervisor position; is that correct?
24    A. That's correct.
25    Q. So you had filled out these -- a similar application

## Page 69

1    MR. ALDERMAN: I'm going to object to the form of
2 that question.
3    BY MS. MOMENI:
4    Q. Did you supplement the application with any
5 information?
6    A. When it comes to facts, the only thing that I know
7 for a fact that you could supplement would be your work
8 history. When it comes to this, I think it was more of a
9 multiple choice type thing.
10   Q. Let's look under, Additional Notes. Very last page.
11 Did you provide that information where it says, "Attended a
12 four-year apprenticeship program?"?
13   A. I'm sure I put that on my application, but I would
14 assume that would have been back where the educational
15 background would have been.
16   Q. So you are saying somehow the program removed it and
17 put it elsewhere?
18   A. I don't know. I can't say what happened. I'm just
19 saying where I would have put that.
20   Q. It's an incomplete sentence for some reason. Do you
21 remember whether you put a complete sentence there?
22   A. I'm not saying I put that at all, because I don't
23 think I would have ended it with just one blank sentence. And
24 the school, like for even Columbia School of Broadcasting,
25 none of that is on there, is on this particular application.

## Page 70

1 So I'm a little confused myself.
2    Q. Before you submit an application online, is it your
3 practice to print it out and look it over?
4    A. No.
5    Q. Why not?
6    A. Because I can go back and view it, the whole thing
7 from start to finish.
8    Q. And in this particular instance, did you do that?
9    A. Yes, I did.
10   Q. How is it that you remember having reviewed it?
11   A. As I do all, because I go back -- there are certain
12 things that if you have not filled out, the system won't let
13 you go forward. So when I hit submit or whatever, it would
14 put little red asterisks by whatever you need to complete or
15 fill out, pertinent information. Then I would go back and
16 look.
17   Q. Sir, have you done any fire alarm work?
18   A. That's a broad question. Have you done any fire
19 alarm work? Fire alarm is almost as indirectly relationship
20 with electrical work. It's just field connection and pulling
21 wire. And when it comes to field connections, let's say
22 you've got terminal A, B and C, 1, 2, 3 out, you know A, B and
23 C coming in, 1, 2, and 3 coming out. You know the color codes
24 of the wire. That's simple.
25      Now, in terms of the other end, because you aren't

## Page 71

1 there, I want you to understand that we don't get into the
2 writing programs and all that. Our fire division or whatever,
3 when they order fire alarm equipment, it comes preprogrammed.
4 All we have to do is install it. Can I do that? Yes.
5      Now, what's basic in our shop is that you know how
6 to take a zone out. Let's say if we were going to have some
7 plumbers doing work in this room, that needs to be shut off.
8 I know how to shut it off. That's basically our function as
9 electrical division.
10   Q. To shut off?
11   A. To shut off a zone, to take water flows out or
12 whatever is going on in that particular zone in the building.
13 Now, do I know how to do that? Yes. That's what we commonly
14 do on the day shift.
15      The only thing different than what we do on the day
16 shift and what the night people do is the field connections
17 that I just talked about, the pulling of the wire and making a
18 connection to each smoke head. That's the basic difference.
19      It's not rocket science that you got to know all
20 these different things to be able to do fire alarm. Most
21 electricians that I know can do fire alarms for what duties we
22 perform on Capitol Hill.
23   Q. How is it that you are familiar with the fire alarm
24 process?
25   A. Because the same guys that I'm talking about, there

## Page 72

1 was one room in particular where we had to go to and get in
2 the area where they didn't have keys or couldn't get into at
3 night, because they do have some kind of those rooms they call
4 SCIF, the classified room, all this kind of thing. I've gone
5 in with a couple of the people and they showed me what they
6 do. Bring wires in, bring wires out.
7    Q. Who are those couple of people?
8    A. I don't remember the guys who stayed over, but I can
9 provide the information at a later date.
10   Q. When did you do that?
11   A. I would be only speculating. I don't remember.
12   Q. Before 2001?
13   A. I would have to look back when Ken Kaldenbach and
14 the old regime retired. It was prior to that. Now, what date
15 that was, I don't know.
16   Q. Sir, you were interviewed for the job in question;
17 is that correct?
18   A. That's correct.
19   Q. And how is it that you were invited to the
20 interview?
21   A. Via e-mail.
22   Q. You got an e-mail?
23   A. Yes.
24   Q. From whom?
25   A. Let me go back. Or let me clarify something. I

Page 77

1  Q. So sometime in the fall of 2004?
2  A. Sounds reasonable.
3  Q. And who was in the interview room, please, if you
4  recall?
5  A. Let me think for a minute. I think Pete Acheson,
6  Steve Stewart, Kenny Masters, and I believe it was Ann Whitman
7  and it might have been Cornice Brown from my EEO department.
8  Q. And the last two people you just named, Ms. Whitman
9  and Ms. Brown, were they on the interview panel or were they
10 acting in some other capacity?
11 A. They were acting in some other capacity.
12 Q. What was your understanding of what they were doing
13 there?
14 A. We've had so many problems in the electrical
15 division, I'm assuming Cornice Brown was there to make sure
16 that everybody was asked the same questions, whatever. I
17 think Ann Whitman was a neutral observer.
18 Q. Ms. Brown was also a neutral observer or no? Do
19 you know?
20 A. I think she was a neutral observer also.
21 Q. And again, what is your understanding of what a
22 neutral observer is supposed to do?
23 A. Well, to see that the same questions that I'm asked
24 that the other interviews are asked, pretty much the same
25 question.

