**Capital Reporting Company**

Page 1

```
 1            SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                   FOR THE DISTRICT OF COLUMBIA

 3       _ _ _ _ _ _ _ _ _ _ _ _

 4   MICHAEL GRAHAM,            )

 5         Plaintiff,            )

 6   Vs.                         )    Case No.

 7   THE ARCHITECT OF THE        )    1:05CV01340

 8   CAPITOL,                    )

 9         Defendants.           )

10       _ _ _ _ _ _ _ _ _ _ _ _ )

11

12                                         Washington, D.C.

13                                   Wednesday, April 5th, 2006

14   Deposition of:

15              FRANK TISCIONE

16   Called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Ford House

18   Offices, 2nd and D Street, S.W., Room B39, Washington,

19   D.C., before Christine Fox, a Notary Public, beginning

20   at 2:00 p.m. when were present on behalf of the

21   respective parties:

22
```

GOVERNMENT EXHIBIT 8

Page 6

1  A. No.
2  Q. Good, excellent.
3     Can you take me through briefly your work
4  history at Architect of the Capitol. Start earliest
5  and taking us through to date.
6  A. Okay. In 1998, I came to work here and
7  worked at the office of the superintendent for the
8  Senate. I was an assistant superintendent at that
9  position for two years.
10    After that, I went to the Library of
11 Congress, where I was a superintendent for 18 months,
12 and then in November of '01, 2001, I started the
13 position as superintendent for The House Office
14 Building which is a position I currently hold.
15 Q. Can you briefly describe for me your duties
16 as superintendent of the House Office Building?
17 A. Yes. I'm responsible for all the facility
18 maintenance, operation, and construction for four major
19 buildings, the Cannon Building, the Longworth Building,
20 the Rayburn Building, and this building hear the Ford
21 Building, and also we have a small dormitory that we're
22 also responsible for maintenance of which is 501 First

Page 7

1  Street, which is over by the Capitol power plant, on E
2  Street.
3  Q. Who is above you in the chain of command
4  leading to the Architect?
5  A. At the present time, there is a chief
6  operating officer who is my boss, his name is Steven
7  Ayers.
8  Q. A-y-r-e-s?
9  A. A-y-e-r-s.
10 Q. Okay.
11 A. And then in his direct report is Mr. Hammond
12 who is The Architect of the Capitol.
13 Q. And can you give me the chain below you?
14 A. The chain below me is I have a deputy that
15 reports to me, his name is Bob Gleich, G-l-e-i-c-h.
16 Below him are four assistant superintendents, one is
17 Pete Aicheson, who is responsible for the shop that
18 we're discussing here.
19 Q. I don't need the other assistants, but if you
20 could take me all the way down to Michael Graham, if
21 possible?
22 A. Then below Pete Aicheson is the general

Page 8

1  foreman for the electric shop, Steve Steward. Then
2  below Steve is a foreman George Hammett, and then
3  Michael is a leader in that shop.
4  Q. We're -- all of my questions today are going
5  to refer and relate to the selection for the assistant
6  supervisor on the night shift in the House Office
7  Building that occurred back in 2004 for which Mr.
8  Graham applied, was interviewed, was not selected and
9  for which David Smith was selected.
10    Are you familiar generally with that
11 selection, in other words, that it occurred?
12 A. Yes.
13 Q. Did you have any involvement in that
14 selection process?
15 A. Yes.
16 Q. Can you tell me what your involvement was?
17 A. I was the concurring official in that
18 selection.
19 Q. And what did you do as the concurring
20 official?
21 A. As the concurring official, I reviewed the
22 documents that were used -- that were developed by the

Page 9

1  interview panel, and then I went into the -- our Human
2  Resources system, AVUE, which I'm sure you're familiar
3  with.
4     And then as a concurring official in there,
5  to complete the process, the selecting official makes a
6  selection and then I look at that, would look at who he
7  selected. I make sure the documents -- that's part of
8  what I do is look to make sure there was interview
9  panel, that there are appropriate documents in there
10 that we have like a rating matrix, which I see you have
11 there, interview question and so on.
12    Once I see all that has happened, then I
13 concur on that selection, that gets forwarded to Human
14 Resources to go ahead and make an offer to the
15 individual that was selected.
16 Q. The way you were describing it sounds as if
17 your review is to make sure that the procedures used
18 were correct and complete, is that accurate?
19    And I make a difference between the procedure
20 and the substance of the decision.
21    MS. MOMENI: If you don't understand the
22 question --

