**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL GRAHAM,** | ) | |
| | ) | **Civil Action No. 1:05CV01340** |
| **Plaintiff** | ) | |
| | ) | **Judge: James Robertson** |
| **v.** | ) | |
| | ) | |
| **ARCHITECT OF THE CAPITOL,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiff Michael Graham, by and through his undersigned counsel, and for his Memorandum in Opposition to the Defendant's Motion for Summary Judgment, presents the following arguments and material facts as to which there is a genuine dispute requiring a trial.

## INTRODUCTION

Mr. Graham demonstrates below that the Defendant manipulated the selection process in order to excuse his nonselection. Although the Architect of the Capitol (AOC) admits that the bulk of the fire alarm work performed on the night shift required only basic electrical skills and knowledge, and despite the fact that seventy percent of the Assistant Manager's time is spent performing supervisory duties, as opposed to electrician work, Peter Aitcheson (Assistant Deputy Superintendent of the House Office Buildings) improperly loaded the interview with technical questions related to fire alarm work in order to provide an advantage to the Caucasian candidates (with no prior EEO history), both of whom were performing fire alarm work at the time. Mr. Aitcheson

and/or Stephen (Steve) Stewart, General Supervisor of the Electrical Division, then disregarded the AOC policy and practice of including the shift supervisor on the panel, bypassed that supervisor (Kevin Banks, the only African American in a position of assistant supervisor or above, and not coincidentally, the only employee at or above the assistant supervisor position never to have been included on an interview panel) and asked an assistant supervisor from a completely different trade and shop to be the third panelist for the selection.

Not surprisingly, none of the panelists selected Mr. Graham as the highest-scoring candidate. The deck had been stacked with technical fire alarm questions that the two Caucasian candidates were at an advantage to answer. In fact, both Caucasian candidates had already encountered approximately half of the interview questions during the course of recent selections. The focus on fire alarm questions, which not surprisingly Mr. Graham did not answer as well as his Caucasian competitors, was designed for the very purpose of providing the AOC with a ready-made "nondiscriminatory" justification to not select Plaintiff.

Additionally, the interview questions were graded arbitrarily and the panelists could not support their scoring. Mr. Masters, one of the three all-White panel members, did not know (and was not provided with) the answers to many of the questions asked of Mr. Graham during the interview, and therefore he could not be expected to have graded Mr. Graham fairly. Moreover, while Mr. Masters could not explain what answers he was looking for with regard to many interview questions, Mr. Aitcheson and Mr. Stewart were abjectly incapable of supporting the scores they provided Mr. Graham. The unsupported and/or internally inconsistent nature of the panelists' explanations belies the

truth of the matter, which is that Mr. Graham was not going to be promoted under any circumstances because of his race and his prior protected activity.

**PLAINTIFF'S RULE 7(h) STATEMENT OF GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE**

***Facts Supporting Prima Facie Case of Discrimination Based on Race***

1. Mr. Graham is an African American male, and at the time of the selection for the Midnight Shift Assistant Supervisor position in September 2004, he was a Leader of the Day Shift in the Electrical Division. Def's Material Fact (Def's MF) 6.

2. Mr. Graham was deemed qualified for the Midnight Shift Supervisor position and was interviewed for the position along with two Caucasian employees of the Electrical Division who were then assigned to the night shift. Def's MF 15.

3. Mr. Graham was not selected for the position, and David Smith, a Caucasian, was selected. Def's MF 38.

Facts Supporting *Prima Facie* Case Of Reprisal

4. Each member of the selection panel, which was composed of Peter Aitcheson (Assistant Superintendent of the House Office Buildings), Steve Stewart (General Supervisor of the Electrical Division), and Kenny Masters (Day Shift Assistant Supervisor of the Building Engineer Division), was aware of Mr. Graham's prior EEO Activity. Exhibit 1, Def's Response to Interrogatory No. 12 ("all [selection panelists] were aware [of Plaintiff's previous complaint claim of discrimination, civil action and settlement]. The information was

public and plaintiff and others had made mention of the same in the work place. For example, the matters were publicized in the press."

5. Mr. Graham became notorious around the AOC for his prior EEO activity and the settlement of his first civil action. This set him apart from other employees who had merely filed complaints at the Office of Compliance. Exhibit 2, Aitcheson Dep. at 98:3-9 ("it's my understanding … that it became public knowledge… Mr. Stewart and I – It may have come up in conversation. I believe … the findings of that case became public. You know, everybody kind of knew about it."); Exhibit 3, Masters Dep. at 73:3 ("I was aware just from shop talk going around … Just people talking in the halls … I heard there was a settlement…"); Exhibit 4, Stewart Dep. at 132:13-19.

6. Mr. Graham's prior claim of discrimination and the facts underlying had been elevated to Alan Hantman, the Architect of the Capitol himself, whose representative, Herb Franklin, met with an employee of the AOC's Equal Employment Opportunity and Conciliation Branch, Mr. Edwin Lopez, to verify Mr. Graham's claims. Exhibit 5, Lopez Dep. at 16:11-18:16.

7. Frank Tiscione, the current Superintendent of the House Office Buildings, made the decision to settle Mr. Graham's first claim of discrimination with Bob Gliech, the current Deputy Superintendent of the House Office Buildings, and selection panel member, Peter Aitcheson. Exhibit 6, Tiscione Dep. at 40:6-41:16.

8. Mr. Graham's EEO activity was not limited to his prior civil action and the settlement thereof. Just weeks before the September 2, 2004 interviews for

the selection at issue in this civil action (Exhibit 7, Bates No. 374, list of interviewees), Mr. Graham and one of his coworkers complained to Steve Stewart about Keith (James) Bartlett's promotion to the position of Evening Shift Supervisor. Mr. Graham explained to Mr. Stewart – who in addition to Peter Aitcheson (who sits on all panels, *infra.*), was on the panel that selected Mr. Bartlett (Exhibit 4 Stewart Dep. at 11:15-8) – that Mr. Bartlett (who was only an electrician at the time) should not have been promoted over Kevin Banks (African American, then the Acting Supervisor on the Evening Shift) because Mr. Bartlett had admitted to being a racist. Exhibit 8, Graham Dep. at 82:19-83:9.

9. David Smith, the selectee, did not have a history of EEO activity. The Defendant's concession of this point can be inferred from its Motion for Summary Judgment. Def's P&A at 15-16.

10. Mr. Graham's protected EEO activity, including his protesting Mr. Bartlett's promotion to Evening Shift Supervisor, was fresh in the mind of members of the selection panel. In fact, the conversation regarding Mr. Stewart's selection of Mr. Bartlett occurred immediately after Mr. Bartlett had been promoted in August of 2004 (Exhibit 9, Bates No. 370, list of supervisory appointments), and therefore within weeks of the September 2, 2004 interviews for the selection at issue here. (Exhibit 7, Bates No. 374, list of interviewees). As such, there is a nexus between Mr. Graham's protected Equal Employment Opportunity activities and his nonselection to the Midnight Shift Assistant Supervisor position at issue in this civil action.

***Facts Related To The AOC's Alleged Nondiscriminatory Justification***

11. The Defendant's alleged nondiscriminatory justification for not selecting Mr. Graham to the Assistant Supervisor position is that the interview panel scored Mr. Graham the lowest out of the three candidates. Def's Points and Authorities ("P&A") at 11.