Page 78

1  Q. And let's take each of the interview panel members.
2  Did you know Peter Acheson before you went into the interview?
3  A. I knew of him. When you speak of knowing, I know
4  he's Steve Stewart's boss. He's above him as far as command,
5  in the chain of command. And I speak to him, we pass one
6  another in the hall. But actually knowing him, I don't know
7  him. So that's a pretty broad question. If I had to say yes
8  or no, one way or the other, I don't know him.
9  Q. But you know that he's Mr. Stewart's supervisor; is
10 that correct?
11 A. Right.
12 Q. What's his title, do you know?
13 A. I think it's assistant superintendent.
14 Q. Have you had any interactions with him other than
15 just saying hello in the hall in the past?
16 A. Yes.
17 Q. In what capacity?
18 A. There was a regime change from my first case and he,
19 along with Frank Tiscione, who is the superintendent on the
20 House side, inherited the problems and the conditions of his
21 predecessor which was Bob Marley. So me having the case, he
22 came over to one of the proceedings to, I guess, understand
23 what was going on, whatever. So that was the legal part of
24 it.
25    Then I've gone to his office maybe once or twice on

Page 79

1  my own to discuss some of these things that was going on and
2  had my former assistant foreman take me up for a couple of
3  meetings for something that he didn't particularly think I was
4  doing right. So we had had at least two or three sessions
5  were we had some interaction.
6  Q. Some face time? Would you qualify it that way?
7  A. Yes. Some face time.
8  Q. What were your general impressions of Mr. Acheson
9  during these various meetings?
10 A. My first meeting I thought he was genuine, you know,
11 somebody that you could listen to. My first time meeting you,
12 I'm going to give you the benefit of the doubt until you show
13 me otherwise.
14    That was kind of my view of Pete Acheson. And it's
15 changed since then, because some of the things that I went to
16 him about or with, and I'm convinced in my heart and mind that
17 I was right, and not only -- I think it went beyond what I
18 thought. What I took to him was factual stuff. And he
19 invariably sided with management.
20    So that sent another signal with me, having been
21 with the Architect 30 years, I kind of knew how these things
22 work. Makes no difference what I say, he's going to side with
23 whatever Mr. Stewart says.
24 Q. Did you ever find him to be not truthful?
25 A. Not telling outright lie or anything of that nature.

Page 80

1  But I can lead you to think one thing when in fact the truth
2  is this. Yes, I have. There have been some of those.
3  Q. So you are saying Mr. Acheson misled you on some
4  occasion?
5  A. Not misled me, but not telling the whole truth.
6  Q. Tell me about that, one of those instances.
7  A. I can't think of one thing in particular now. But
8  in one of these meetings, if I come to you and I say that I'm
9  having a problem, let's say with Les. I'm having a problem
10 with him, this and that. And I'm telling you -- I'm
11 explaining to you why I think he did A, B and C and how it's
12 affecting me.
13    Then he in turn says to me to try to explain to me
14 why Les did what he did. That's less than forthright as far
15 as I'm concerned. Because until -- how are you going to
16 defend him with just having heard my side? Shouldn't you have
17 heard his side and then make a judgment?
18    But no, see, you are defending him out of the chute
19 based on the answers that you gave me. That's the kind of
20 person I view Pete as.
21 Q. And the person you went to Mr. Acheson about were
22 other management officials?
23 A. Other? My management as it pertains to me.
24 Q. And that's when he sided with them?
25 A. Oh, yes.

Page 81

1   Q. So he's never told you a lie.
2       MR. ALDERMAN: Objection. Assumes facts not in
3   evidence.
4       BY MS. MOMENI:
5   Q. Has he ever told you a lie?
6   A. I'm not sure how to answer that.
7   Q. Are you aware of any lies that he's ever told you?
8   A. I can't remember.
9   Q. So you are saying it's possible that he lied to you
10  and you can't remember?
11  A. Yes.
12  Q. And can't remember any specific incidents or
13  instances of lies?
14  A. Not at this point, but I'm sure if I checked my
15  records, I can probably tell you things that would raise
16  concern in my mind.
17  Q. Fair enough. And when you say records, are you
18  referring to --
19  A. My notes.
20  Q. The journal notes that you keep or the notes that
21  you keep?
22  A. Yes, ma'am.
23  Q. Do you keep those notes at home or do you keep them
24  elsewhere?
25  A. I keep some at home. I keep some at work.