Page 10

1   A.  Yeah, I don't understand the question.
2       MS. MOMENI: -- and you need clarification,
3   please feel free to ask.
4   A.  Yeah, please rephrase it or --
5   BY MR. ALDERMAN:
6   Q.  When you review the selection and the
7   materials before concurring, are you reviewing to make
8   sure that a correct procedure was used to come to the
9   selection, or are you reviewing to make sure that the
10  selection itself was a good selection and the right
11  selection?
12  A.  The former, the procedures that were used in
13  getting to that selection were consistently used.
14  Q.  Does that mean to say you're familiar with
15  procedure that should be used in the selection process?
16  A.  Yes.
17  Q.  Can you describe for me procedures that
18  should be used in the selection process?
19  A.  For when we conduct -- when we conduct a
20  selection of a position for any position, there is a
21  certification that is forwarded from Human Resources to
22  the selecting official.

Page 11

1       The selecting official then convenes an
2   interview panel. That could happen -- it doesn't have
3   to happen but by and large it does happen they would
4   have an interview panel. There are certain reasons why
5   you wouldn't have one, if there was only one been that
6   applied for the job and so on. That interview panel --
7   then that selecting official sets up an interview panel
8   which is comprised of the selecting official and
9   usually two other people as well as an independent
10  observer that is brought in to make sure the process is
11  done fairly and consistently.
12  Q.  Let me stop you there and ask you to some
13  detailed questions about what you've just discussed.
14  A.  Um-hmm.
15  Q.  In the selection at issue in this civil
16  action, do you recall who the selecting official was?
17  A.  No, I don't -- oh, the selecting official?
18  Q.  Yes.
19  A.  Specifically, no.
20      In the process -- I mean, I'd have to go back
21  and look at the records because it was so long ago
22  because I reviewed many, many of these.

Page 12

1   Q.  Sure.
2   A.  But it is normally the supervisor of the
3   position -- the supervisor of that shop making the
4   selection of that position.
5   Q.  Normally it's supervisor of the shop, so it
6   would be the -- the foreman of the electrical shop?
7   A.  In this case it probably be Steve Steward.
8       Now, I am saying I need to go back, to see if
9   that's the case I would have to go back and look at
10  that.
11  Q.  But under the standard practice --
12  A.  Yes. Yes.
13  Q.  -- it would be Steve Steward?
14  A.  Yes, in that particular case.
15      Now, if it was a supervisor, then it comes
16  one level up so the assistant supervisor, in this case
17  Pete, would be conducting the -- would be the selecting
18  official, but in that particular case it would be Steve
19  Steward.
20  Q.  And how does the selecting official decide
21  whose going to sit with him on the panel, on the
22  interview panel?

Page 13

1   A.  There are -- and I would have to review
2   policy because there certain criterion in the policy
3   that in selecting the panel you have people equal in
4   the grade, so I don't have specific to answer that
5   truthfully I would have to review the policy.
6   Q.  Do you know where that policy is located or
7   where memorialized?
8   A.  We have -- I have a book, a Human Resources
9   book, in my office, that we have hard copies of all
10  those policies.
11  Q.  And do you recall a specific policy that
12  governs composition of a selection panel?
13  A.  It is career staffing policy.
14  Q.  But my question is do you recall a specific
15  rule that governs the composition of an interview
16  panel?
17      MS. MOMENI: I think the witness told you the
18  name of it.
19  BY MR. ALDERMAN:
20  Q.  He referred to the entire staffing policy.
21  A.  Which has in there what the composition of
22  the panel is, the policy has the composition of the

Capital Reporting Company

Page 14

1 panel.
2  Q. Were you involved in any way -- and in any
3 way, I mean, either by making the decision, by making
4 the decision, conferring with the person making the
5 decision or giving advise to the person making the
6 decision in the composition of the interview panel used
7 in the selection at issue here?
8  A. No.
9  Q. So no one talked to you about it, no one came
10 to you to seek your advice about it or to get your
11 approval?
12  A. No.
13  Q. Do you know who was on that interview panel?
14  A. No.
15  Q. We were just talking before I interrupted you
16 to ask this detail question, about the process and your
17 understanding of the process, and you were to the point
18 of implementing a panel.
19  A. Um-hmm. And if you -- if I can just ask you
20 to go from there.
21  Q. What happens next after that panel?
22  A. The panel then interviews the -- the people