12. In support of its alleged nondiscriminatory justification, the Defendant explained as follows:

    a. Mr. Aitcheson ranked Mr. Graham the lowest under the category of "Knowledge and Ability to plan, layout & install elec. installation using tools & materials of elec. trade, … because of his past work performance as a work leader and the way Plaintiff answered some of the technical interview questions." Def's P&A at 11-12.

    b. Mr. Aitcheson ranked Mr. Graham the lowest under the category of "Ability to recommend personnel actions, schedule leave, maintain work orders & schedule work, provide tech advice and on job training because of the answers Plaintiff gave during the interview and the description Mr. Stewart gave Mr. Aitcheson of Plaintiff's work performance in regards to each of those categories except inability to recommend personnel actions." Def's P&A at12.

    c. Mr. Stewart rated the Plaintiff the lowest of the candidates, purportedly because, "Plaintiff's work ethic had declined since being promoted to leader … did not demonstrate leadership qualities, as certain jobs

previously assigned to him were not finished by their deadline … [and] lacked knowledge of the fire alarm systems." Def's P&A at 12.

d. The Defendant explains that Mr. Masters ranked Mr. Graham the lowest of any candidates because he was looking for additional or different information in response to interview questions 2, 3, 4, 5, 6, 11 and 14. Def's P&A at 13.

***Facts Related to Pretext***

AOC Explanation Is An After-The-Fact Justification

13. The AOC's account of its nondiscriminatory justification is an after-the-fact fabrication that it developed only after this civil action was initiated. When Mr. Graham asked Mr. Stewart the reason for his non-selection, Mr. Stewart merely said that the selectee had responded to the fire alarm questions better than Mr. Graham. Exhibit 8, Graham Dep. at 108:19-22. *See also* Exhibit 1, Def's Response to Interrogatory No. 4: "Mr. Stewart provided limited information at the time that was considered sufficient."

Manipulation Of The Interview Panel To Avoid Involving Kevin Banks, The Only African American Supervisor In The Electrical Division

14. Mr. Stewart and Mr. Aitcheson have been involved in all interview panels that have occurred since Mr. Stewart was promoted to General Supervisor of the Electric Shop in 2002. Exhibit 2, Aitcheson Dep. at 8:4-6, 11:12-14.

15. The AOC has a practice of including, as the third panelist, the person who will be supervising the selectee on the selection panel. See Def's Material Fact ("MF") 17; Exhibit 2, Aitcheson Dep. at 13:19-13-1 and 18:2-5 ("The guy is going to be working for this person, you know, so you want him to have some

say of who he's going to be working very closely with for a number of years"); Exhibit 6, Frank Tiscione Dep. at 19:10-18; Exhibit 4, Stewart Dep. at 11:6-14 ("It's the way it's been with us so far").

16.    The AOC's policy is that a panelist from another shop will only be used, "[i]f there is no individual from the same shop, trade, or work area [available] to be a member of the interview panel." Exhibit 1, Def's Response to Interrogatory No. 2.

17.    The person who would have supervised Michael Graham had he been selected as the midnight shift Assistant Supervisor was Kevin Banks, who at that time was the Acting Night Shift Supervisor. Exhibit 4, Stewart Dep. at 24:15-18 (Q: "at the time [of the selection at issue] do you remember who was the supervisor on the midnight shift was? A: Kevin Banks."); Exhibit 2, Aitcheson Dep. at 42:10-22.

18.    The Defendant explained that none of the assistant supervisors or supervisors from the Electrical Division was available to conduct the interviews and that, as a result, Kenny Masters, the Day Shift Assistant Supervisor from the Electrical Division, was asked to sit on the interview panel. Exhibit 1, Def's Response to Interrogatory No. 2; Exhibit 2, Aitcheson Dep. at 44:1-5.

19.    Contrary to the Defendant's contention that no other Electrical Division supervisor or assistant supervisor was available for the interviews, Mr. Banks was available. Exhibit 10, Banks Dep. at 68:15-18. Mr. Banks simply was not asked to sit on the selection panel. *Id.* at 31:21-32:2; Exhibit 2, Aitcheson Dep. at 43:2-5. In fact, despite the fact that the selection was for a position

under his supervision, Mr. Banks was not informed that the interviews were taking place at all.  Exhibit 10, Banks Dep. at 67:9-67:22.

20.  Although Mr. Aitcheson initially testified that he chose the interview panelists for the selection at issue (Exhibit 2, Aitcheson Dep. at 41:6-19), when questioned about whether Mr. Banks had been asked to sit on the panel, Mr. Aitcheson disavowed responsibility for choosing the panelists and testified that he asked Steve Stewart to identify the third panelist.  Exhibit 2, Aitcheson Dep. at 43:19-44:3 ("I don't recall who Steve would have asked, who he asked and who he didn't ask … I asked Steve to try and find someone else … preferably in the [electrical] shop … I remember him coming back to me and saying that he couldn't get anybody in the shop.").

21.  Mr. Stewart also denied responsibility for choosing the third panelist and stated, "Pete [Aitcheson], he selects the other panel member."  Exhibit 4, Stewart Dep. at 24:11.

22.  When Mr. Banks asked Mr. Stewart why he had not been asked to sit for the interview, Mr. Stewart told him that he had not been asked because he was only an assistant supervisor.[1]  Exhibit 10, Banks Deposition at 67:9-15. Mr. Masters, who was the third panelist, was not only a mere assistant supervisor, but he was a mere assistant supervisor in a completely different shop.  See Exhibit 3, Masters Dep. at 6:1-6.

---

[1] During his deposition, Mr. Stewart testified that Mr. Banks never told him that he wanted (or given the opportunity would have wanted) to be involved in making the selection for the Assistant Supervisor position.  Exhibit 4, Stewart Dep. at 25:2-11.

23. Mr. Banks has repeatedly requested to be permitted to sit on interview panels for positions that will be under his supervision. See Exhibit 10, Banks Dep. at 65-66.

24. Mr. Banks has never been asked to sit on an interview panel. Exhibit 10, Banks Dep. at 62:18-20.

25. All other assistant supervisors and supervisors of other shifts, each of whom is Caucasian, have participated on interview selection panels. See Exhibit 4, Stewart Dep. at 133-134.

26. Mr. Banks testified that Michael Graham would have been a better selection for the Assistant Supervisor position. Exhibit 10, Banks Deposition at 70:3-13.

27. When Ken Kaldenbach – who was the Supervisor on the Midnight Shift prior to the time Mr. Banks held that position – was the Supervisor of the Midnight Shift, interviews for positions on the midnight shift were held in the mornings, immediately after the midnight shift concluded so that Mr. Kaldenbach, who is Caucasian, could attend and participate in hiring decisions for his shift. Exhibit 10, Banks Dep. at 66:3-67:5.

Fire Alarm Experience Not Listed On The Vacancy Announcement Or Position Description

28. Mr. Aitcheson has a practice of ensuring that the vacancy announcement reflects the major duties of the position to be filled when selections are occurring under his supervision. Exhibit 2, Aitcheson Dep. at 24:18-22.

29. According to Rebecca Tiscione, the Director of the AOC's Human Resources Management Division since February 2002 (Exhibit 11, R. Tiscione Dep. at

6:8-20), if a major duty of a position is to work on fire alarm equipment, then that duty should be listed on the position description (*Id.* at 45:3-10), and the purpose of such a rule is, in part, to inform the candidate of the major duties for which he or she will be responsible. *Id.* at 45:11-22.

30. Mr. Aitcheson's practice has been to update position descriptions to include the target knowledge, skills and abilities under numerous circumstances. Exhibit 2, Aitcheson Dep. at 19:21-24:7.  For instance, Mr. Aitcheson specifically "requested that [Human Resources] put in the job announcement some language with respect to the fire alarm system" when the Electrical Division was advertising for electrician positions that required fire alarm experience. *Id.* at 22:11-21 (emphasis added).

31. With respect to the position at issue here, although the Defendant contends that work related to fire alarm equipment was the primary responsibility of the midnight shift, neither the vacancy announcement nor the position description used to announce and fill the vacancy mentioned the need to have knowledge, skills and experience related to fire alarm equipment work.  See Exhibit 12, Vacancy Announcement (Bates 1-2); Exhibit 13, Position Description (Bates 3-5).