Page 82

1       MS. MOMENI: Again, we would like to ask for both
2   sets. We'll be propounding discovery on those as well.
3       BY MS. MOMENI:
4   Q. Let's move on to Mr. Stewart here. How long have
5   you known Mr. Stewart?
6   A. Since he came into the electrical division.
7   Q. Do you recall how long ago that was approximately?
8   A. How long, Steve? 15 years.
9   Q. Well, he can't really testify.
10  A. I would be guessing. I'm thinking 10, 15 years.
11  Q. And how would you describe your relationship with
12  Mr. Stewart?
13  A. It's good.
14  Q. Have there been any incidents where you found that
15  Mr. Stewart has not been truthful?
16  A. Yes.
17  Q. Tell me about that.
18  A. Well, there's probably a few. I may have them set
19  down in my records. I'll give you one. We had a gentleman
20  that was promoted to assistant foreman on the evening shift
21  and I knew his shady past. He was a racist. Me and him had
22  conversations where he admitted to me he was a racist. I
23  think Mr. Stewart was aware of this, too. But anyway, he was
24  promoted to assistant foreman.
25      Gordon Tolson and I, because of our past history,

Page 83

1   went in and spoke to him about this. And he told me he had
2   changed.
3   Q. Who had changed?
4   A. That this particular gentleman that was promoted to
5   assistant foreman, his name is Keith Bartlett, he told Gordon
6   and I that he had changed. I mean we discussed a whole array
7   of things and how we felt, this and that. But the bottom line
8   of what he said to us is that Keith Bartlett had changed.
9   That was a lie.
10  Q. What do you base that on, that comment you just
11  made, that that's a lie?
12  A. I don't know everything, if he would have came in
13  and said he was saved or he received Jesus Christ last night,
14  I might have gave him the benefit of the doubt. But my
15  history of racists and racism, you don't change overnight.
16  They may change their little subtle ways of doing things or
17  whatever to achieve whatever they want. But -- and maybe that
18  wasn't a lie from his point of view; from my point of view, it
19  was a lie. Now, maybe he truly believed that. But I didn't.
20  Q. So it's not necessarily a lie from his point of
21  view?
22  A. Might not. But that would be one instance because I
23  know his views on him even before he promoted him.
24  Q. So you would agree with me that people's points of
25  view can differ?

Page 84

1   A. They can differ, but see, that's a slippery slope.
2   I know that's a lie. How do I convey or articulate that to
3   you in words? It's hard for me to sit here and do. But that
4   was a lie.
5   Q. Any other instances of significance that you believe
6   Mr. Stewart has been less than truthful with you?
7   A. There are other things and I just probably have to
8   refer to my notes.
9   Q. Okay. Sir, do you recall Mr. Stewart going with you
10  to see -- to complain about discrimination sometime after 1997
11  against John Chabot (phonetic). I don't know if I'm
12  pronouncing that last name correctly.
13  A. Yes. I remember him going, yes. Now, with the date
14  I would have to -- I know you pretty much have that right.
15  But I'm saying I don't remember the date exactly. But, yes, I
16  do remember him.
17  Q. Tell me about that, please.
18  A. Well, we had a name-calling, names that we had given
19  different people for whatever reason, and I think Steve had
20  just had enough of the name-calling and stuff like that.
21  Q. When you say "name-calling," what are you referring
22  to?
23  A. Well, name-calling. Some of the guys in the shop
24  used to call him Jethro, for whatever reason.
25  Q. Jethro Bodean on Beverly Hillbillies. Now, for

## Page 85

1 whatever reason, I don't know.
2  A. Gordon Tolson, we called him Rerun. And that was
3 kind of obvious.
4  Q. Is he African-American?
5  A. He's African-American.
6  Q. Is he large?
7  A. He's large. Now you are getting the picture. There
8 were other names.
9  Q. Well, you are laughing. I guess we're all kind of
10 smiling.
11  A. It was humorous. But at the same time it was
12 hurtful for a lot of folks. There was a guy named John Rye,
13 we used to call Homer Simpson.
14  Q. Sounds like a lot of TV watching going on.
15  A. I wouldn't say everybody, but a majority of us was
16 doing it. As long as it wasn't from a racial point of view
17 where you were blatantly doing it in public. Those kind of
18 things and he was fed up with that kind of stuff.
19  Q. He was fed up with what kind of stuff?
20  A. The name-calling.
21  Q. The racist stuff?
22  A. I don't know if that could be deemed as racist.
23  Q. Well, why were you going to the EEO counseling?
24  A. I was going to EEO for racist stuff and
25 discrimination.