Page 15

1 that are on that certification, based on -- they review
2 certifications and decide who to interview on the
3 qualified people forwarded to them to interview.
4     Once they do that, they have a series of
5 questions that they asked. They ask questions to the
6 applicant as they come in. The independent observer is
7 there just to make sure all question are asked
8 consistently, all that is documented.
9     They do a rating matrix based on the answer
10 to the question, and then the panel makes determination
11 on who they should select.
12     That is then -- then in AVUE they go in and
13 make that selection, and then I end up getting the
14 documents that were used for the questions and rating
15 matrix, and the individuals that were on the panel,
16 sign the documents.
17     And then I look at the information and then I
18 go into the system, and once I'm comfortable that
19 everything was done consistently, I go ahead and
20 concur, AVUE and then forward that to HR.
21  Q. Okay. Backing up a little bit.
22     And focusing in on the interview questions

Page 16

1 themselves, who makes the interview questions up?
2  A. Usually the supervisor of that shop.
3  Q. And does the supervisor typically also write
4 down what he thinks the correct answers are to the
5 interview questions?
6  A. No.
7  Q. Is there any way to make sure that other
8 panelists know what the answers are to the interview
9 questions?
10  A. No.
11  Q. Is it important that the panelists know what
12 the correct answers to the questions are in the
13 interview process?
14  A. I don't know. I mean, I -- could you ask the
15 question again?
16  Q. Sure. If I ask you -- I'm now an
17 interviewing official, and you are a candidate. If I
18 ask you what tool you would use to measure something,
19 and you give my an answer, is it important for that
20 interview panel to know whether that is a correct
21 answer or not?
22  A. Yes.

Page 17

1  Q. And is there any practice to ensure, practice
2 or policy to ensure that the panelists actually know
3 what the answers are to the interview questions?
4     MS. MOMENI: If you don't understand the
5 question, feel free to ask for clarification.
6  A. Yeah, I don't -- I don't understand the
7 question.
8 BY MR. ALDERMAN:
9  Q. Okay. Are you aware of any requirement or
10 practice that the person that makes the questions up
11 also distributes answers to those questions to the
12 interview panelists who will be scoring candidates'
13 answers to those questions?
14  A. There is no practice that I'm aware of that
15 they provide an answer to the questions.
16     MS. MOMENI: Counsel, I have to object to
17 that whole line of questioning, because it assumes a
18 certain set of facts that are -- there's no foundation.
19 You kind of missed a foundation there.
20     MR. ALDERMAN: Actually there is.
21     Mr. Tiscione indicated he was familiar with
22 practices and the policies by which they make

Capital Reporting Company

Page 18
1  selections.
2       He also indicated that he reviews the
3  procedure by which the selection was made to make sure
4  it's consistent with those practices and policies.
5  Therefore, he certainly has established the foundation
6  that he can describe to me what practices and policies
7  are in place and are not in place.
8       MS. MOMENI: Well, your question is based on
9  certain assumptions about the panelist not knowing the
10 answers. What kinds of people sit on the panel, not
11 going to pull somebody out of the air, somebody that
12 knows nothing about the business at hand.
13 BY MR. ALDERMAN:
14    Q. Say, for example, someone that works in HVAC.
15 Is it customary in an electrician selection to have an
16 HVAC -- so HVAC is heating, ventilation --
17    A. Air conditioning, um-hmm.
18    Q. -- mechanic on the interview panel?
19       MS. MOMENI: For what?
20 BY MR. ALDERMAN:
21    Q. For an electrician?
22    A. They do have a working hand knowledge of it.

Page 19
1  I guess in this particular case though we're not
2  talking about an electrician. We're talking about a
3  supervisor. It may be a practice where you'd have a
4  supervisor from another organization participate on the
5  panel because it's a supervisor position.
6     Q. Is there a preference policy or practice to
7  have the individual who will be supervising the
8  assistant supervisor on the interview panel for -- let
9  me kind of clarify that.
10       In a selection process, for an assistant
11 supervisor position, is there a practice of including
12 the supervisor who will be directly over that assistant
13 supervisor on the interview panel?
14    A. Is it a practice, is that what you're asking
15 or policy?
16    Q. Practice, policy, or preference?
17    A. I would say it would be a preference to do
18 that, yes.
19    Q. When you reviewed the materials you used to
20 make the selection in the case at issue in this
21 complaint, did you have any concerns over procedures
22 that were used in making the selection?