Fire Alarm Questions Were Weighted To Benefit The Caucasian Employees With No EEO History

32. The Defendant concedes that the basic fire alarm work performed by the electrical division is to take out "zones" when other divisions need to do work in that zone and that an experienced electrician can perform fire alarm work at the component level or work that is related to field devices such as smoke

detectors, strobes, and beam detectors. Def's Material Facts 25, 26. Mr. Aitcheson also testified that a contractor actually performs the year-round, full-time job of providing "all of the maintenance on all of our [fire alarm] devices in all of the buildings." Exhibit 2, Aitcheson Dep. at 32:5-15.

33.  The electronic personnel system, AVUE, will generate questions designed to correspond to the actual position description and the allotment of percentages attached to each particular type of duty. Exhibit 2, Aitcheson Dep. at 56:13-21. Despite this, Mr. Aitcheson wrote the interview questions so that seven of the nine questions calling for technical electrical knowledge came directly from interviews Mr. Aitcheson had previously performed for fire alarm technicians, and demanded that technical questions that only fire alarm technicians would know be included. Exhibit 2, Aitcheson Dep. at 44:18-22.

34.  While the position description for the Midnight Shift Assistant Forman position indicated that 70 percent of the incumbent's responsibilities would be supervisory in Nature (Exhibit 13, Position Description), Mr. Aitcheson identified only seven of the interview questions as being targeted at supervisory duties, while nine of the interview questions were targeted at technical skills and knowledge (seven of the nine being questions that related to technical aspects of fire alarm equipment installation). Exhibit 2, Aitcheson Dep. at 58:12-59:9; Exhibit 14, (Redacted) Interview Questions.

35.  Mr. Aitcheson preferred drafting his own interview questions because the AVUE generated questions were designed to elicit information about the candidates' particular experiences related to the duties of the position, while

his questions were designed to elicit specific, correct or incorrect answers related to the knowledge he believed were important for the position. Exhibit 2, Aitcheson Dep. at 56:13-57:5.[2] Disregarding the AVUE system also permitted Mr. Aitcheson to include questions that he knew would give the Caucasian candidates an advantage over Mr. Graham.

36. The two Caucasian candidates who were interviewed, David Smith and Phillip Rupprecht, worked on the midnight shift and dealt primarily with fire alarm systems at the time of the selection. Exhibit 2, Aitcheson Dep. at 50:22-51:3. Mr. Graham was, therefore, the only person interviewed who was not then working on the midnight shift and primarily working on fire alarm equipment.

37. This was not the first time Mr. Aitcheson asked Mr. Smith many of the same interview questions, including the same fire alarm equipment questions. In fact, Mr. Smith encountered the same fire alarm questions when he was originally hired as a fire alarm technician. Exhibit 2, Aitcheson Dep. at 38:4-40:3; 44:18-22.

38. The Defendant produced the document included here as Exhibit 15 (Bates Nos. 2535-2537) in response to Mr. Aitcheson's pledge to produce the interview questions used for Mr. Smith's January 22, 2003 (Exhibit 18) fire alarm technician selection. Exhibit 2, Aitcheson Dep. 38:4-40:3. The interview questions for that selection (Exhibit 15), however, are entitled "Interview Questions for Electrician WG-2805-10." Since Mr. Rupprecht was

[2] Mr. Aitcheson's answer to this question during his deposition contradicts the AOC's Supplemental Response to Interrogatory No. 9 (Exhibit 17), for which Mr. Aitcheson provided a certification, which reads, in part: "interviews and other materials submitted to the panel are not considered tests with correct or incorrect answers."

a Grade 10 electrician at the time of the selection at issue here, and was promoted to that position only in March 2004 (Exhibit 17, Rupprecht Application), it is likely that Mr. Rupprecht also encountered the same interview questions at that time.

39.    Comparing the interview questions used in Mr. Smith and Mr. Rupprecht's prior selections under Mr. Aitcheson to the selection for the Midnight Shift Assistant Supervisor reveals that nine of the 19 interview questions (1, 5, 7, 8, 12, 13, 17, 18, and 19) were identical.

Questions Without Answers

40.    Despite the fact that nine of the interview questions called for technical answers, Mr. Aitcheson did not initially provide the other interview panelists with answers to the interview questions.  In fact, despite the fact that Mr. Stewart did not have significant experience in fire alarm equipment (Exhibit 2, Aitcheson Exhibit at 61:5-10) and that Kenny Masters was "not a fire alarm guy" (Exhibit 2, Aitcheson Exhibit at 61:2-4), Mr. Aitcheson did not even ask either if they needed answers to the interview questions in order to be able to evaluate the candidates' interview responses.

41.    The Defendant asserts that the interview questions did not have "right or wrong" answers.  Exhibit 18, Def's Supplemental Response to Interrogatory No. 9 ("interview material and other materials submitted to the panel are not considered tests with correct and incorrect answers").  Despite the fact that the interview questions did not have correct or incorrect answers, the candidates were graded on the accuracy of their responses.  Exhibit 2, Aitcheson Dep. at

72:19-73:5 (Graham received a score of only 3 out of 5, in large part because "the way he answered some of the technical questions."); Exhibit 3, Masters Dep. at 65:22-66:3; Exhibit 4, Stewart Dep. at 61:2-4.

The Interviewers Cannot Justify The Scores They Provided To The Candidates

*Panelist Peter Aitcheson*

42. Mr. Aitcheson explained that his score for the category entitled, "knowledge and ability to plan, layout and install electrical installation using tools and materials of the electric trade," was based – in part – on what he alleged were reports from Steve Stewart that certain of the projects Mr. Graham had been assigned had fallen behind schedule. Exhibit 2, Aitcheson Dep. at 72:19-73:5.

43. Mr. Aitcheson was not able to name a single specific project that Mr. Stewart had purportedly identified as being behind schedule. Exhibit 2, Aitcheson Dep. at 74:6-10.[3]

44. With regard to the score for, "Ability to recommend personnel actions, schedule leave, maintain work orders & schedule work. Provide technical advice and on the job training," Mr. Aitcheson attributed the lower score he gave to Mr. Graham – not to any consideration that Mr. Graham would not be able to perform the human resources-type tasks of "recommending personnel decisions and scheduling leave" (Exhibit 2, Aitcheson Dep. at 77:13-78:7),

[3] When Mr. Stewart was questioned about these purportedly late projects, he was also unable to identify any specifics. When pressed for specifics about these purportedly numerous and egregious late projects, Mr. Stewart indicated that he did not have personal knowledge of any such projects and was otherwise unable to identify them in detail: "I haven't seen the specifics … I'm not on the job." Exhibit 4, Stewart Dep. at 113:1-5. Eventually, Mr. Stewart admitted that, in fact, the majority of projects that Mr. Graham had lead get completed on time. *Id.* at 113:8-14. (emphasis added).

but to his belief – based on what Mr. Stewart had purportedly told him – that Mr. Graham's performance as a leader suggested he would not be able to "maintain work orders, schedule work, and provide technical advice on the job and on-the-job training," and Mr. Graham's responses to the fire alarm technician questions that were asked of him (Exhibit 2, Aitcheson Dep. at 77:15-78:7). Mr. Aitcheson contradicted this very testimony when, explaining the Defendant's response to Interrogatory 3,[4] he indicated that Mr. Graham lacked the desirable human resources-type supervisory skills the Defendant was seeking. Exhibit 2, Aitcheson Dep. at 105:9-106:1.

45. According to Mr. Aitcheson, Mr. Graham's experience as the Day Shift Leader would have applied to the second (Ability to use & review building plans & blueprints) and third (Ability to supervise & assign work ad to follow through with several work assignments at same time) categories on the scoring matrix. Exhibit 2, Aitcheson Dep. at 77:1-14. Mr. Aitcheson, however, gave Mr. Graham the same score as the score he gave to Messrs. Rupprecht and Smith, who were not performing "Leader" or supervisory functions whatsoever at the time, and therefore had no track record in which to evaluate the White candidates in these categories. Exhibit 19, Aitcheson Scoring Sheet.

*Panelist Steve Stewart*

[4] The interrogatory response reads, in part, "Plaintiff did not have the desirable or necessary supervisory skills for the position particularly compared to those of the selectee in this area."