## Page 86

1  Q. And Mr. Stewart came with you, did he not?
2  A. Yes.
3  Q. What did he tell you he was coming for?
4  A. But when he went and filed his formal complaint, he
5 went alone. And because of the problem that I was having or
6 some of the things that or had transpired, he and I both was
7 in the Ford building and he came to me, I guess he was being
8 sensitive and let me know he is fed up with it. He's going up
9 to EEO and filing a formal complaint --
10  Q. On whose behalf?
11  A. Well, I think from his own behalf. But the nature
12 of our conversation was he was concerned about what they were
13 going to think because everybody pretty much at that time knew
14 the action of -- not necessarily of what I was doing, but knew
15 that I had had problems and had filed a complaint. And Steve
16 and I discussion was that, They are going to think it's you.
17  Q. Who?
18  A. That when he went and filed his formal complaint,
19 that they were so closely related, that when the managers find
20 out or when he gets back to John Chabot, that everybody is
21 going to think that this was Michael Graham that filed this
22 complaint about name-calling and all this stuff.
23     And I'm not going to say he was right. We was right
24 because I kind of agreed with him. But I said, I can deal
25 with it.

## Page 87

1 As it related to that, I didn't care what they
2 think. He did. Truly, that's what happened.
3     Now, the foreman at that time made the statement
4 publicly, I'm going to get whoever did this.
5     Well, who do you think he thought done it? It
6 didn't come out later that people found out that it was him
7 that filed that complaint.
8  Q. It did not come out later?
9  A. It came out later.
10  Q. So you appreciated the support Mr. Stewart was
11 giving you at that time?
12  A. Well, I don't know if it was support.
13     MR. ALDERMAN: Objecting to the form of the
14 question.
15     BY MS. MOMENI:
16  Q. You said that he was being sensitive and he
17 expressed concern to you that this might be hurtful to you in
18 the future; is that correct?
19  A. Not in the future. It might affect me as opposed to
20 what people were going to think.
21  Q. Did you appreciate the fact that he was concerned?
22  A. Yes.
23  Q. Did you appreciate the fact that he was being
24 sensitive?
25  A. Yes, I did.

## Page 88

1  Q. Did you appreciate the fact that he had gone out of
2 his way to go to the EEO office to complain about the same
3 people who are upsetting you?
4  A. All the people that was throwing these names around
5 were not -- I don't want to sit here and lump them all into
6 the same basket, because all of those people were not causing
7 me problems. Follow what I'm saying?
8     On both sides of the aisle, all were not causing me
9 problems. Some of the people we were referring to as those
10 names were not the cause of what I was going through. They
11 might have been a part of the ripple effect. But my problems
12 was with the managers.
13  Q. So this is the same person you just said was not
14 fully truthful with you. Why is it that you think he's
15 changed over the years?
16  A. I've watched the change.
17  Q. You don't think he's the same person?
18  A. Do I think -- he might be still sensitive? Yes.
19 Have he changed? Yes. And I can base that change based on
20 some of the things that I've seen happen or the fallout in our
21 division. The old Steve Stewart, when he went back to the EEO
22 office and complained about the names, this and that, wouldn't
23 have never promoted a Keith Bartlett. He would have never
24 promoted a Bill Sanders.
25  Q. And he was a deciding official in both those cases?

## Page 105

1 whether it's day shift, evening shift or midnight shift, I
2 don't think you should ask questions pertaining to what, say,
3 the evening shift does more lamping. If you are trying to
4 hire a manager, you shouldn't be asking particular what they
5 do. And you shouldn't do that for day shift.
6     If it's a management position, management is
7 management, because in my tenure of time, they take night
8 managers, bring them on day shift. They take day shift
9 managers, put them on the evening shift. They take evening
10 shift managers, so when you are asking questions that only
11 pertain to one, yes, then I feel like the deck is stacked
12 against me.
13   Q. And the questions were --
14   A. Having to deal with fire alarm. I have been in
15 other interviews where we were talking about assistant
16 foremans, wasn't no fire alarm questions asked.
17   Q. Were they for the midnight shift?
18   A. No. It was for a different shift. But as the
19 vacancy reads, a manager is a manager is a manager.
20   Q. Anything else during the interview that gave you a
21 sense that there may be a problem?
22   A. Not that I can think of.
23   Q. How did you feel after you walked out of the
24 interview session?
25   A. From my point of view, I had a pretty good idea who

## Page 106

1 was going to get the job.
2   Q. And who was that?
3   A. I hate to say that because that's not fact. That's
4 just my thinking.
5   Q. Who was that?
6   A. Dave Smith.
7   Q. How is it that you knew he had applied?
8   A. How did I know that he applied?
9   Q. Um-hum.
10   A. Well, the lady that calls.
11   Q. From human resources?
12   A. The superintendent's office, Vicki Rankin. She
13 called, may I speak to Michael Graham. Or maybe Sean Cox.
14 I'm just using these hypothetically. We know then pretty much
15 who is going to be getting the interview.
16   Q. I see. So I guess my question is still pending.
17 You haven't answered my question. How is it that you knew
18 Dave Smith had applied?
19   A. How did I know?
20   Q. Yes.
21   A. I asked him.
22   Q. Why did you do that?
23   A. Because I wanted to know what the competition was.
24   Q. Fair enough. That's fair enough. And when did you
25 ask him that question?