Page 20
1    A. I can't recall.
2    Q. Would you have any notation?
3    A. No.
4    Q. Any memorandum or any explanation that
5  supports your concurrence with the recommendations to
6  you?
7    A. Other than the actual concurrence in AVUE,
8  which I put a -- normally I concur with the selection,
9  and that's the extent of it.
10   Q. But there's no explanation, no justification
11 -- no justification, no extra materials that you
12 include?
13   A. No.
14   Q. I'm going to show you a document that has
15 already been marked as exhibit.
16      MR. ALDERMAN: Let's go off the record right
17 quick.
18      (Recess taken.)
19 BY MR. ALDERMAN:
20   Q. I'm going to hand you a document that has
21 already been marked Exhibit 6. It is marked RT
22 Exhibit 6, it's got today's date, 4/5/06. I just ask

Page 21
1  you to take a look at that document briefly, it is a
2  three-page document, I think.
3       MS. MOMENI: Um-hmm.
4     A. Okay.
5  BY MR. ALDERMAN:
6     Q. Can you explain to me what this document is?
7     A. It is rating matrix that is used by the panel
8  in their interview to rate the individuals that are
9  being interviewed by the panel.
10    Q. Do you know where this document comes from
11 and who generated it?
12    A. No. This particular document, no.
13    Q. Are there any instructions provided to the
14 selection panel for using this to be --
15       MS. MOMENI: You're talking in general --
16 BY MR. ALDERMAN:
17    Q. General terms, general procedure policy?
18    A. Written instructions?
19    Q. Yes.
20    A. No.
21    Q. Are there any oral instructions given about
22 use of this matrix?

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1  A.  I have given oral instructions that I want
2  some way of being able to differentiate between how you
3  came about selecting the individual. So, in other
4  words, just to have a group of questions when I get a
5  package and just have a group of questions and then to
6  say I picked employee X, I need some kind of system in
7  place to know that there was a -- they evaluated the
8  employ -- the applicants, and they had away of doing a
9  rating so they could determine who the selected person
10 was or is.
11     Q.  The method that you're talking about right
12 now, is that method the use of this matrix?
13     A.  Yes.
14     Q.  Do you recall these -- seeing these specific
15 documents these completed matrices?
16     A.  This --
17     Q.  Yes.
18     A.  -- Exhibit right here, yes.
19     Q.  And was there anything about these matrices
20 that gave you concern at that time, the correct
21 procedures weren't used in the selection?
22     A.  No.

Page 23

1      Q.  Do you know why these three specific
2  individuals were selected to be interviewed?
3      A.  No.
4      Q.  Have you had any conversation with any one
5  excluding counsel about why these three individuals
6  were selected for interview?
7      A.  No.
8      Q.  Do you normally ask why a selecting official
9  chose the interviewees that he or she chooses?
10     A.  No.
11     Q.  You concurred -- is it accurate that you
12 concurred with the selection of David Smith for the
13 position at issue in this complaint?
14     A.  Yes.
15     Q.  Can you tell my why you concurred with
16 Mr. Smith?
17     A.  Again, as I stated earlier, the package was
18 presented to me, the -- I went through and looked to
19 make sure consistently that we had questions in there,
20 that there were independent observer in there, and that
21 they had rating matrix. I looked at the rating matrix.
22        I looked at the numbers on here to make sure

Page 24

1  they were selecting the one with the highest numbers
2  and then I concurred.
3      Q.  Did you do anything to verify that the
4  candidates had given accurate responses to the
5  interview questions that were asked of them?
6      A.  No.
7      Q.  Did you review the candidates' responses to
8  the interview questions?
9      A.  I don't remember.
10     Q.  Okay. Do you remember seeing in the packet
11 that you've referenced the interview questions and
12 answers?
13     A.  Yes.
14     Q.  Did anyone either selecting official or
15 anyone on the interview panel explain to you their
16 choice of David Smith in this selection?
17     A.  No.
18     Q.  Did you ask anybody why Mr. Smith was
19 selected?
20     A.  No.
21     Q.  Are you familiar with Mr. Graham and his work
22 performance as an employee of The Architect of the

Page 25

1  Capitol?
2      A.  Familiar with Mr. Graham, yes.
3         As far as his work performance is concerned,
4  would you elaborate a little bit more.
5      Q.  Do you know anything about Mr. Graham as an
6  employee of Architect of the Capitol?
7      A.  Can you be a little more specific?
8      Q.  Is he good at his job?
9      A.  I can say that he's probably not bad at his
10 job, because that's where I tend to hear more about the
11 bad employees.
12        If I don't hear they're bad employees, then
13 there was not a problem. So, is he a good employee,
14 great employee, outstanding, I can't evaluate that.
15        I can evaluate that he's not a bad employee
16 because I don't hear.
17        Those are the only ones I hear about.
18     Q.  Are you aware of any reason to believe that
19 Mr. Graham would not perform as required for an
20 assistant supervisor?
21        MS. MOMENI: Can you repeat. Question
22 confused me, I'm sorry?

202.857 DEPO   www.CapitalReportingCompany.com
1000 Connecticut Avenue NW   Suite 505   Washington, DC 20006