46.    Mr. Stewart indicated that his scoring was based on his personal observation and knowledge of the candidates' performance over the previous several years:  "When I grade these things, I look at … in all three of these gentlemen, I've seen them work, I've seen their results, I've seen their work ethic, I've seen how they present themselves that has a lot to do with my selection, my grading these guys.  You know, what their knowledge is in all these categories, their interview questions.  And with that, with what I've seen with how they work over the years, you know, how they conduct themselves, how they work in the electrical field, the whole broad picture." Exhibit 4, Stewart Dep. at 72:12-73:1.  Interestingly, however, when pressed for details about Mr. Rupprecht and Mr. Smith, Mr. Stewart testified "Okay. As far as witnessing being there, I'm not on the shift." *Id.* at 74:3-4. When pressed to testify about Mr. Graham's "supervisory" performance as a Leader on the day shift, Mr. Stewart stated: "*I don't see day-to-day operations with the guys in the position.*" *Id*. at 72:12-73:1 (*emphasis added*).

47.    When Mr. Stewart was asked to explain his purported high esteem for Mr. Smith and Rupprecht's supervisory abilities, Mr. Stewart indicated that his opinion was based on his "personal observation of them in supervisory situations."  Exhibit 4, Stewart Dep. at 70:13-20.  When pressed further, however, Mr. Stewart again admitted that he had not actually witnessed Mr. Smith or Mr. Rupprecht operate in supervisory situations.  *Id.* at 71:6-8.  In fact, Mr. Stewart does not work on the midnight shift, where both Mr.

Rupprecht and Smith worked prior to the selection: "*Okay.   As far as witnessing being there, I'm not on the shift*." *Id.* at 74:3-4. (*emphasis added*).

48.    When asked to support his statement that Mr. Davis had performed better on projects than Mr. Graham ("Dave has done a better job.  He just … exhibits better qualities in that category," Exhibit 4, Stewart Dep. at 71:16-21), Mr. Stewart was unable to identify any specific projects that he was aware of, and after a long struggle admitted, "I don't recall specific jobs." *Id.* at 71:16-76:20").

49.    With regard to the second (Ability to use & review building plans & blueprints) and third (Ability to supervise & assign work ad to follow through with several work assignments at same time) categories, despite Mr. Stewart's deposition testimony that Mr. Graham performs the leader functions of "planning, scheduling, reviewing prints … gathering material, reviewing [the project] with the men assigned to the job … coordinating with other trades … [and] generally running the job from start to finish," (Exhibit 4, Stewart Dep. at 110:20-111:13), and the fact that the other candidates were not in Leader or supervisory positions, Mr. Stewart scored Michael Graham lower (scores of 4 and 3, respectively) than he scored Mr. Smith (5 and 4, respectively) and Mr. Rupprecht (4 and 4, respectively).   See Exhibit 20, Stewart Scoring Sheet. Mr. Stewart was unable to provide any specifics for his assertion that Mr. Graham did not perform these duties adequately. Exhibit 4, Stewart Dep. at 110:20-113:14.

50.   During his deposition, Mr. Stewart testified that certain of Mr. Graham's projects were "over, way over, …, overdue. I mean they're late," to such a degree that the shop "had to rush to get men over there to finish up what should have been done on time, that happened a few times." Exhibit 4, Stewart Dep. at 107:5-9. When pressed for specifics about these purportedly numerous and egregious late projects, Mr. Stewart backtracked and testified that he did not have personal knowledge of any such projects and was otherwise unable to identify them in detail: "A: All I know, Les, is … [there were] a few jobs that he has not completed. I mean not completed, but hasn't been up to par on what he should have done. I haven't seen the specifics … I'm not on the job." *Id*. at 113:1-5. Eventually, Mr. Stewart admitted that, in fact, the majority of projects that Mr. Graham had lead get completed on time. *Id*. at 113:8-14.

*Panelist Kenny Masters*

51.   Mr. Masters' recommended Phillip Rupprecht for the position but was outvoted by Mr. Stewart and Mr. Aitcheson. See Def's MF 36.

52.   Mr. Masters, additionally, was incapable of accurately grading the candidates on the basis of their interview responses. Mr. Masters was uncertain of the answers for approximately six of the interview questions (specifically question nos. 7, 8, 12, 17, 18, and 19; see Interview Questions, Exhibit 14). Mr. Masters only asked for the answers to three of these questions, leaving him incapable of scoring the remaining three questions accurately. See Exhibit 3, Masters Dep. at 50:5-59:10.

53.    Furthermore, for many of the non-technical questions, Mr. Masters was unsure of what responses he was looking for. See Exhibit 3, Masters Dep. at 44:3-10 ("I don't know if there's a particular answer I was looking for [to question no. 1]"); 52-1:10 ("I guess I was just looking for a little more commentary on [question no. 9]. No specific answer"); 52:11-18 (Masters was not looking for any particular response to question no. 10).

The Defendant "Gutted" Mr. Graham's Leader Position Of Its Responsibilities And Did Not Send Him To Management Training Unlike His Caucasian Predecessors

54.    Mr. Graham's supervisors denied him the opportunity to perform and learn the same human resources-type duties that his Caucasian predecessors (who were also Day Shift Leaders) performed and he was not even issued a password to access records and forms that were kept on the shop computer. See Exhibit 8, Graham Dep. at 44:2-50:7.

55.    Mr. Graham was not sent to the same management training classes to which former Leaders, who were Caucasian, were sent. Exhibit 8, Graham Dep. at 115:6-10.

56.    Instead of giving him Leader-type duties, Mr. Graham's superiors have consistently treated him, in terms of his day-to-day assignments, as if he were a regular electrician, rather than as an Electrician Leader. Exhibit 8, Graham Dep. 43:1-18.

Additional Disputed Facts in Response to the Defendant's Statement of Material Facts Not in Genuine Dispute

57.    In response to paragraph 3 of the Defendant's Material Facts (Def's MF), the Plaintiff notes that Mr. Stewart's complaint was independent of the

complaints that Plaintiff was making at the time.  Exhibit 8, Graham Dep. at 144:13-21, 147:10-22.

58.    In response to Def's MF 4, Complainant testified that Mr. Stewart has changed dramatically since he became the General Supervisor of the Electrical Division. Exhibit 8, Graham Dep. 151:18-152:19.

59.    In response to Def's MF 12, the Plaintiff disputes any assertion that any computerized system, including the AVUE system, is infallible.

60.    In response to Def's MF 23, during the interviews for the previous selection to the Assistant Supervisor for the midnight shift, Mr. Banks did not know the answers to the fire alarm questions that were asked of him.  Exhibit 10, Banks Dep. at 61:10-17.  In fact, when he was later interviewed for the Midnight Shift Supervisor position, Mr. Banks specifically told the interviewers that he did not know the answers to the fire alarm questions and that supervisory skills and experience were fungible.  Exhibit 10, Banks Dep. at 42:20-43:10. Despite expressly stating that he did not know the answers to fire alarm equipment-related questions, Mr. Banks was selected for the position.

61.    In response to Def's MF 27, the Plaintiff notes that while he did not talk to supervisors on the midnight shift, he did discuss the work performed on the shift with the midnight shift electricians. Exhibit 8, Graham Dep. At 52:18-53:6.

## LAW AND ARGUMENT

***Summary Judgment Standard***

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions. Rule 56 states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

A Court deciding a Motion for Summary Judgment must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in his favor:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150-52, 120 S. Ct. 2097 (2000). "A district court may grant summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Waterhouse v. District of Columbia,* 298 F.3d 989 (D.C. Cir. 2002) (internal citations omitted).

In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The court must determine, "not whether [it] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." *Id.* at 252.