## Page 107

1   A. Probably a week or two after the applying, because
2 you hear all these rumors, so I asked.
3   Q. So when you walked out of the interview, that's what
4 we were just talking about, you had a sense that you knew who
5 was going to get that job. And what was your thought on that?
6   A. Deja vu.
7   Q. Please explain.
8   A. Meaning it's the same thing happening all over
9 again. Because prior to his selection to his position, I went
10 through the same thing with that general foreman. Prior to
11 that general foreman, I went through the same thing with
12 another general foreman.
13   Q. I'm sorry. When you say his selection?
14   A. Steve Stewart.
15   Q. Prior to Mr. Stewart's selection?
16   A. Right. You were talking about how I felt or what I
17 thought who had the job, when I said deja vu, I see the same
18 thing unfolding that I have seen before unfold. Based on the
19 questions that I was asked, of all the people that were
20 interviewed, who would it be more tailored to? That was my
21 thinking.
22   Q. So you think that the questions were tailored for a
23 particular person?
24   A. Yes.
25   Q. Other than what you've testified about, what other

## Page 108

1 proof of that do you have, if anything?
2   A. Nothing that I can think of other than the questions
3 is the proof.
4   Q. The question that I put to you earlier is, how did
5 you feel after walking out of the interview? I need to
6 rephrase it because I'm still not clear. How did you feel
7 like you had done when you walked out of the interview?
8   A. In terms of answering the questions or whatever,
9 I thought I had did, let's say, average.
10   Q. Did you discuss the interview with anyone afterwards
11 other than you've already told us you spoke with Kenny Masters
12 in the hall. Anyone else?
13   A. Yes. I went to Steve Stewart.
14   Q. Okay. Tell me when you did that, please.
15   A. I don't remember. We would have to look back and
16 see when the promotion was. It was somewhere within that time
17 frame. After the promotion was announced.
18   Q. I see.
19   A. Somewhere within that time frame I went to
20 Mr. Stewart and asked him where was I lacking or how did I
21 get edged out. And his response was, he thinks Dave Smith did
22 a little bit better on the fire alarm questions than I did.
23   Q. What was your response?
24   A. I just took it at his word.
25   Q. Speaking of your conversations with Mr. Stewart, you

Page 121

1  A. Management didn't try to stop me.
2  Q. Sir, in your profession as work leader, I guess we
3  have been using the terms interchangeably, work leader and
4  electrician leader?
5  A. Electrician leader, yeah.
6  Q. So we're talking about the same thing, right?
7  A. We're talking about the same thing.
8  Q. Okay. Are there periods during the day where you
9  are able to walk away from a project for a good hour or so and
10 attend to whatever else you need to?
11 A. I do. And if I do, then I know that if I'm called
12 into question for it, I got an explanation for it. Or
13 sometimes I will come back and say to my supervisor what it is
14 I done.
15      Yesterday was a perfect example. He assigned me to
16 do one thing, and another guy had to go and unlock some doors
17 or do something with somebody else. That left this one guy to
18 do this one particular job in a member's office. And I went
19 over and helped him out.
20      I came back and told George Hammett what it was.
21 And he said, Good idea. I wasn't thinking of that.
22      But he was the one that took the call to send the
23 guy somewhere else.
24      So some of the guys, I get a little respect from,
25 call me, ask me certain things. I go give them a hand. But I

Page 122

1  know in the back of my mind that if I'm called into question,
2  I got to be on my toes.
3  Q. Does that happen often?
4  A. Does it happen often? It may happen every day this
5  week, might not happen for the next four weeks. But there are
6  times when it happens.
7  Q. Do you have the flexibility to just walk away from a
8  project you are working on to go see friends in another
9  building or in another building elsewhere?
10 A. No employee has that flexibility.
11 Q. You've never done it?
12 A. I didn't say that. You asked me about flexibility.
13 So I was just answering your question.
14 Q. So have you done it?
15 A. Yes.
16 Q. Can you do it pretty much whenever you want?
17 A. No.
18 Q. How often have you done it in the past year?
19 A. I don't know.
20 Q. Once a week?
21 A. No. It wouldn't be that often.
22 Q. How often would it be? We're both smiling here.
23 A. We're both smiling because you are dealing with
24 a slippery slope. Let me say --
25 Q. I just want the facts.