Summary judgment should seldom be used in employment discrimination cases. *See Fennel v. First Step Designs*, 83 F.3d 526, 535 (1st Cir. 1996) (summary judgment appropriate in cases where motive or intent are at issue only if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation); *Crawford v. Runyan*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant"), *relying on Hillebrand v. M-Tron Industries, Inc.,* 827 F.2d 363, 364 (8th Cir. 1987), *cert. denied*, 488 U.S. 1004, 109 S. Ct. 782 (1989). *See also Perdomo v. Browner*, 67 F.3d 140 (7th Cir. 1995) (Summary judgment standard applied with added rigor in employment discrimination cases).

***<u>The McDonnell-Douglas Burden Shifting Analysis</u>***

Under *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1972), it is the employee's burden to first establish a *prima facie* case of discrimination. *Id.* at 802. Once the employee makes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Once the employer has

articulated a nondiscriminatory reason, the inference of discrimination "drops out of the picture" (*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)), and the employee is provided the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [Agency] were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (*quoting Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

With regard to proving pretext, the Court held, in *Reeves*:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. *Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination*.
>
> …
>
> *In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose*. Such an inference is consistent with the general principle of evidence law that *the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt*. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id*. at 147-48 (*emphasis added*). Thus, based on *Reeves*, a Plaintiff may overcome the employer's alleged nondiscriminatory justification if the falsity of that reason gives rise to an inference that the employer is dissembling to obscure its retaliatory or discriminatory motivation. *Id*. *See also Salazar v. Washington Metro. Area Transit Auth.,* 401 F.3d 504, 511-12 (D.C. Cir. 2005) (following *Reeves*).

**GRAHAM ESTABLISES A *PRIMA FACIE* CASES OF DISPARATE TREATMENT AND REPRISAL**

***Mr. Graham's Claim For Disparate Treatment With Respect To The Non-Promotion***

To establish a *prima facie* case of discriminatory non-promotion, the Plaintiff must establish that: (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone not of his protected class filled the position or the position remained vacant and the employer continued to seek applicants. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (*citing Cones v. Shalala,* 199 F.3d 512, 518 (D.C. Cir. 2000). *See also McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973))*; Kolstad v. American Dental Association*, 108 F.3d 1431, 1436 (D.C. Cir. 1997)*, rev'd in part on other grounds en banc*, 139 F.3d 958 (D.C. Cir. 1998)*, en banc opinion vacated*, 119 S. Ct. 2118 (1999)).

In this case, it is undisputed that Mr. Graham is African American, that he was qualified for the position and was among the three persons to be interviewed for the position, that he was rejected despite being qualified, and that the selectee, David Smith, is Caucasian. Mr. Graham has clearly established a *prima facie* under the classic non-selection formulation. *See Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1150 (D.C. Cir. 2004) ("*McDonnell Douglas*'s formulation of the required elements of a prima facie case remains the standard in typical failure-to-hire cases"); *Lathram*, 336 F.3d at 1085; *Cones,* 199 F.3d at 518; *Kolstad*, 108 F.3d 1431, 1436 (D.C. Cir. 1997); *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973).

The Defendant's argument that Mr. Graham failed to demonstrate a *prima facie* case of discrimination is premised on a mistaken understanding of the *prima facie*

burden. The Defendant uses a different formulation of the *prima facie* case that requires the plaintiff to demonstrate that the facts surrounding the decision give rise to an inference of discrimination. The Defendant then jumps to its alleged legitimate justification and argues that Mr. Graham failed to state a *prima facie* case because he failed to demonstrate that the alleged legitimate justification was false and a pretext for discrimination. Def's P&A at 10-14. Contrary to the Defendant's assertion,[5] by establishing that a person outside of his protected class was selected, Mr. Graham satisfies the requirement that he demonstrate that the selection itself gives rise to an inference of discrimination. *Lathram v. Snow*, 336 F.3d at 1088; *Teneyck v. Omni Shoreham Hotel,* 365 F.3d at 1150.

***Mr. Graham's Claim For Reprisal***

As a preliminary matter, Mr. Graham notes that the Defendant has repeated its motion to dismiss on grounds of issue exhaustion, despite the fact that this court has already ruled on the issue. Def's P&A at 17-20. The Defendant has not set forth any new or additional arguments for dismissal that were unavailable when this Court first decided this issue in Plaintiff's favor, nor has the Defendant provided any new relevant

[5] The Defendant argues that *Stella v. Mineta*, 284 F.3d 135 (2002) stands for the proposition that an employee does not raise an inference of discrimination by demonstrating that someone outside of his protected class was selected to the position sought. Def's P&A at 10 FN 2. The Defendant misreads *Stella* in the extreme. *Stella* stands for the proposition – not that the employee does not raise an inference of discrimination by showing that a person outside his protected class was selected in his place – but that the employee is not required to demonstrate that a person outside of his or her protected class was selected in order to raise the inference of discrimination. The Court held, "in conformity with the overwhelming majority of other circuits to consider the issue, that a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case under *McDonnell Douglas*." *Id*. at 146.

evidence that was not already available.[6] As such, the renewed (and redundant) motion to dismiss should be again denied for the same reasons it was initially denied. Mr. Graham incorporates his Opposition to the Defendant's first motion to dismiss on these grounds by reference here.

In order to establish his *prima facie* case of retaliation, Mr. Graham must present evidence that (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) the adverse action was causally related to the exercise of his rights. *See Holcomb v. Powell*, 433 F.3d at 901-02 (*citing Forkkio v. Powell*, 353 U.S. App. D.C. 301, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 452-53 (D.C. Cir. 1999)).

In this case, there is no dispute that Mr. Graham engaged in activity protected under the Congressional Accountability Act. Def's Material Fact 5. There is additionally no dispute that Mr. Graham's first civil action and the settlement thereof were notorious at the AOC and that each member of the selection panel was keenly aware of the civil action and the settlement. Plaintiff's Material Fact Nos. (Pl's MF) 4-6. Additionally, the Defendant elicited testimony from Mr. Graham that demonstrates he was engaged in activity protected by the CAA only weeks before the selection at issue when he protested Mr. Aitcheson and Mr. Stewart's selection of an admitted racist to the position of Evening Shift Supervisor. Pl's MF 8.

[6] The Defendant argues that Mr. Graham's 2001 request for counseling is somehow relevant to the current litigation. The Defendant has failed to explain how the 2001 request for counseling form has any bearing on this case. The 2001 request for counseling has nothing to do with this case, and therefore cannot support grounds for reconsideration based on newly discovered evidence.

There is additionally no dispute that Mr. Graham's nonselection constitutes an adverse employment action, especially in light of the Supreme Court's recent decision in *Burlington Northern v. White*, __ U.S. __, 2006 U.S. LEXIS 4895 (June 22, 2006). In that case, the Court recognized that for the purpose of retaliation claims, adverse actions are any "employer actions that would have been materially adverse to a reasonable employee or job applicant ... [actions] that could well dissuade a reasonable worker from making or supporting a charge of discrimination."

Lastly, there is a causal connection between Mr. Graham's protected activity and the nonselection: all members of the selection process were aware of Mr. Graham's prior protected activity, at least one of the panelists (Peter Aitcheson[7]) was involved in the decision to settle Mr. Graham's first civil action, and the non-selection occurred approximately one year following the settlement of Mr. Graham's first civil action against the Defendant and only weeks after he protested Mr. Aitcheson's and Mr. Stewart's[8] promotion of Keith Bartlett, an admitted racist, for the position of Evening Shift Supervisor. Pl's MF 8. Contrary to the Defendant's argument that none of the

7 While the Defendant names Steve Stewart, the General Supervisor of the Electrical Division since November 2002 (Exhibit 4, Stewart Dep. at 6:8-14), as the selecting official, he appears to have been the selecting official in name only, and Peter Aitcheson the Assistant Superintendent of the House Office Building since December 2001 (Exhibit 2, Aitcheson Dep. at 6:2-7), had the power and control over the selection process and the ultimate selection. See Exhibit 1, Def's Response to Interrogatory No. 1.