Page 123

1  A. I'm going to give you the facts. I don't know of
2  not one employee, including management, that don't go see
3  people from time to time.
4       So what are we talking about? I don't want to be
5  casting this light or this situation to say or assume that
6  Michael Graham does things that other employees don't do.
7  That's what I want you to understand. When you asked me the
8  question, Have I done it?
9       Yes.
10 Q. So how often do you do it?
11      MR. ALDERMAN: I'm going to object on the relevance
12 of this. If we're talking about anything that happened in the
13 last year, then it has absolutely no relevance to the position
14 and selection that we're talking about today. And it's
15 completely irrelevant. It's argumentative.
16      MS. MOMENI: Counsel, I heard you. I'm sorry.
17 You are right.
18      BY MS. MOMENI:
19 Q. In 2004, how often did you walk away from your job
20 to go meet and greet?
21      MR. ALDERMAN: Are we talking about before August
22 2004 or are we talking about after August 2004?
23      MS. MOMENI: In 2004. I think that's fair. I just
24 want to get a general flavor.
25      MR. ALDERMAN: There is a significant amount of the

Page 124

1  year that falls after the selection at issue. So if he can
2  remember specifically, prior to August 2004.
3       MS. MOMENI: Counsel, I think the speaking objection
4  is heard very loudly by everyone in the room. Let me
5  rephrase my question just to move things along.
6       BY MS. MOMENI:
7  Q. Sir, you have been with the Architect over 30 years,
8  correct? Architect of the Capitol?
9  A. Yes.
10 Q. You know a lot of people in the buildings, correct?
11 A. Yes.
12 Q. You're a fairly popular guy; isn't it true?
13 A. Yes.
14 Q. And would it be correct to say that you have the
15 luxury of walking away from your projects. And in fact, you
16 have walked away from your projects to go see friends and
17 acquaintances?
18      MR. ALDERMAN: Asked and answered. Objection.
19      BY MS. MOMENI:
20 Q. Go ahead and answer it, please.
21 A. Based on the way that you are asking it, I would
22 have to say no. As I said, not Michael Graham or anybody else
23 has that luxury just to walk away from their job. That would
24 be like saying I come in and sign in, I can do whatever I want
25 to. I can't do that.

Page 145

1 That's the reason we had the conversation about what people
2 was going to think and their reaction that we may get out of
3 this.
4   Q. And that's what you believe he went down to the EEO
5 office with you for was because of the name-calling and
6 nothing else; is that correct?
7   A. That's what I understand.
8   Q. And absolutely nothing else?
9   A. I can't say absolutely nothing else.
10  Q. So the same person that goes to the EEO office with
11 you is going to retaliate against you for doing the same thing
12 that he did; is that correct? Is that what you are saying in
13 paragraph 12?
14  A. I'm being confused.
15  Q. I'm sorry. You are right. Let me clarify that.
16 That's my fault.
17       Mr. Stewart was a decision-maker for you becoming
18 electrician leader, correct?
19  A. Yes.
20  Q. And so you've also testified that he also went to
21 the EEO office with you on the same issues, correct?
22  A. Some of the same issues.
23  Q. Some of the same issues that you know of. You don't
24 know, I think you testified what all his thoughts were in his
25 head, correct?

Page 146

1   A. I know what he voiced to me why he was going. That
2 was for name-calling. Some of the names that might have been
3 used somebody could have viewed as racist. But he didn't go
4 down for racism, to support me in my fight against racism.
5   Q. He went down there on your -- did he go down to
6 support you in your fight against the racist comments that you
7 were allegedly dealing with back then?
8   A. I don't want to say yes, because that would give you
9 a different view of actually what he went for. I'm telling
10 you why he actually went, that I know of, because if he would
11 have actually went there for the cause that I was fighting, he
12 wouldn't have only made that one meeting.
13  Q. Did he end up filing a complaint with you at the
14 same time?
15  A. No. He filed a complaint on his own on the tails of
16 me filing a complaint. And supposedly my issues were not
17 really dying down, but let's say some of the gossip and the
18 innuendos has -- was being less and less talked about until he
19 went and filed about name-calling. So I don't --
20  Q. So did it make a difference that he filed?
21  A. Yeah. It made a big difference.
22  Q. Help your --
23  A. Because all of a sudden, I was the snake again.
24  Q. My question is, did it help your complaint along?
25 Did it help the issues to come to the forefront a little more?

Page 147

1   A. I don't think so.
2   Q. So you are saying that what Mr. Stewart did was not
3 supportive of your concerns?
4       MR. ALDERMAN: Objection to the characterization of
5 his testimony.
6       BY MS. MOMENI:
7   Q. I'm asking you. Did it support your cause or not?
8   A. If I got to say yes or no, I'm going to say no.
9   Q. Because?
10  A. Because along the way of every step that I made in
11 terms of fighting racism and what I went through legally,
12 nothing that he ever said was mentioned, was ever brought up.
13 And the people that he told his story to, it didn't go outside
14 of their office of EEO.
15      When I went to Office of Compliance, I was on my
16 own. I'm on my own in terms of the information and everything
17 that I provided to them as to what I was dealing with and what
18 I was going through.
19      There was never nothing brought up about
20 name-calling, this and that. And the only thing that EEO
21 does, I'm sure they probably do other things that I don't know
22 of, but they serve as a mediator. You follow what I'm saying?
23      So they would mediate between John Chabot, Pete
24 Acheson or whoever the superintendent was at that particular
25 time about what was going on and how are we going to handle