8 The Defendant argues that it is impossible for Mr. Stewart to retaliate against Mr. Graham because at one time Mr. Stewart accompanied Mr. Graham to the Office of Compliance to file a claim of discrimination. Def's P&A at 15. This assertion is baseless. Mr. Stewart made his own complaint of discrimination that was independent of Mr. Graham's claims years ago, prior to the time that Mr. Stewart was promoted from Mr. Graham's colleague as a Grade 10 Electrician to the General Supervisor for the Electrical Division. Pl's MF 57. Additionally, Mr. Graham has produced evidence demonstrating that Mr. Stewart has excluded an African American Supervisor from selection decisions (Pl's MF 19-22) and knowingly promoted a self-proclaimed racist to the position of Evening Shift Supervisor. Pl's MF 8.

selection panelists or the concurring official were implicated in Mr. Graham's prior EEO activity (Def's P&A at 15), Mr. Graham had protested two of the panelists' (Mr. Stewart and Mr. Aitcheson) discriminatory conduct (passing Kevin Banks over for the Evening Shift Supervisor in favor of a self-proclaimed racist, Pl's MF 8) and Mr. Aitcheson and Frank Tiscione (the concurring official) were implicated in Mr. Graham's first civil action, since they were the persons who made the decision to settle it. Pl's MF 7.

The nonselection in this case is sufficiently close in time to Mr. Graham's protected activity to demonstrate a causal connection. Measured from the date Mr. Graham's first civil action against the AOC occurred, the intervening length of time was 15 months.[9] Measured from the time that he protested Mr. Bartlett's promotion – over Kevin Banks – to the position of Evening Shift Supervisor on the basis that Mr. Bartlett had admitted to being a racist, the time between the protected activity and nonselection was only a matter of weeks.

This Court has held that an adverse action that follows one year after protected activity is sufficiently close in time to establish a causal nexus. *Sullivan v. Catholic Univ. of Am.*, 387 F. Supp. 2d 11 (D.D.C. 2005) (protected activity that occurred in August 2002 followed by denied promotion in August 2003, deemed sufficient to establish *prima facie* case of retaliation).

Additionally, Mr. Graham's case is distinguishable from cases cited by the Defendant in its motion, such as *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-

[9] The Defendant incorrectly contends that three years had passed between the protected activity and the nonselection. Def's P&A at 16. Mr. Graham's protected activity did not end on the day he initiated EEO counseling, as the Defendant's calculation assumes. Instead, Mr. Graham was engaged in protected activity from the time he initiated his administrative complaint up until the day his case settled in June of 2003.

274 (U.S. 2001) (holding that *if the only evidence of causality* is the length of time between the protected activity and the adverse action, the length of time between protected activity and a purported act of reprisal must be "very close" in order to be sufficient evidence of causality to establish a *prima facie* case of reprisal). In *Breeden*, there was no evidence that the responsible supervisor was aware of the plaintiff's protected activity. *Breeden*, 532 U.S. at 273 ("there is no indication that [the responsible supervisor] even knew about the right-to-sue letter when she proposed transferring respondent"). In this case, each of the panelists, including Mr. Masters who was not even working in the Electrical Division, was aware of Mr. Graham's protected activity. The evidence of record also demonstrates that Mr. Graham's first civil action and settlement was notorious throughout the AOC and was the subject of talk in the halls and "shop talk." Additionally, the notoriety of Mr. Graham's protected activity and his "victory" (by way of a significant settlement) over the Agency would likely cause the AOC to remember the protected activity (and bide its time before exacting its reprisal) longer than it would the mere filing of an administrative complaint of discrimination (as was the case in *Breeden*).

Unlike the case in *Breeden*, temporal proximity is not the only factor that Mr. Graham uses to establish the causal nexus. 532 U.S. at 273-274 ("cases that accept *mere temporal proximity* ...") (*emphasis added*). Instead, Mr. Graham offers: 1) the notoriety he earned by his prior protected activity; 2) the fact that each member of the selection panel knew about his prior activity; and 3) the fact that Mr. Aitcheson (who ran the selection process) and Frank Tiscione (the Superintendent of the House Office Building, who accepted the interview panel's recommendation) were involved in the decision to

settle Mr. Graham's first civil action. As a result, Mr. Graham can demonstrate a causal connection between his (notorious) protected activity and his nonselection to the Assistant Supervisor position. Thus, Plaintiff establishes each element of his *prima facie* burden for reprisal.

**THE DEFENDANT'S PROFFERRED LEGITIMATE JUSTIFICATION IS FALSE AND A PRETEXT FOR DISCRIMINATION AND REPRISAL**

The Defendant's alleged nondiscriminatory justification for not selecting Mr. Graham to the Assistant Supervisor position was that the interview panel scored Mr. Graham the lowest out of the three candidates.

Before discussing the fact that the interview panelists have contradicted each of these explanations in their sworn deposition and discovery responses, Mr. Graham focuses on the fact that the AOC manipulated the selection process from the outset to ensure that he would not be selected for the position. As such, the scores the panelists gave to the candidates, and the fact that Mr. Graham received the lowest score of the three candidates who were interviewed for the position do not constitute a legitimate, nondiscriminatory justification for the AOC's conduct, but the unavoidable result of the AOC's manipulation to mask its discriminatory and retaliatory purposes.

***Manipulation Of The Process***

An employer's manipulation of the selection process and inconsistent application of its practices and policies can demonstrate that its proffered legitimate explanation is a pretext for discrimination. *See Salazar v. Wash. Metro. Area Transit Auth.,* 401 F.3d 504, 508-9, 365 U.S. App. D.C. 222, (D.C. Cir. 2005). In *Salazar*, an official suspected of harboring discriminatory animus placed himself at the center of the selection process (despite the employer's promise to exclude him from the selection), formulated the

questions, de-emphasized criteria that would have provided Mr. Salazar with a competitive advantage and assigned the weight provided to each interview question. The D.C. Circuit Court of Appeals held, under these circumstances, that despite Mr. Salazar being scored the lowest of the candidates by the interview panel, he had demonstrated sufficient evidence of pretext to defeat a motion for summary judgment. *Id.* at 509. *See also Lathram v. Snow*, 336 F.3d 1085, 1094, 357 U.S. App. D.C. 413 (D.C. Cir. 2003) (manipulation of selection process by inexplicably accepting external candidates, where the practice for recent similar selections was not to do so, and therefore making a veterans preference available to the selectee demonstrated pretext).

Similarly, in *Cones v. Shalala*, 199 F.3d 512, 519, 339 U.S. App. D.C. 299 (D.C. Cir. 2000), the employee established pretext by demonstrating the inconsistent application of the employer's policies. Specifically, the plaintiff in *Cones* established pretext where the employer justified her non-selection on the grounds that an executive order discouraged hiring at the GS-15 level, although the AOC had recently promoted three White GS-14s to GS-15 positions. *See also Krodel v. Young*, 748 F.2d 701, 709, 242 U.S. App. D.C. 11 (D.C. Cir. 1984) (denial of summary judgment proper where "the district court relied on the improper procedures and uncreditable testimony concerning [the selectee's] promotion to conclude that the government's explanation was unworthy of belief.").

*Manipulation Of The Selection Process in the Present Case*

Mr. Stewart and Mr. Aitcheson disregarded the AOC's practice of including, as the third panelist, the person who would be supervising the selectee on the selection panel. Pl's MF 15-19. In this case, the person who would have supervised Michael

Graham had he been selected to the midnight shift Assistant Supervisor was Kevin Banks, who at that time was the Acting midnight shift Supervisor. Pl's MF 17.  The Defendant has attempted to obfuscate its actions to avoid including Mr. Banks on the selection panel.  The AOC states that <u>none</u> of the assistant supervisors or supervisors from the Electrical Division was available to conduct the interviews. Pl's MF 18.  This assertion is simply untrue: Mr. Banks was never asked to sit on the selection panel; therefore there is no basis for Defendant to assert that he was unavailable to participate on the panel. Pl's MF 19.  In fact, despite the fact that the selection was for a position under his direct supervision, <u>Mr. Banks was not even informed that the interviews were taking place</u>. Pl's MF 19.