Page 148

1 this question. That's as far as that went.
2       So did it help me further my cause after I went to
3 the Office of Compliance? No, it did not.
4   Q. Your earlier testimony, sir, and we can have the
5 court reporter read it back, was that you appreciated his
6 support. Are you now changing your testimony?
7       MR. ALDERMAN: Objection to that gross
8 mischaracterization.
9       BY MS. MOMENI:
10  Q. I can have the court reporter read the testimony
11 back. Are you changing your testimony?
12  A. No, I'm not.
13  Q. So you still appreciated the support that Mr.
14 Stewart gave you when you initially went to the EEO office in
15 2004?
16  A. In the context of the EEO office complaint.
17  Q. Okay. That's all I'm asking. So the question now
18 is, just a year later, the person who had been supportive of
19 the situation that you were in or supporting the issues that
20 you were in, is going to turn around and retaliate against
21 you.
22      MR. ALDERMAN: Objection to the characterization of
23 the testimony. Ask him a question about what he thinks. But
24 don't try to characterize what you think he said.
25      MS. MOMENI: We can have the court reporter read it

Page 161

1 if Michael Graham understands what "on information and belief"
2 means, which is a legal term which I wrote when I wrote this
3 complaint.
4     MS. MOMENI: Right. Counsel, I assume you have your
5 clients look at complaints before you submit them to the
6 Court.
7     MR. ALDERMAN: Of course. But I'll also assume that
8 you will understand that my client doesn't know everything I
9 do and that he doesn't understand all of my legal theories and
10 he can't be expected to.
11     MS. MOMENI: I'm talking about what information he's
12 basing his claim on that the AoC intentionally manipulates the
13 selection process. That's all.
14     BY MS. MOMENI:
15   Q. I just want to know what you mean by that?
16   A. Well, I gave you one specific reason or how that's
17 happened. Mr. Stewart can call down and get me an interview.
18 Not only me. Probably any other employee. That's a
19 manipulation of the system.
20   Q. And again, was that a bad thing in this instance?
21   A. It's a bad thing when you are selling me that
22 everything is going to be fair and above water and that's the
23 reason we're installing Avue. That's not supposed to happen.
24   Q. Installing?
25   A. Avue.

Page 162

1   Q. Avue. Okay. I'm sorry. Any other instances other
2 than this one particular instance where you got an interview?
3   A. That's just one I gave you. I can't sit here and
4 think of all that off the top of my head. There may be other
5 instances and things that I can probably provide, but that's
6 all I can remember at this time.
7   Q. So there are other instances that you are familiar
8 with where the system was manipulated to help -- to manipulate
9 the selection process. Are there other instances that you
10 know of?
11   A. I can't remember at this time.
12   Q. But there are some that you are familiar with?
13     MR. ALDERMAN: Asked and answered. Now it's getting
14 to a point of argument. You've asked him that three times.
15 He just told you that he can't remember. How many times are
16 you going to ask him the question?
17     BY MS. MOMENI:
18   Q. The question was whether he knew of any. And he
19 said nothing that I can remember off the top of my head. And
20 then I asked if there is anything specific that he may be
21 referring to.
22     MR. ALDERMAN: If there was anything specific then
23 he would have told you. That wouldn't have been, I don't
24 remember.
25     BY MS. MOMENI:

Page 163

1   Q. Sir, if you think of one later, please let me know.
2   A. Fair enough.
3   Q. We'll move on.
4     MS. MOMENI: Thank you, Counsel. That's a fair
5 point.
6     BY MS. MOMENI:
7   Q. Paragraph 21, "on information and belief -- well,
8 you can skip that part. Let me get to the meat of what I'm
9 asking you -- "the AoC knowingly permits manipulation in order
10 to permit the selecting officials to discriminate against
11 African-American applicants."
12     To what are you referring, sir?
13   A. Of all the problems that we've had, to whatever
14 problem an African-American has pointed out, I have never seen
15 one time where it was dealt with.
16   Q. My question is more specific to what you've outlined
17 in paragraph 21. You say that the selecting officials -- that
18 AoC knowingly allows the manipulation of, I guess, the
19 selection process to discriminate against African-Americans.
20     I'm asking what you are talking about here.
21     MR. ALDERMAN: Object again because it relates to
22 counsel's theory of the case that Mr. Graham wouldn't
23 necessarily know.
24     BY MS. MOMENI:
25   Q. If you understand it, go ahead and answer, please.