Evidence of ill motive can also be found in the fact that Messrs. Stewart and Aitcheson point the finger at each other as being responsible for contacting Mr. Banks to participate on the panel.  Although Mr. Aitcheson initially testified that he chose the interview panelists for the selection at issue, when questioned about whether Mr. Banks had been asked to sit on the panel, Mr. Aitcheson disavowed that responsibility and testified that he asked Steve Stewart to identify the third panelist. Pl's MF 20.  Mr. Stewart also denied responsibility for choosing the third panelist and stated,"Pete [Aitcheson], he selects the other panel member." Pl's MF 21.

When Mr. Banks later learned about the selection and asked Mr. Stewart why he had not been asked to sit for the interview, Mr. Stewart told him that he had not been asked because he was only an assistant supervisor. Pl's MF 22.  This explanation was a transparent fabrication, since Mr. Masters, who was asked to be the third panelist, was

not only an assistant supervisor, but was an assistant supervisor in a completely different shop. Pl's MF 22.

Despite his requests to participate in the selection process, Mr. Banks has never been asked to sit on an interview panel. Pl's MF 24. This sets Mr. Banks (who is African American) apart from other Electric Branch Supervisors and Assistant Supervisors, each of whom is Caucasian, and has participated on interview selection panels. Pl's MF 25. The reasons for excluding Mr. Banks are obvious. He is African American, and he believed that Michael Graham would have been a better selection for the Assistant Supervisor position. Pl's MF 26.

*Manipulation Of The Selection Criteria*

Mr. Aitcheson has a practice of ensuring that the vacancy announcement reflects the major duties of the position to be filled when selections are occurring under his supervision (Pl's MF 28), and the AOC's personnel rules require that if a major duty of a position is to work on fire alarm equipment then that duty should be listed on the position description. Pl's MF 29. Mr. Aitcheson even has a practice of updating position descriptions to include the target knowledge, skills and abilities. Pl's MF 30. Although the Defendant contends that work related to fire alarm equipment was the primary responsibility of the midnight shift and that experience, knowledge, skills and abilities related to fire alarm equipment was the primary factor they were looking for when filling the Assistant Supervisor position, neither the Vacancy Announcement nor the Position Description mentioned fire alarm equipment work or experience. Pl's MF 31.

The fact that fire alarm experience was not included in the position description and vacancy announcement – the very mechanisms by which the AOC notifies the

candidates of their expected duties for the position (Pl's MF 29) and to weed out candidates who do not have the requisite knowledge, skills and abilities for the job (Pl's MF 30) – demonstrates that the emphasis on fire alarm equipment is a pretextual justification for denying the promotion to Mr. Graham.

*Fire Alarm Questions Asked to benefit the Caucasian Employees*

The Defendant has conceded: 1) that a contractor actually performs the year-round, full-time job of providing maintenance on all of the AOC's fire alarm devices in all of the House Office Buildings; 2) that the majority of the actual fire alarm work done by the electrical division was to simply take out zones when other divisions need to do work; and 3) that an experienced electrician can perform fire alarm work at the component level and on field devices such as smoke detectors, strobes, and beam detectors. Pl's MF 32. Consistent with this evidence of record, the position description for the Midnight Shift Assistant Supervisor position indicates that 70 percent of the incumbent's responsibilities would be supervisory in nature while only 30 percent of the positions duties are related to technical electrical work. Pl's MF 34.

Despite this record, Mr. Aitcheson eschewed the AVUE system that would have generated objective interview questions based on the elements identified in the vacancy announcement and position description (Pl's MF 33), in favor of interview questions that were suspiciously overloaded with technical questions related to fire alarm equipment. In fact, seven of the nine questions calling for technical electrical knowledge came directly from interviews Mr. Aitcheson had previously performed for Fire Alarm Technicians, and demanded answers to technical questions only fire alarm technicians would know. Pl's MF 33.

Mr. Aitcheson's actions demonstrate his clear desire to put the two Caucasian interviewees, David Smith and Phillip Rupprecht, at an advantage to Mr. Graham. Both Mr. Rupprecht and Mr. Smith (who are Caucasian with no known prior EEO activity) worked on the midnight shift and primarily on fire alarm systems at the time of the selection. Pl's MF at 36. Mr. Graham was, therefore, the only person interviewed who was not then working on the midnight shift and primarily working on fire alarm equipment. What makes Mr. Aitcheson's actions more obvious is the fact that this was not the first time Mr. Aitcheson asked Mr. Smith and Mr. Rupprecht these exact fire alarm equipment questions. Pl's MF 37, 38.

Based on the foregoing, Mr. Graham is able to demonstrate that the manipulation that occurred in this case is at least, if not more, egregious than that found in *Salazar,* 401 F.3d 504, *Lathram*, 336 F.3d 1085, *Cones*, 199 F.3d 512, and *Krodel*, 748 F.2d 701, *supra.* In this case, the selection panel deliberately excluded Kevin Banks from the selection process (ignoring, in the process, its practice of including the shift Supervisor on Assistant Supervisor selections), then Mr. Aitcheson eschewed the AVUE-generated interview questions so that he could ask technical fire alarm questions that clearly favored the two Caucasian employees (who were then working primarily on fire alarm equipment). The focus on fire alarm questions was unjustified and in disregard of the facts: 1) that the vast majority of the assistant supervisor's time is spent supervising employees and not performing technical work; 2) that knowledge, skills and abilities related to fire alarm equipment was not included in the vacancy announcement or position description; and 3) that the majority of the fire alarm equipment work done in the shop can be performed by an experienced electrician. Mr. Aitcheson's choice of

interview questions additionally heavily favored the selectee and the other Caucasian candidate, both of whom encountered the same technical fire alarm questions during the course of earlier selections.

***Arbitrary, Shifting, and Unjustified Rankings***

Mr. Graham also demonstrates pretext by way of the Defendant's shifting, arbitrary and inconsistent justifications for scoring Mr. Graham the lowest of the three candidates. *See Southwest Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1344, 311 U.S. App. D.C. 370 (D.C. Cir. 1995) (inconsistent explanations for terminating plaintiff established pretext); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) ("A plaintiff attacking a qualifications-based explanation is … not limited to comparing his qualifications against those of the successful candidate. The plaintiff can instead seek to expose other flaws in the employer's explanation. For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision."); *Kalinoski v. Gutierrez*, 2006 U.S. Dist. LEXIS 32922 (D.D.C. 2006) (shifting rationales for decision demonstrated pretext); *Ferguson v. Small*, 225 F. Supp. 2d 31, 40 (D.D.C. 2002) (Where responsible official contradicted her own explanation for her actions, Plaintiff demonstrated "issues of fact most suitable for consideration by a fact finder.")

It must be remembered, at the outset, that the Defendant, through Stephen Stewart, explained that Mr. Graham was not selected because he did not answer the fire alarm questions as well as the selectee did. Pl's MF 13. Only after this civil action was filed did the AOC develop the laundry list of excuses for not selecting Mr. Graham found in the Defendant's response to Interrogatory No. 3 (Exhibit 1). Such an after-the fact

justification provides evidence of pretext. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d at 1295 ("plaintiff can instead seek to expose other flaws in the employer's explanation. For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision"); *see also DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993) ("The pretext inquiry includes whether "the putative non-discriminatory purpose was stated only after the allegation of discrimination.")

Moreover, the panelists were unable to justify their scoring of Mr. Graham, as demonstrated below.

***Questions Without Answers***

Despite the fact that nine of the interview questions called for technical answers, Mr. Aitcheson did not initially provide the other interview panelists with answers to the interview questions. In fact, Mr. Aitcheson did not even ask either if they needed answers to the interview questions in order to be able to evaluate the candidates' interview responses. Pl's MF 40. This evidence demonstrates that the actual responses were irrelevant to the panelists' decision.