Page 164

1   A. I agree with counsel.
2   Q. You don't understand the question?
3   A. No, I don't.
4   Q. Do you understand that you are claiming that the
5 Architect of the Capitol discriminates against
6 African-Americans?
7   A. Yes.
8   Q. That's your claim?
9   A. Yes.
10   Q. And you are saying that they allow selection
11 processes to be manipulated so that African-Americans aren't
12 promoted. Do you understand that?
13   A. Yes, I do.
14   Q. I'm saying what do you base that on?
15   A. I'm drawing a blank at this point. Nothing that I
16 can think of right now.
17   Q. So the only instance that you can remember is -- of
18 manipulation is the instance where you were permitted an
19 interview about the job in question, for the job in question;
20 is that correct?
21   A. If I'm -- yeah, off memory, yes. But if I go to my
22 notes, I'm sure there are other things.
23   Q. Did you have a chance to review those notes before
24 you came in today, sir?
25   A. No, I did not.

Page 181

1  MS. MOMENI: That's exactly right. It's leading.
2 It's your own witness.
3  MR. ALDERMAN: I'm still going to ask the question
4 as it is. It's not leading. He can answer.
5  MS. MOMENI: It's a yes or no, that's leading. Go
6 ahead and ask him.
7  BY MR. ALDERMAN:
8  Q. Did you make a claim for retaliation as well as
9 discrimination or was it just discrimination?
10  A. If my memory serves me correctly, I think it was
11 both promotion -- I mean, race and retaliation.
12  Q. Earlier you were talking about a selection when you
13 did not make the original cert list. Was that for the night
14 shift position or was it for the evening shift assistant
15 supervisory position which I think occurred a year later?
16  So the night shift was in 2004 sometime and I think
17 the evening shift was in 2005 sometime. Do you remember
18 specifically which one you didn't initially make the cert for?
19  A. If my memory serves me correctly, I think it was
20 the evening shift.
21  Q. So not the night shift?
22  A. Not the night shift.
23  Q. So earlier when you were talking with Ms. Momeni
24 about not making the cert, and you indicated that it was for
25 the night shift, were you making a mistake?

Page 182

1  MS. MOMENI: Counsel, I think the record will be the
2 record. We'll have to go back and look at it.
3  MR. ALDERMAN: I wanted to give you the opportunity
4 to clear it up. I think he made a mistake in attributing it
5 to one and not the other.
6  MS. MOMENI: Well, it's in his complaint, I think.
7 But anyway, we'll have to look at it. Go ahead.
8  BY MR. ALDERMAN:
9  Q. So what is your recollection of the promotion that
10 you did not initially make the cert on?
11  A. I'm certain it was 4:00 to 12:00.
12  Q. The 4:00 to 12:00?
13  A. 4:00 to 12:00.
14  Q. Do you remember what Mr. Stewart -- Steve Stewart's
15 position was when he complained to the EEO about name-calling?
16  A. He was a WG-10.
17  Q. What does that mean?
18  A. It means he was a mechanic electrician.
19  Q. So he was the same grade as you?
20  A. Yes.
21  Q. He wasn't a supervisor?
22  A. No, he was not.
23  Q. Do you remember your exact answers to all of the
24 interview questions that were asked of you?
25  A. No.

Page 183

1  MR. ALDERMAN: That's all I have.
2  RECROSS EXAMINATION
3  BY MS. MOMENI:
4  Q. One quick question actually. Actually, two. Sir, I
5 had asked you previously whether you knew of any situations
6 where Mr. Acheson had been untruthful and you gave me one
7 instance where you thought maybe he was misleading or
8 something to that effect. I don't recall your exact words.
9 The testimony is what it is. Is there any other instance
10 where you have found Mr. Acheson to have been less than
11 truthful?
12  A. Not that I can think of right now.
13  Q. How about Mr. Masters, other than the incidents you
14 mentioned already in the hallway?
15  A. Well, how do I answer that? Because usually in your
16 profession, if you find out somebody told you a lie, they
17 pretty much discredit them on everything. So how long has he
18 been lying to me? I don't know.
19  Q. So I'm not clear. Has he lied to you in other
20 instances?
21  A. Who can say? Only God would know that. That's
22 just my point. If he told me an outright lie about something
23 so trivial, just a thing, I don't know how long he had been
24 lying to me or what he had lied to me about.
25  Q. And what about Mr. Stewart? Tell me of any

Page 184

1 instances where he's not been truthful with you.
2  A. Nothing that I can remember at this point. There are
3 things that we have had in our weekly meeting that -- maybe
4 statements he had made or say this is going to happen, that's
5 going to happen and it didn't.
6  Now, was that a lie? Should I say that's a lie from
7 my point of view? Maybe things changed. I don't know.
8  Q. Maybe beyond his control, what have you?
9  A. Right. Only God would know that. But if you didn't
10 come back and change it to me, I could sit here today and say,
11 Oh, that was a lie.
12  But without me knowing the circumstances, I can't
13 sit here and say that. So I just reserve the right to maybe
14 give you more factual stuff if I think of some things.
15  MS. MOMENI: Nothing further. Thank you very
16 much.
17  (Reading and signature not waived.)
18  (Whereupon, at 3:50 p.m., on Wednesday, January 18,
19 2006, the deposition was adjourned.)