Consistent with the theory that the interview process itself was designed to mask the Defendant's discriminatory animus, the Defendant's explanation about whether the accuracy of the interview responses was important to the selection process is internally inconsistent. The Defendant asserted, in response to discovery, that the interview questions did not have "right or wrong" answers (Pl's MF 41), while Mr. Aitcheson, who drafted all of the interview questions, testified that he preferred and used questions that

have answers as opposed to merely promoting conversation. Exhibit 2, Aitcheson Dep. 57:1-5.

***The Interviewers Could Not Justify The Scores They Provided To The Candidates***

*Peter Aitcheson*

Mr. Aitcheson explained that his score for the category entitled "Knowledge and ability to plan, layout and install electrical installation using tools and materials of the electric trade," was based – in part – on what he alleged were reports from Steve Stewart that certain of the projects Mr. Graham had been assigned had fallen behind schedule. Pl's MF 42. Mr. Aitcheson, however, was not able to name a single project that Mr. Stewart had purportedly identified as being behind schedule. Pl's MF 43.

With regard to the score for, "Ability to recommend personnel actions, schedule leave, maintain work orders & schedule work. Provide technical advice and on the job training," Mr. Aitcheson attributed the lower score he gave to Mr. Graham – not to any consideration that Mr. Graham would not be able to perform the human resources-type tasks of "recommending personnel decisions and scheduling leave," – but to his belief that Mr. Graham's performance as a leader suggested he would not be able to "maintain work orders, schedule work, and provide technical advice on the job and on-the-job training." Pl's MF 44. Mr. Aitcheson contradicted this very testimony, however, when he later explained that Mr. Graham lacked the desirable human resources skills the Defendant was seeking in a supervisor. *Id*.

According to Mr. Aitcheson, Mr. Graham's experience as the Day Shift Leader would have applied to the second (Ability to use & review building plans & blueprints) and third (Ability to supervise & assign work ad to follow through with several work

assignments at same time) categories on the scoring matrix. Pl's MF 45. Mr. Aitcheson, however, gave Mr. Graham the same score as the score he gave to Messrs. Rupprecht and Smith, who were not in "Leader" or any type of supervisory positions at the time. *Id.*

*Steve Stewart*

Mr. Stewart indicated that his scoring was based on his personal observation and knowledge of the candidates' performance over the previous several years:

> When I grade these things, I look at … in all three of these gentlemen, I've seen them work, I've seen their results, I've seen their work ethic, I've seen how they present themselves that has a lot to do with my selection, my grading these guys. You know, what their knowledge is in all these categories, their interview questions. And with that, with what I've seen with how they work over the years, you know, how they conduct themselves, how they work in the electrical field, the whole broad picture.

Pl's MF 46. Interestingly, however, when pressed for details about Mr. Graham's "supervisory" performance as a Leader on the Day shift, Mr. Stewart stated: "*I don't see day-to-day operations with the guys in the position.*" *Id.*

When Mr. Stewart was asked to explain his purported high esteem for Mr. Smith and Rupprecht's supervisory abilities, Mr. Stewart indicated that his opinion was based on his "personal observation of them in supervisory situations." Pl's MF 47. When pressed further, however, Mr. Stewart again admitted that he had not actually witnessed Mr. Smith or Mr. Rupprecht operate in supervisory situations: "*Okay. As far as witnessing being there, I'm not on the shift*." *Id.*

When asked to support his statement that Mr. Davis had performed better on projects than Mr. Graham ("Dave has done a better job. He just … exhibits better qualities in that category," Pl's MF 48), Mr. Stewart was likewise unable to identify any

specific projects that he was aware of, and after a long struggle admitted, "I don't recall specific jobs." *Id.*

With regard to the second (Ability to use & review building plans & blueprints) and third (Ability to supervise & assign work ad to follow through with several work assignments at same time) scoring categories, despite Mr. Stewart's deposition testimony that Mr. Graham performs the leader functions of "planning, scheduling, reviewing prints … gathering material, reviewing [the project] with the men assigned to the job … coordinating with other trades … [and] generally running the job from start to finish," Pl's MF 49, Mr. Stewart scored Michael Graham lower (scores of 4 and 3, respectively) than he scored Mr. Smith (5 and 4, respectively) and Mr. Rupprecht (4 and 4, respectively). Mr. Stewart was unable to provide any specifics for his assertion that Mr. Graham did not perform these duties adequately. *Id.*

During his deposition, Mr. Stewart additionally testified that certain of Mr. Graham's projects were "over, way over, …, overdue. I mean they're late" to such a degree that the shop "had to rush to get men over there to finish up what should have been done on time, that happened a few times." Pl's MF 50. When pressed for specifics about these purportedly numerous and egregious late projects, Mr. Stewart backtracked and testified that he did not have personal knowledge of any such projects and was otherwise unable to identify them in detail: "A: All I know, Les, is … [there were] a few jobs that he has not completed. I mean not completed, but hasn't been up to par on what he should have done. I haven't seen the specifics … I'm not on the job." *Id.* Eventually, Mr. Stewart admitted that, in fact, the majority of projects that Mr. Graham had lead get completed on time. *Id.*

After admitting that he does not see the day-to-day work that the candidates perform (Pl's MF 46, 47), Mr. Stewart was forced to fall back on the explanation that Mr. Graham was not the right candidate for the job because of his "work ethic." Exhibit 4, Stewart Dep. at 96:4-11. Such subjective justifications, especially when not supported by specific facts (Pl's MFs 46-50), must be viewed with caution since they are frequently used to mask discrimination. *Carter v. George Wash. Univ.*, 387 F.3d 872, 879, 363 U.S. App. D.C. 287 (D.C. Cir. 2004) ("We review subjective considerations … with caution, since employers can easily use such criteria to mask discrimination.").

*Kenny Masters*

Mr. Masters' choices and scoring are irrelevant in this case since he recommended Phillip Rupprecht for the position but was outvoted by Mr. Stewart and Mr. Aitcheson. Pl's MF 51. Notwithstanding this, Mr. Masters was ill-prepared to grade the candidates on the basis of their interview responses, because he did not know the answers for approximately six of the interview questions (specifically question nos. 7, 8, 12, 17, 18, and 19). Mr. Masters only asked for the answers to three of these questions, leaving him incapable of scoring the remaining three questions fairly or accurately. Pl's MF 52. With regard to many of the non-technical questions, Mr. Masters' deposition testimony reveals that he was even unsure of what responses he was looking for. Pl's MF 53.

The Defendant's shifting, arbitrary and inconsistent justifications for scoring Mr. Graham the lowest of the three candidates demonstrate that its proffered explanation is false and merely a pretext for discrimination and retaliation. *Reeves*, 530 U.S. at 143 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the

explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt."); *Southwest Merchandising Corp. v. NLRB,* 53 F.3d at 1344 (inconsistent explanations for terminating plaintiff established pretext); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d at 1295; *Kalinoski v. Gutierrez*, 2006 U.S. Dist. LEXIS 32922 (D.D.C. 2006) (shifting rationales for decision demonstrated pretext); *Ferguson v. Small*, 225 F. Supp. 2d 31, 40 (D.D.C. 2002) (Where responsible official contradicted her own explanation for her actions, Plaintiff demonstrated "issues of fact most suitable for consideration by a fact finder.")

**CONCLUSION**

In addition to demonstrating his *prima facie* cases of discrimination and retaliation, Mr. Graham has established: 1) that the Defendant manipulated the selection process to provide itself a ready-made excuse for not selecting him to the Assistant Supervisor position; 2) that the non-fire alarm experience justifications for passing him over were developed only after this civil action commenced; and 3) that the selecting panelists' explanations for scoring him lower than the selectee were unjustified, inconsistent and unsupported. Based on the foregoing, Mr. Graham has demonstrated that a genuine dispute exists as to whether his nonselection was motivated by discriminatory and retaliatory animus. As such, the Defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted,
/s/ Leslie D. Alderman III (D.C. # 477750)
ALDERMAN & DEVORSETZ, PLLC
1025 Connecticut Ave., NW
Suite 1000
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224