**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - - - - - - - X
 5   MICHAEL GRAHAM                 :
 6        Plaintiff,                :
                                    : Case No.:
 7   vs.                            : 1:05CV01340
 8   THE ARCHITECT OF THE CAPITOL   :
 9        Defendants.               :
10   - - - - - - - - - - - - - - - X
11                                       Washington, D.C.
12                                    Thursday, April 6, 2006
13
14   Deposition of:
15                      PETER AITCHESON
16   called for oral examination by counsel for
17   Plaintiff, pursuant to notice, at the Ford House
18   Office, 2nd and D Street, S.W., Room B39,
19   Washington, D.C., before Jodi Scheffel, a Notary
20   Public in and for the District of Columbia,
21   beginning at 12:30 p.m., when were present on
22   behalf of the parties.
```

## Page 2

APPEARANCES:
On behalf of the Plaintiff:
   LESLIE D. ALDERMAN, III, ESQUIRE
   Alderman & Devorsetz, PLLC
   The Blake Building
   1025 Connecticut Avenue, N.W.
   Suite 1000
   Washington, D.C. 20036
   (202) 969-8220

On behalf of the Defendant:
   MERCEDEH MOMENI
   ASSISTANT UNITED STATES ATTORNEY
   United States Department of Justice
   555 4th Street, N.W.
   Washington, D.C. 20530
   (202) 305-4851

Also Present: MICHAEL GRAHAM
              DAVID SCRIMAGER

* * * * *

## Page 3

CONTENTS

EXAMINATION BY:         PAGE:
Counsel for Plaintiff         4

EXHIBITS
AITCHESON DEPOSITION EXHIBITS:
No. 1 HOB 2004 173         46
No. 2 List of Applicants in the
     Pool (42)

No. 3 Electrician Assistant Supervisor
     WS-2805-08
No. 4 Interview Questions For
     Assistant Electrician Supervisor

(Exhibits Attached to Transcript.)

## Page 4

PROCEEDINGS
Whereupon,
    PETER AITCHESON
called as a witness, and having been first duly sworn, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. ALDERMAN:
    Q  Good afternoon. My name is Leslie David Alderman, III. I'm counsel for Michael Graham, who is the Plaintiff, in a lawsuit against The Architect of the Capitol. Can you give us your name for the record?
    A  Peter, middle initial C, Aitcheson.
    Q  And your position and work address, please?
    A  I'm assistant superintendent of the House Office Buildings. My work address is Room B341, Rayburn House Office Building, Washington, D.C. 20565, I think it is.
    Q  I'm just going to go over the ground rules for the deposition real quickly. Jodi, the court reporter, is going to be taking down every

## Page 5

word that we say. It will help her immensely if we allow each other to finish what we're saying before -- in other words, it will help her if we don't interrupt each other. Also, your responses should be verbal and not by body language. So shakes of the head, nods of the head don't show up on paper. Also, things like uh-huh or uh-uh don't show up on paper. You can't tell what that is. You don't know if it's yes or no. So verbal, clear responses.
    If you don't understand any of my questions, please ask me to repeat them, rephrase them, let me know you don't understand them. If you answer my questions, then the record will make it look as if you understood the question. Make sense?
    A  Uh-huh.
    Q  Lastly, are you on any medication that would hinder your ability to testify truthfully today?
    A  No.
    Q  Great. Can you describe for me your work

Capital Reporting Company

Page 6

1 history at The Architect of the Capitol?
2    A   Sure. I was hired December 2001 in my
3 current capacity.
4    Q   In your current capacity. Repeat your
5 position again, please.
6    A   I'm an assistant superintendent of the
7 House Buildings Office Buildings.
8    Q   Who is your immediate supervisor?
9    A   Bob Gleich.
10   Q   His title is?
11   A   Deputy superintendent.
12   Q   As it relates to the electrical
13 division --
14   A   Yes.
15   Q   -- who is your immediate subordinate?
16   A   Steve Stewart.
17   Q   His title?
18   A   General supervisor of the electrical
19 division.
20   Q   Could you tell us what your regular
21 duties as the assistant superintendent of the House
22 Office Buildings entail?

Page 7

1    A   I'm responsible for all of the mechanical
2 and electrical and transportation maintenance,
3 operations and maintenance of the House Office
4 Buildings.
5    Q   Are there specific divisions that are
6 under your supervision?
7    A   There are.
8    Q   Can you name those for me?
9    A   There's the building engineering
10 division, the electrical division, of course, sheet
11 metal division and the elevator division.
12   Q   Have you been responsible for those four
13 divisions throughout your tenure as the assistant
14 superintendent?
15   A   I have.
16   Q   Have there been any changes, additions or
17 omissions from the divisions that were under your
18 supervision?
19   A   No.
20   Q   I'd like to talk to you a bit about your
21 experience on selection panels and making selection
22 decisions for positions at The Architect of the

Page 8

1 Capitol.
2       Can you tell me on how many selection
3 panels on which you have been involved?
4    A   I can't give you an exact number. I'm
5 basically on all selection panels that are within
6 my area of responsibility.
7    Q   Since 2001, would you say that you've
8 been on more than 10 selection panels?
9    A   Oh, absolutely.
10   Q   More than 20 panels?
11   A   Yes.
12   Q   More than 30?
13   A   Yes.
14   Q   More than 50?
15   A   Probably, yes.
16   Q   Do you have the same role? Do you play
17 the same role in each of those selections?
18   A   Yes.
19   Q   What has that role been?
20   A   When a vacancy announcement closes, human
21 resources sends us the cert or list of the eligible
22 candidates. I normally have one of the ladies in

Page 9

1 the office call the people that we elect to
2 interview and set up the appointments. I sometimes
3 develop questions with input from the appropriate
4 supervisors in the appropriate shops. During the
5 interview, I'm normally the one that -- well, I can
6 say, in every case, I've been the one that actually
7 asks the questions. I don't have to be. It's just
8 the way it always turns out.
9    Q   Do you typically act as the selecting
10 panelist?
11   A   No. I'm not sure how that's determined.
12 That is determined by human resources. I think
13 it's based on the position that's being interviewed
14 for. So I really don't know -- you know, I go in
15 the AVUE with our new system and I physically put
16 the check mark in the box, but that does not
17 necessarily mean I'm the selecting official on the
18 job.
19   Q   Can you recall having sat on a panel for
20 any assistant supervisor position?
21   A   Yes.
22   Q   Can you tell me which assistant

Page 10

1  supervisor positions on which you have sat on the
2  panel?
3      A   I have to think back to all of the
4  various assistant supervisors that have been hired
5  over the past four years.
6      Q   Take your time.
7      A   Well, let's start with the -- I haven't
8  done any in the sheet metal shop. In the elevator
9  shop, the three current assistant supervisors. I
10 sat on the panel for all three of those
11 supervisors. Would you like their names or is that
12 necessary?
13     Q   Yes, I would like their names.
14     A   Joe Zeoli --
15     Q   Joe Zeoli?
16     A   Z-e-o-l-i, I believe, Rob Reburn and Ron
17 Gist, G-i-s-t.
18     Q   Okay.
19     A   In the electric shop, Bill Sanders, John
20 Houston, Dave Smith -- and I'm trying to think --
21 George Hammett. Then in the building engineering
22 division -- let's see here -- Joe Walkup, Danny

Page 11

1  Stivers, I believe, William Richardson and Theon
2  Parker. I think that's everybody but I'm not
3  100 percent sure.
4      Q   For the time being, let's focus on the
5  electric shop assistant supervisor selections.
6  With regard to the selection of Bill Sanders, do
7  you remember who was on the interview panel? I'll
8  ask you for their positions and shifts on which
9  they were working.
10     A   Okay. That's going to be tough because
11 that was a while ago. Bill Sanders, Steve Stewart
12 -- I think I'm safe to say Steve Stewart was on all
13 of the panels. That's normal practice to have the
14 general supervisor on all of the panels. The third
15 member is going to be more difficult to come up
16 with.
17     Q   Let me help you. With Bill Sanders, what
18 shift was he going to be on?
19     A   He's day shift.
20     Q   Day shift?
21     A   Uh-huh.
22     Q   Was the day shift supervisor included on

Page 12

1  his panel?
2      A   I'm not sure. That's the thing, I can't
3  remember if the day shift supervisor was on that
4  panel or not. Sometimes we select people based on
5  their availability if someone is not available.
6      Q   Let's go with John Houston. Do you
7  remember the third person on that panel?
8      A   I think it was George Hammett but don't
9  hold me to that.
10     Q   The selection for John Houston was the
11 evening shift?
12     A   Uh-huh.
13     Q   George Hammett?
14     A   Is day shift.
15     Q   Day shift supervisor?
16     A   Right. And the -- well --
17     Q   Go ahead.
18     A   I think Keith Bartlett declined to be on
19 the interview panel.
20     Q   Who is Keith Bartlett?
21     A   Evening shift supervisor.
22     Q   Was he approached to participate on the

Page 13

1  panel?
2      A   I believe so, yes.
3      Q   Did you approach him to participate on
4  the panel?
5      A   No.
6      Q   Do you know who would have approached
7  him?
8      A   Steve Stewart would have.
9      Q   How about for George Hammett; do you
10 remember when that selection was?
11     A   George, I believe -- and, again, I'm not
12 100 percent about this -- I believe he was promoted
13 to assistant on the evening shift but I don't know
14 if Carl was still here at that time. Carl Whitley
15 was a past supervisor on the evening shift. I'm
16 not sure who the third person was on that one.
17     Q   Is there a policy or practice of
18 including -- strike that. Let me try to rephrase
19 it more clearly. When making a selection for
20 assistant supervisor, is there a policy or practice
21 of including the supervisor who will be directly
22 over that assistant supervisor on the panel?

4 (Pages 10 to 13)

Capital Reporting Company

Page 18

1  A  No. It's just more or less, you know,
2  common courtesy. The guy is going to be working
3  for this person, you know, so you want him to have
4  some say of who he's going to be working very
5  closely with for a number of years.
6  Q  Now, I would like to bring the focus of
7  your attention on the selection that is being
8  challenged on this particular selection. That
9  selection, just so we're clear, is the 2004
10 selection to the midnight shift assistant
11 supervisor position in the electrical division.
12 A  Okay.
13 Q  Later on and throughout the course of
14 this deposition, when I say the selection or the
15 selection at issue, that's the selection that I'm
16 referring to, okay?
17 A  Okay.
18 Q  Were you involved in the selection at
19 issue?
20 A  Yes.
21 Q  What was your involvement?
22 A  I was one of the interview panel members.

Page 19

1  Q  Were you the selecting official?
2  A  I don't know, to be quite honest with
3  you. I don't know who was officially selecting
4  official on this.
5  Q  Did you have any involvement in the
6  development of the vacancy announcement used for
7  this position?
8  A  No. Human resources, I believe put
9  that -- it's a generic announcement.
10 Q  In any case, you had no involvement in
11 the development of the vacancy announcement used
12 for the selection at issue in this complaint?
13 A  No. That's all done by human resources.
14 Q  Did you have any involvement in
15 developing a position description used to fill the
16 vacancy in the selection at issue in this
17 complaint?
18 A  No. These positions are not generic in
19 nature but the position descriptions are the same
20 pretty much across The Hill for the same position.
21 Q  In your experience as the assistant
22 superintendent, have you ever worked in human

Page 20

1  resources to develop either the vacancy
2  announcement or the position description that would
3  be used to fill any particular vacancy?
4  A  I have.
5  Q  Tell me about each instance.
6  A  I probably can't tell you each instance
7  because I don't remember. I'll give you an
8  example. The most recent one was an insulator for
9  work leader, which was a new position that
10 currently didn't exist within the House Office
11 Buildings. In that case, I wanted to make sure a
12 screen-out factor was -- they had to be a certified
13 asbestos abatement supervisor.
14 Q  Now, you've given one example of an
15 instance in which you worked on human resources to
16 develop position descriptions?
17 A  Yes.
18 Q  And that is where the position is a new
19 position?
20 A  Correct.
21 Q  Are there any other circumstances that
22 have caused you to work with human resources to

Page 21

1  develop a vacancy announcement or position
2  description?
3  A  Normally, the only time I get involved is
4  if it hasn't been previously been done in AVUE. In
5  other words, if it is a new position -- it doesn't
6  even have to be a new position. It has to be a new
7  position that wasn't done in AVUE before it was
8  advertised.
9  Q  Are those the -- you've given two
10 examples, one where you've got a new position
11 altogether --
12 A  Right.
13 Q  -- and another circumstance is when it's
14 the first time that an assistant position
15 description has been used in the AVUE system?
16 A  Correct.
17 Q  Are those the only two circumstances that
18 have caused you to work with human resources to
19 develop a vacancy announcement or position
20 description that will be used in filling a vacancy?
21 A  Well, I can give you another example.
22 Human resources is constantly updating, modifying

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1  trying to improve this AVUE system. We just
2  advertised for two elevator mechanics where they
3  wanted to add a screen-out factor to try to improve
4  the quality of candidates that apply for the
5  position. When they do something like that, they
6  will normally run it by me.
7      Q  Can you rack your brain and think of any
8  other circumstances under which you have worked
9  with human resources to develop a vacancy
10 announcement and position description?
11     A  We are trying to hire two new industrial
12 equipment mechanics. They have never been
13 advertised in AVUE before. They're still working
14 on it down here in this building in human
15 resources. We advertised for a fire alarm
16 technician on the midnight shift and we still
17 haven't filled that position because we were
18 getting applicants that had no fire alarm
19 experiences. So I requested that they put in the
20 job announcement some language with respect to the
21 fire alarm system.
22        There are probably other examples. We

Page 23

1  have advertised for a pipefitter welder, which
2  we've never had in the House Office Buildings
3  before and I worked with human resources on both
4  the PD and the job announcement.
5      Q  This fire alarm technician position, is
6  that a new position?
7      A  No. It's actually to back fill
8  Mr. Smith's old position, which we never filled
9  because, when we advertise, we get people who work
10 on the communications equipment for the Army or
11 something like that and that's not the type of
12 electronics technician we're looking for.
13     Q  So Mr. Smith, prior to the selection at
14 issue in this complaint, was a fire alarm
15 technician?
16     A  Yes.
17     Q  That was his title?
18     A  Yes.
19     Q  But the position description used for
20 that position did not include specific fire
21 alarm --
22     A  The position description did but the job

Page 24

1  announcement made no mention of fire alarm work,
2  which is why we were getting electronics
3  technicians that were working on all kinds of
4  things from fixing PCs to advanced communications
5  equipment.
6      Q  So you changed the vacancy announcement
7  to reflect the primary duties of the position?
8      A  Yes.
9      Q  Is that The Architect's practice, to
10 ensure that the vacancy announcements reflect the
11 primary duties of the position to be filled?
12     A  I don't know whether I can answer that.
13 I know when we have difficulty hiring people, in
14 getting good applicants, sometimes you have to do a
15 better job in describing the job duties in the
16 vacancy announcement. Whether it's a practice or
17 not, I don't know that.
18     Q  Is it a practice of yours to ensure that
19 when selections are occurring under your
20 supervision that the vacancy announcements reflect
21 major duties of the position to be filled?
22     A  I think we try to, yes.

Page 25

1      Q  When you say, "we try to", how do you try
2  to?
3      A  Well, I mean, there's certain positions.
4  I'll use an example. The building engineering
5  division has a multitude of trades but all of the
6  supervisors are called maintenance mechanic
7  supervisors or assistant supervisors, and so the
8  job position descriptions for those position tend
9  to be generic in nature. That's kind of the way
10 they've been developed over the years.
11     Q  Let me ask you a detailed question about
12 that. Are they generic because those
13 supervisors -- are the position descriptions for
14 the assistant supervisor and supervisor positions
15 kept generic because the assistant supervisor and
16 supervisor can be expected to perform a wide
17 variety of duties and have a wide variety of
18 expertise?
19     A  I think, in many cases, it is kept very
20 generic for that reason. Like I said, in the
21 building engineering division, you know, you've got
22 plumbers, pipefitters, you've got HVAC mechanics,

**Capital Reporting Company**

Page 30

1  Q  Earlier you said that you're down to four
2  temporary fire alarm technicians --
3  A  Yes.
4  Q  -- and one permanent fire alarm
5  technician. What do you mean, you're down to?
6  A  Well, before we had six -- originally we
7  had six temporary fire alarm technicians and two
8  permanent fire alarm technicians. We've lost them
9  and haven't replaced them because temporary
10  employees have to have a specific job to charge to.
11  They're hired for a specific job. I have to do
12  kind of a balancing act between our funding for
13  these specific jobs and having these people doing
14  the work. I don't want to hire somebody today, you
15  know, and lay them off six months from now because
16  we've run out of work. Like I say, there's this
17  balancing act.
18  Q  Is that to say that there's less fire
19  alarm work to do today than there was a year ago?
20  A  No, there's probably more but there's
21  less funded fire alarm work. That's the
22  difference.

Page 31

1  Q  So there's less fire alarm work that's
2  going to be done?
3  A  There's less -- let me put it this way:
4  If I could hire more permanent fire alarm
5  technicians -- see the permanent employees -- the
6  distinction here is the permanent employees get
7  paid out of payroll, a payroll account. Temporary
8  employees get paid out of project money. So when
9  the project money runs out, you have to lay off the
10  temporary employees.
11      I have just as much, if not more, fire
12  alarm work now than I had, say, two years ago. The
13  problem is, I don't have funding. I don't have
14  funds to execute that work with temporary
15  employees.
16  Q  Is that to say there's a backlog of work
17  orders on fire alarm equipment work?
18  A  Yes.
19  Q  Is that a written document, this backlog?
20  A  We have monthly fire protection meetings
21  where we have an agenda that we discuss all of the
22  fire alarm work. Yes, if need be, I could show you

Page 32

1  minutes of all of the work that needs to be done.
2  It's a lot of work.
3  Q  What other type of work goes on on the
4  midnight shift in the electrical division?
5  A  We have a maintenance contract for the
6  fire alarm system in our buildings. It's an annual
7  maintenance contact. So we have a contractor go
8  through and perform maintenance on various devices
9  in the fire alarm system. They do our semi-annual
10  maintenance and our annual maintenance for us.
11  That is pretty much year-round, full time, one
12  person's job, to go around with BFPE, who is the
13  contractor, and go with them while they do all of
14  the maintenance on all of our devices in all of the
15  buildings.
16  Q  Whose full-time job is that?
17  A  Right now, Gordon Tolson is doing that
18  work.
19  Q  His position is?
20  A  He's an electrician.
21  Q  What other kind of work goes on on the
22  midnight shift in the electrical division?

Page 33

1  A  We do some security work.
2  Q  What type of security?
3  A  If you've seen in hallways those card
4  readers that access control, we have a fair amount
5  of that work to do as well that is also done on the
6  midnight shift.
7  Q  Any other activity?
8  A  I mean, I would imagine -- they don't
9  tell me everything -- I would imagine occasionally
10  plain old room calls come in or something like that
11  where somebody needs to have something done when
12  Congress is in session late or something like that,
13  routine electrical-related work.
14  Q  Is there anything about the installation
15  and expansion of the fire alarm system that
16  requires specific fire alarm system knowledge as
17  opposed to knowledge that an experienced
18  electrician would have?
19      MS. MOMENI: For whom?
20      MR. ALDERMAN: If you understand the
21  question, you can answer it.
22      MS. MOMENI: You can ask counsel to

9 (Pages 30 to 33)

Page 38

 1  but they do, like I said, some more routine things
 2  on the fire alarm system during the day and the
 3  evening shift.
 4      Q   Mr. Aitcheson, earlier you indicated
 5  there had been two full-time fire alarm
 6  technicians; is that accurate?
 7      A   Yes.
 8      Q   Who were they?
 9      A   Tony Anderson and Dave Smith.
10      Q   When were they hired as fire alarm
11  technicians?
12      A   Originally both of them were temporary
13  employees and they had both, I think, been there
14  since the early '90s. And then I forget when they
15  became permanent but --
16      Q   Was it while you were assistant
17  superintendent?
18      A   It was, yes.
19      Q   And did they go through an interview
20  process?
21      A   Yes.
22      Q   Were you involved with that interview

Page 39

 1  process?
 2      A   I was.
 3      Q   Did you develop some interview questions?
 4      A   I developed some interview questions. I
 5  believe I had some assistance from Mr. Kaldenbach.
 6      Q   Do you remember if you asked specific
 7  fire alarm questions during those interviews?
 8      A   Yes, I did.
 9      Q   Do you have a copy of those specific
10  interview questions?
11      A   Not with me but I could probably produce
12  them.
13          MR. ALDERMAN: Ms. Momeni, can I ask you
14  to provide them to me?
15          MS. MOMENI: We're looking for the
16  interview questions for?
17          MR. ALDERMAN: The fire alarm technician
18  interview questions.
19          THE WITNESS: Yes, that would be for Dave
20  Smith and Tony Anderson, when they became
21  permanent.
22          MS. MOMENI: Do you have them somewhere

Page 40

 1  in your file?
 2          THE WITNESS: Yes. I have them
 3  electronically in my computer.
 4          MR. ALDERMAN: Thank you.
 5  BY MR. ALDERMAN:
 6      Q   Also earlier you indicated that Keith
 7  Bartlett declined to sit on an interview panel?
 8      A   I believe he did.
 9      Q   Do you know why he declined?
10      A   I don't. I know that sometimes the
11  supervisors, for whatever reason, you know, elec
12  not to be on an interview panel.
13          MS. MOMENI: Please don't guess or
14  speculate. It's his state of mind.
15          THE WITNESS: I can't speculate. I've
16  seen this happen on several occasions, not just
17  Keith, but other supervisors have backed down.
18  BY MR. ALDERMAN:
19      Q   We've been down a nice little trail here
20  and I would like to get back to the road, which is
21  the selection process at issue in Mr. Graham's
22  complaint.

Page 41

 1      I think that you testified that you were
 2  not involved in developing the vacancy announcement
 3  or position description used for this selection; is
 4  that accurate?
 5      A   That is accurate.
 6      Q   Were you involved in selecting the
 7  individuals who would sit on the interview panel
 8  for this selection?
 9      A   I was, yes.
10      Q   Describe your involvement in selecting
11  the people who would sit on the interview panel.
12      A   Well, since this position was within the
13  electrical division, of course, Mr. Stewart would
14  always be on the interview panel. It was sort of
15  automatic, him being on it. What I'm not sure of
16  is who declined and why we went outside the shop
17  and asked Kenny Masters. We went and asked Kenny
18  Masters because we couldn't get anybody within the
19  electric shop to be on the interview panel.
20      Q   Do you know who Kevin Banks is?
21      A   Yes.
22      Q   At the time of the selection at issue,

**Capital Reporting Company**

Page 42

1  what was Mr. Banks' position?
2  A   I believe he was an assistant supervisor
3  on the evening shift, but I'm not 100 percent
4  correct. He's moved around some.
5  Q   Do you remember who the supervisor on the
6  midnight shift was at the time of these interviews,
7  which counsel and I have stipulated occurred on --
8      MS. MOMENI: On or about September 2nd,
9  2004.
10  A   I believe, at that time -- again, I'm
11  going on memory -- I believe Mr. Kaldenbach had
12  already retired. So we had no supervisor or maybe
13  Kevin was assigned to the midnight shift. I can't
14  recall exactly what happened. I believe Ken
15  Kaldenbach retired officially on September 30th,
16  2004, but his last day of work was like the day
17  before Labor Day Weekend. He took the rest of the
18  time off.
19  Q   So Mr. Banks may have been acting as
20  supervisor on the midnight shift?
21  A   He may have been, but I'm not sure. We
22  usually don't leave a shift unsupervised. That's

Page 43

1  not normal practice to leave a shift unsupervised.
2  Q   Do you recall any efforts to have
3  Mr. Banks sit on the selection panel at issue in
4  this complaint?
5  A   I don't. I don't recall who Steve would
6  have asked, who he asked and who he didn't ask. I
7  do remember that we had to go outside of the shop.
8  The interview panel member has got to be either the
9  same grade of the position that you're
10  interviewing for or higher.
11  Q   You indicated that you were involved in
12  the selection of the people that would be on the
13  interview panel, correct?
14  A   Yes.
15  Q   But you just now said you weren't sure
16  who Steve talked to about sitting on the panel.
17  A   What I normally do is I ask Steve to --
18  it goes without saying that Steve and I are going
19  to be on the interview panel. I asked Steve to try
20  to find somebody else, you know, preferably in the
21  shop. I don't know whether it was due to vacations
22  or schedules or what exactly transpired -- that was

Page 44

1  two years ago -- I remember him coming back to me
2  and saying that he couldn't get anybody within the
3  shop. And then, at that point, I believe I called
4  Greg Green in the building engineering division and
5  asked him if he could supply somebody.
6  Q   Did you specifically ask for Kenny
7  Masters?
8  A   No, I don't think I did. I think I just
9  asked Greg Green for somebody and he probably asked
10  Kenny.
11  Q   Did you have written interview questions
12  for the selection at issue?
13  A   Yes.
14  Q   Did you draft any of those questions?
15  A   Yes.
16  Q   Did you have anybody's help in drafting
17  those questions?
18  A   I used some of the fire alarm questions
19  that came from -- that we talked about from the
20  Dave Smith and Tony Anderson interviews. You know,
21  I mixed some of those in with the management
22  questions.

Page 45

1  Q   Did you have any assistance from anybody
2  else when you were developing the interview
3  questions?
4  A   No, not that I can recall.
5  Q   Do you remember who was interviewed for
6  that position at issue?
7  A   Yes, I do.
8  Q   Who was interviewed?
9  A   Besides Mike and Dave Smith, I believe
10  Phil Rupprecht.
11  Q   Do you know who chose those three
12  individuals to be interviewed?
13  A   I think it was a combination of Steve and
14  myself.
15  Q   How was it a combination between you and
16  Steve, in other words?
17  A   I would say we probably met. You know, I
18  don't remember exactly how the conversation went.
19  I think we felt like we had enough in-house
20  candidates to interview without having to interview
21  outside candidates. So we elected to stay with
22  in-house people because that shortens the interview

12 (Pages 42 to 45)

Capital Reporting Company

Page 50

1  THE WITNESS: There were six. We
2  selected the top three.
3  BY MR. ALDERMAN:
4  Q   When you say the top three, what do you
5  mean by top?
6  A   What I mean by top is, like I said, we
7  look at the in-house candidates because they are
8  in-house candidates and we wanted to keep the
9  interviewing, you know, within the agency or within
10 the organization. We look at their application, we
11 look at the fact they're in-house people.
12 Q   You said you interviewed the top three
13 in-house people?
14 A   Right.
15 Q   What made them the top three?
16 A   Well, I'm not sure exactly what we said
17 or how we decided at the time. I can tell you
18 that, you know, Mr. Graham was a work leader. So
19 that would make him a likely candidate in my mind
20 because he is a level above the regular
21 electricians.
22    Mr. Smith was probably one of our best

Page 51

1  fire alarm technicians. Mr. Rupprecht was on the
2  midnight shift doing some work, some fire alarm
3  work. I don't recall at the time how much
4  experience he had with the fire alarm system. I do
5  know that Mr. Rupprecht was also a master
6  electrician as well. He got his master's
7  electrician's license. He had solid
8  qualifications.
9  Q   Is it accurate to say that you were
10 looking for a specific fire alarm experience when
11 you made the selection of the people who you would
12 interview?
13 A   Like I said, I can't remember, you know,
14 exactly what transpired when we investigated who we
15 selected. Like I said, Mr. Stewart and I had a
16 discussion, I'm sure, about who off this list we
17 wanted to interview. I don't recall exactly how
18 that discussion went. What I -- for your previous
19 question was just more or less how I would select
20 right now sitting here today.
21 Q   So it's a general answer and not
22 specific?

Page 52

1  A   It is; that's correct. I can't say
2  specifically.
3  Q   Do you remember who had the final say on
4  who would be interviewed?
5  A   Well, I don't know that anybody has a
6  final say. I think, you know, it's a discussion
7  and we kind of come to an agreement on who we think
8  we should interview.
9  Q   Were you unanimous in your decision on
10 who to interview?
11 A   I don't know; I'm not sure.
12    MR. ALDERMAN: I would like to show you
13 another document. This one we'll mark Aitcheson 2.
14    (Aitcheson Exhibit No. 2 was
15    marked for identification.)
16 BY MR. ALDERMAN:
17 Q   I'm handing you a document marked
18 Aitcheson Exhibit 2.
19    You'll see on the bottom right corner of
20 each of those pages stamped numbers. On the first
21 page is 1268, and then you've got 1269, 1270 and
22 1271. Do you have that document in front of you?

Page 53

1  A   Yes.
2  Q   Do you recognize this document?
3  A   I know what it is but I've never seen it
4  before.
5  Q   I'm going to ask you to look at the
6  column that's titled Elements on page 1269, the
7  second page. That has some numbers underneath that
8  column.
9  A   Correct.
10 Q   Did those numerical scores under the
11 elements column go into your consideration of who
12 would be interviewed.
13 A   No. Like I said, I don't see this --
14 I've never seen this before.
15 Q   You've never seen how the applicants
16 for this position were rated by human resources?
17 A   No.
18 Q   Getting back to the development of the
19 interview questions -- I'm sorry to jump around.
20 We're back on the interview questions themselves.
21 When you developed those interview questions, did
22 you have in mind the position description for the

14 (Pages 50 to 53)

**Capital Reporting Company**

Page 54

1 selection?
2   A  When I developed the interview questions,
3 I used my knowledge of the job, which probably
4 wasn't completely reflected in the position
5 description.
6   Q  At the time you wrote the interview
7 questions, had you seen the vacancy announcement
8 and position description that would be used for the
9 selection?
10   A  I have seen the position description
11 before, but I don't know that that's been around
12 for a long time.
13       MR. ALDERMAN: Let's go ahead and mark
14 this document Aitcheson Exhibit 3.
15       (Aitcheson Exhibit No. 3 was
16        marked for identification.)
17 BY MR. ALDERMAN:
18   Q  The document we've marked Aitcheson
19 Exhibit 3 is, at the top, titled Electrician
20 Assistant Supervisor WS-2805-08. On the bottom
21 right, it's marked with page numbers that go from
22 one to five. Do you have that document in front of

Page 55

1 you?
2   A  Yes.
3   Q  Do you recognize this as the vacancy
4 announcement for the selection at issue?
5   A  Yes.
6   Q  If you take a look at page three, do you
7 recognize that document?
8   A  That is the position description.
9   Q  I see, referring you to page three,
10 percentages that are assigned to different, it
11 looks like duties. Do you see that, where
12 supervisory authorities has a 70 percent by
13 electrical maintenance, installation testing,
14 troubleshooting and repair has 30 percent by it --
15   A  Correct.
16   Q  Do you know what those percentages
17 correspond to?
18   A  These percentages are -- in this
19 position description, they estimate the amount of
20 time that someone would spend in this position
21 doing these various things.
22   Q  When you wrote the interview questions,

Page 56

1 did you factor in those stated percentages of time
2 that the incumbent would be spending on each of
3 these factors?
4   A  Probably not. I would have to go back to
5 the interview questions. I had a number of
6 supervisory situations, but I don't know how these
7 percentages compare with the actual number of
8 questions.
9   Q  Is it your policy or practice to respect
10 this allotment of percentages when you conduct an
11 interview and develop interview questions?
12   A  Not necessarily.
13   Q  Have you ever referred to the allotment
14 of positions in a position description when
15 developing a set of interview questions?
16   A  I did one time and that's why I don't use
17 it anymore. AVUE will actually develop interview
18 questions for you. I did that for one position and
19 I wasn't happy with the results because all of the
20 questions were, tell me about your experience doing
21 this, which doesn't really give you a good feel for
22 whether the person has the appropriate knowledge.

Page 57

1   Q  So you prefer --
2   A  To make my own questions, yes.
3   Q  And you prefer questions that actually
4 have answers as opposed to promote conversation?
5   A  Right.
6       MR. ALDERMAN: This we'll mark Aitcheson
7 Exhibit 4.
8       (Aitcheson Exhibit No. 4
9        was marked for identification.)
10 BY MR. ALDERMAN:
11   Q  Now, Mr. Aitcheson, I've just given you a
12 new document that we've marked Aitcheson Exhibit
13 No. 4. At the top, the document has a title House
14 Office Buildings Interview Questions For Assistant
15 Electrician Supervisor WS2805-08. This packet is
16 approximately 12 pages in length and goes from page
17 numbers 72 through 80, which means that it is nine
18 pages in length.
19       Do you have that document in front of
20 you?
21   A  Yes.
22   Q  Do you have pages 72 through 80?

15 (Pages 54 to 57)

Capital Reporting Company

Page 58

1   A   I do.
2   Q   Do you recognize this packet?
3   A   Yes. These are the interview questions
4   that were asked to all three candidates.
5   Q   Does your handwriting appear on this
6   document?
7   A   It does.
8   Q   Can you tell me why you wrote on this
9   document?
10  A   What we do, when we ask questions and the
11  candidates answer, we write their answer down.
12  Q   Just going through these questions, I
13  would ask you to identify which questions relate to
14  supervisory skills. If you can just call them off
15  by number.
16  A   I would say two, four, six, nine, 10, 11,
17  14. That's about it, I think.
18  Q   Now, would you go through and identify
19  those questions that relate specifically to fire
20  alarm equipment?
21  A   Number seven, eight, 12, 13, 16, 17 and
22  18.

Page 59

1   Q   Can I ask you about number 19 in the NEC
2   what this Table 310-16 relate to?
3   A   There are several questions sprinkled in
4   here on that are just basic electrical work.
5   That's one of them.
6   Q   Let's go through, then, those questions
7   that relate to basic electrical work.
8   A   That would be five -- I think just five
9   and 19.
10  Q   When you were developing these questions,
11  did you ever contemplate or consider that employees
12  who were then on the midnight shift and doing work
13  related to the fire alarm equipment would be at an
14  advantage to Mr. Graham because of the number of
15  fire alarm equipment questions asked?
16  A   Not really. You know, different people
17  throughout the years have worked on different
18  shifts. We were looking for somebody who had a
19  knowledge of the fire alarm system to be on that
20  shift, since that is the bulk of work that takes
21  place on that shift. I put these questions
22  together because I thought they most accurately

Page 60

1   reflected the knowledge required to do the job at
2   hand.
3   Q   If you were looking for someone that had
4   fire alarm equipment experience to fill this
5   assistant supervisor position, how do you
6   communicate that desire to the people who would be
7   applying for the position?
8   A   Well, we didn't communicate -- I mean,
9   outside -- human resources puts out the job
10  announcement. I think it's fairly common knowledge
11  that, you know, what's done on that shift and what
12  the bulk of the work is on that shift. Someone on
13  the outside wouldn't know. I agree with that. On
14  the inside, people currently working here would
15  know.
16  Q   In this particular instance, were there
17  more people on the inside applying or more people
18  from the outside applying?
19  A   More people from the outside.
20  Q   At any time after you developed these
21  questions, did you provide answers to these
22  questions to the other members of the interview

Page 61

1   panel?
2   A   I believe that Kenny Masters requested
3   some answers because, you know, he is not a fire
4   alarm guy.
5   Q   Did Steve Stewart request answers?
6   A   I don't believe so.
7   Q   Is he a fire alarm guy?
8   A   He is not but he's been through this
9   process before and I believe he knows what the
10  answers are.
11  Q   Did you know all of the answers to these
12  questions at the time that you incorporated them
13  for this selection?
14  A   The fire alarm questions, I have the
15  answers. Mr. Kaldenbach, when he provided me those
16  questions, he supplied the answers as well.
17  Q   Otherwise would you have known the
18  answers to those questions?
19  A   Not all of them, no.
20  Q   Did you expect that Mr. Stewart would
21  know the answers to those questions if you didn't?
22  A   I expected Mr. Stewart to know the

16 (Pages 58 to 61)

202.857.DEPO  www.CapitalReportingCompany.com
1000 Connecticut Ave NW  Suite 505  Washington D.C.  20006

**Capital Reporting Company**

Page 70

1  shift. When I first got here, Charlie Garner was
2  an assistant supervisor. He was the only
3  supervisor on the shift.
4      Q  So Charlie Garner was the assistant
5  supervisor previous to Dave Smith?
6      A  I'm not sure we had an assistant
7  supervisor. I can't remember the timing. I know
8  Ken Kaldenbach was the -- actually, the --
9          MS. MOMENI: Think your answer through
10 before you -- take your time, it's okay.
11         THE WITNESS: It's hard for me to
12 remember that long ago. Kevin Banks, I believe,
13 may have been working with Ken Kaldenbach as
14 assistant supervisor on the midnight shift prior to
15 his retirement. I think he was.
16 BY MR. ALDERMAN:
17     Q  Do you remember if he was acting in that
18 role or if he had been selected to that role?
19     A  He was an assistant supervisor.
20     Q  So he had been switched from one shift to
21 the --
22     A  One shift to the next, yes.

Page 71

1          MR. ALDERMAN: I'm going to give you
2  another document to take a look at. This is going
3  to be marked Aitcheson No. 5.
4          (Aitcheson Exhibit No. 5 was
5           marked for identification.)
6  BY MR. ALDERMAN:
7      Q  I've just given you a document that we've
8  marked Aitcheson Exhibit 5. You'll see a number
9  stamp on there of 399. Do you see that
10 (indicating)?
11     A  Yes.
12     Q  Do you recognize this document?
13     A  Yes. This is my scoring sheet for the
14 selection in question.
15     Q  Did you use any preliminary scoring sheet
16 or other tabulation before developing this final
17 scoring sheet?
18     A  I did not.
19     Q  Do you have any notes that reflect your
20 deliberation in how to score this scoring sheet?
21     A  No, not in this case.
22     Q  Have you done that in other cases?

Page 72

1      A  I have.
2      Q  Why not in this case?
3      A  I only do that if I'm having difficulty
4  making -- if it's really close between several
5  candidates, then, you know, I have to use something
6  more than what's on here to arrive at what I
7  believe is a fair decision.
8      Q  In this case, it was clear-cut?
9      A  It was.
10     Q  Was there any particular weight given
11 to -- I'm looking at what looks like four different
12 categories at the top of this matrix. The first is
13 knowledge to plan, the second is to use interview
14 building from the blueprints, third is the ability
15 to supervise, fourth is ability to recommend
16 personnel actions.
17     A  No specific weights. These are just raw
18 scores that you see on here.
19     Q  Can you explain why Mr. Graham only
20 received a three under knowledge and ability to
21 plan, layout and install electrical installation
22 using tools and materials of the electric trade?

Page 73

1      A  The basis for that was, if I remember
2  correctly, twofold; one is his past work
3  performance as a work leader and the other was the
4  way he answered some of the technical interview
5  questions.
6      Q  What about his performance as a work
7  leader prompted you to give him a three?
8      A  Well, again, I don't work side by side
9  with Mr. Graham. So I can only go on what the
10 supervisors are communicating back to me. You
11 know, they had indicated to me on several occasions
12 that some of the projects that Mr. Graham had been
13 given had fallen behind schedule.
14     Q  Can you tell me what supervisor told you
15 that?
16     A  Probably Mr. Stewart is what I would
17 guess.
18     Q  Do you recall a specific conversation in
19 which Mr. Stewart told you that Mr. Graham's
20 projects had fallen behind schedule?
21     A  I remember Mr. Stewart telling me that.
22 I don't know exactly when it was.

Page 74

1  Q  It was in the time frame of this actual
2  selection; in other words, was it during the time
3  that you were making the selection for the
4  assistant supervisor on the night shift?
5  A  I believe it was.
6  Q  Did he indicate specific projects he was
7  referring to?
8  A  I can't recall the actual specific
9  projects. I would have to go back and talk to Mr.
10 Stewart.
11 Q  Jumping over to the column labeled
12 ability to recommend personnel actions, schedule
13 leave, maintain work orders and schedule work,
14 provide technical advice and on-the-job training,
15 you gave Mr. Graham the lowest score of anyone
16 there, a three, whereas Mr. Rupprecht received a
17 four and Mr. Smith received a five.
18    Can you explain why Mr. Graham received
19 the lowest score?
20 A  Yes. That's also a result of his answers
21 on the interview questions coupled with his work
22 performance as described to me by Mr. Smith?

Page 75

1  Q  What about Mr. Stewart's description of
2  Mr. Graham's work performance led you to believe he
3  did not have strong abilities to recommend
4  personnel actions?
5    MS. MOMENI: Objection. That's not the
6  testimony. The three doesn't mean not strong
7  necessarily. I think you need to elicit that
8  information from the witness first. I guess my
9  objection is to the foundation.
10   MR. ALDERMAN: I will go ahead and ask my
11 question.
12 BY MR. ALDERMAN:
13 Q  You made the score, you considered it.
14 What was it about what Mr. Stewart told you that
15 led you to believe that Mr. Graham, when compared
16 to Mr. Smith and Mr. Rupprecht, had a lesser
17 ability to recommend personnel actions?
18 A  Well, I think if you look at the
19 question, it's not just that. It's also maintain
20 work orders, schedule work, provide technical
21 advice and on-the-job training.
22 Q  So which one of those qualities did

Page 76

1  Mr. Stewart's comments to you affect?
2  A  The second part, the part that I just
3  described.
4  Q  Schedule leave?
5  A  No. Maintain work orders, schedule work,
6  provide technical advice on the job and on-the-job
7  training.
8  Q  As a leader, an electrician leader, would
9  Mr. Graham have had more experience than the other
10 candidates with regard to maintaining work orders?
11 A  I'm not sure because I'm not sure whether
12 that is done at the work leader level. I don't
13 believe it is. I might be wrong. I believe the
14 supervisors and assistant supervisors generally
15 maintain the work orders and schedule work.
16 Q  Same question as to provide technical
17 advice?
18 A  Again, that's generally what supervisors
19 and assistant supervisors do.
20 Q  And then on-the-job training; same?
21 A  Likewise, yes.
22 Q  What does a leader do?

Page 77

1  A  A work leader is a nonsupervisory person
2  who you can give a project and they can lead a
3  group of workers through that project to completion
4  with little or no -- well, basically with no
5  supervision from the supervisors.
6  Q  So Mr. Graham's experience as a leader
7  would have, if it fell anywhere, would have fallen
8  into the third category, ability to supervise and
9  assign work?
10 A  It would, in part, fall into assigning
11 work. As a leader, he would have some people
12 working with him. It would be his responsibility
13 to divvy up the tasks but it would also fall under
14 the second item as well.
15 Q  Can you tell me specifically, with regard
16 to the fourth category over there, ability to
17 recommend personnel, et cetera, why Mr. Graham
18 scored lower than Mr. Smith and Mr. Rupprecht?
19 A  Well, I think part of it is your
20 technical knowledge as it was reflected in the
21 interview questions. You've got to have technical
22 knowledge, a good technical basis for providing

Capital Reporting Company

Page 78

1 technical advice and on-the-job training. So, you
2 know, in that respect, his answers to the questions
3 didn't really demonstrate that he had that.
4   Q   When you're referring to his answers to
5 the questions, are you referring to his answers to
6 the fire alarm questions?
7   A   That is correct.
8   Q   Have you had any conversations with
9 anybody about the selection at issue in this
10 complaint other than conversations among the
11 panelists who actually make the decision and you're
12 taking into a view the candidate that was
13 recommended for selection?
14   A   I'm sorry, could you repeat that? I
15 heard what you said. I didn't understand what you
16 were asking.
17   Q   Have you had any conversations with
18 anybody -- let's make it broad -- with anybody
19 about the selection at issue in this complaint?
20   A   Any conversations with anybody about this
21 complaint?
22   Q   About the selection?

Page 79

1   A   Oh, I'm sorry.
2   Q   About the selection?
3   A   About the selection, no, other than the
4 interview panel members. That's it.
5   Q   What conversations did you have with the
6 interview panel members?
7   A   Just when we got together to compare our
8 notes. I don't know what the conversation was as I
9 mentioned to you earlier but, you know, the process
10 is, was we go back to our office, do this
11 independently of each other and then we meet and
12 discuss the results of our scoring. That's really
13 all there was to this particular selection.
14   Q   Do you know if you were the person that
15 actually typed in selection to a view system?
16   A   I think I was, yes.
17   Q   Did you have any conversations with the
18 concurring official?
19   A   No.
20   Q   Who was the concurring official?
21   A   I believe Frank Tiscione is always the
22 concurring official.

Page 80

1   Q   You didn't have any conversations about
2 the selection?
3   A   I don't think I did.
4   Q   Did you have any conversations with Bob
5 Gleich about the selection?
6   A   No. I only talked to Frank about it if
7 he comes back to me with something. If you follow
8 what I'm saying.
9   Q   Did you provide Mr. Tiscione with any
10 documents in the selection process?
11   A   No.
12       MR. ALDERMAN: Can we take a quick break?
13       MS. MOMENI: Sure.
14       (Recess taken.)
15 BY MR. ALDERMAN:
16   Q   Mr. Aitcheson, do you remember a time
17 when electrical division used a rotating assistant
18 supervisor slot or system?
19   A   I don't. I don't recall that that was
20 done when I was here. Actually I didn't know it
21 was done even prior to me being here to tell you
22 the truth.

Page 81

1   Q   So you don't remember any time when Mr.
2 Graham acted as assistant supervisor?
3   A   I'm sorry, I may have misunderstood your
4 previous question. That follow-on sounded a lot
5 different than the first one.
6   Q   Do you remember a time when Mr. Graham
7 acted as assistant supervisor on any shift in the
8 electrical division?
9   A   I believe there have been times where Mr.
10 Graham was either acting or the person in charge
11 when there was no -- you know, for whatever reason
12 there were no other supervisors there, be it on a
13 Saturday. I know Mike worked some Saturdays, I
14 believe, when there were no supervisors working
15 that Saturday, for example.
16       MR. ALDERMAN: Let's go off the record
17 real quick.
18       (Discussion off the record.)
19 BY MR. ALDERMAN:
20   Q   Other than instances when Mr. Graham
21 would have acted for an assistant supervisor in the
22 assistant supervisor's absence, do you remember

21 (Pages 78 to 81)

**Capital Reporting Company**

Page 98

1 panelists about the fact that Mr. Graham filed the
2 rope complaint.
3    A   Well, it's my understanding -- although I
4 didn't see the article -- that it became public
5 knowledge. I have not talked about it. I may have
6 talked about it -- you know, Mr. Stewart and I --
7 it may have come up in conversation. I believe,
8 like I said, the findings of that case became
9 public. You know, everybody kind of new about it.
10    Q   Do you recall when, specifically, you
11 spoke with Mr. Stewart about that case?
12    A   I don't.
13    Q   Are you aware of any individuals within
14 the House Office Buildings who have been
15 disciplined as a result of discriminatory conduct,
16 people who have actually been disciplined for
17 discriminatory conduct?
18    A   Like I said, I think Mr. Kaldenbach was
19 disciplined for -- I believe that was for -- well,
20 I don't know.
21    Q   That's Mr. Kaldenbach. Anybody else come
22 to mind?

Page 99

1    A   Not anybody else that I'm aware of.
2    Q   When you were evaluating candidates at
3 issue in the selection, did you consider
4 Mr. Smith's prior military experiences?
5    A   Yes, to a certain degree. I believe he
6 had supervisory responsibilities when he was in the
7 military, if my memory serves me correctly.
8    Q   You say, yes, to a certain degree. What
9 do you mean, to a certain degree?
10    A   Well, I mean, when someone is applying
11 for supervisor position, one of the things we look
12 for is past supervisory experience.
13    Q   Did you find his military supervisory
14 experience to be relevant to his potential to do
15 supervisory work at The Architect of the Capitol?
16    A   I think so, yes.
17    Q   Was it your opinion that the Plaintiff's
18 work performance as a work leader, an employee,
19 reflected that he would not perform as required for
20 a supervisor?
21    A   Based on what I saw and the interview and
22 all of the information I had at the time, you know,

Page 100

1 it was my opinion that Mr. Smith was the best
2 selection for the job. I'm not saying that Mr.
3 Graham couldn't perform as an assistant supervisor.
4    Q   I'm going to ask you the question again.
5 It's a specific question. Was it your opinion that
6 Plaintiff's work performance and as a work leader,
7 an employee, reflected that he would not perform as
8 required for a supervisor?
9       MS. MOMENI: Counsel, maybe you can put
10 the interrogatory in front of the witness. It
11 would be easier.
12       MR. ALDERMAN: Do you understand the
13 question?
14       THE WITNESS: I do understand the
15 question, but you're asking me all or none. I
16 don't think I can answer it that way.
17 BY MR. ALDERMAN:
18    Q   Was it your opinion that the Plaintiff's
19 work performance as a work leader, an employee, did
20 not reflect that he met the qualifications to be a
21 supervisor?
22    A   I don't think I can answer that either.

Page 101

1    Q   That's fine. If you can't answer it, you
2 can't answer it. Let me do what Ms. Momeni just
3 suggested. We're not going to mark it as an
4 exhibit --
5    A   Sure.
6    Q   -- but I'm going to show you Agency's
7 Responses to the Plaintiff's First Set of
8 Interrogatories. We're flipping to Interrogatory
9 No. 3 which says, please identify and explain any
10 and all legitimate, nondiscriminatory
11 justifications for not selecting Mr. Graham for the
12 position at issue in the complaint identifying each
13 document that supports the Agency's Response to
14 this interrogatory.
15       If you would, just take a couple of
16 minutes and review the Response to Interrogatory
17 No. 3 that the Agency just provided, which appears
18 at page four and five of the Interrogatory
19 Responses.
20    A   Okay. Sure.
21    Q   Let me know when you're finished.
22    A   Okay.

202.857.DEPO  www.CapitalReportingCompany.com
1000 Connecticut Ave NW  Suite 505  Washington D.C. 20006

Page 102
1  Q  I'm going to ask you a very specific
2  question.
3  A  Okay.
4  Q  Did you provide any of the information
5  contained in that response?
6  A  Yes.
7  Q  When did you provide that information?
8  A  Whenever it was requested. I don't
9  recall the exact date and time but yes.
10 Q  In Response to Interrogatory No. 3, the
11 first statement is that the Plaintiff was not
12 selected because he lacked the skills, knowledge,
13 and abilities and other qualifications for the
14 position.
15     Can you identify what skills, knowledge,
16 and abilities and other qualifications for the
17 position Mr. Graham lacked?
18 A  Well, I believe the KSAOs actually refer
19 to these items across the top of the scoring sheet.
20 Q  Well, should we look at the KSAOs?
21 A  I think these are the KSAOs (indicating),
22 but if you want to look at the --

Page 103
1     MS. MOMENI: Let the record reflect that
2  the witness was pointing to Exhibit 5.
3  BY MR. ALDERMAN:
4  Q  And now we're going to look at Exhibit 3.
5  Can you locate the KSAOs in that exhibit?
6  A  This is a screen-out element, which is
7  ability to supervise. And then the job elements
8  are ability to troubleshoot, use and maintain hand
9  tools used in electrical work, ability to use
10 electrical drawings, knowledge of electrical and
11 electronic theory and instruments, and knowledge of
12 electrical equipment. I'm sorry, your question is?
13 Q  Are those the KSAOs of the position?
14 A  They should be. I think so, yes.
15 Q  Going back to the Response to
16 Interrogatory No. 3 which, in the first sentence
17 says, the Plaintiff was not selected because he
18 lacked the skills, knowledge and abilities, KSAs,
19 and other qualifications for the position.
20     Referring to the position description,
21 which skills, knowledge and abilities did Mr.
22 Graham lack?

Page 104
1  A  Well, I think if you go back to the
2  interview -- if you go back to his answers on the
3  interview questions, some of the areas where he had
4  trouble with was some of the questions that reflect
5  his ability to troubleshoot, knowledge of
6  electrical equipment.
7  Q  There, are you specifically referring to
8  the interview questions that related to the fire
9  alarm equipment?
10 A  Correct.
11 Q  Let's move to the second sentence of
12 Response No. 3, which says the position required
13 knowledge in fire alarm systems among other
14 qualifications.
15     You agree with that statement?
16 A  Yes.
17 Q  The Response continues, quote, Plaintiff
18 lacked knowledge in fire alarms especially as
19 compared to the fire alarm qualifications of the
20 selectee, et cetera, end quote.
21     Now, the second paragraph of the Response
22 begins, quote, the Plaintiff did not have the

Page 105
1  desirable or necessary supervisory skills for the
2  position particularly as compared to those of the
3  selectee and me in this area, end quote.
4     Can you explain why this answer indicates
5  that the Plaintiff did not have desirable and
6  necessary supervisory skills for the position?
7  A  I believe his resume didn't reflect any
8  prior supervisory experience.
9  Q  So his experience as a leader in leading
10 groups of electricians wouldn't go to supervisory
11 experience?
12 A  I think, in part, there is some crossover
13 in what a work leader does and say what a
14 supervisor does but it's only with respect to the
15 work, not with respect to any type of human
16 resource-related functions.
17 Q  So when you say the Plaintiff did not
18 have -- sorry -- when this Response says, the
19 Plaintiff did not have the desirable or necessary
20 supervisory skills for the position, were you
21 referring to the human resources side of the
22 supervisory requirements?

27 (Pages 102 to 105)

**Capital Reporting Company**

Page 106

1  A  Yes.
2  Q  This paragraph goes on to say, quote, the
3  Plaintiff had about one-year experience as a work
4  leader, which is not a supervisory position as
5  such. The selectee's supervisory experiences
6  included about three years in a supervisory
7  position with the military, end quote.
8     Referring to selectee's supervisory
9  position with the military, did he indicate or did
10 you believe he had human resources supervisory
11 experience?
12 A  Yes.
13 Q  The last sentence in that second
14 paragraph says, quote, Plaintiff did not meet the
15 required work ethic considerations for a supervisor
16 position, end quote.
17    Can you explain that statement or why
18 that statement appears in this Response?
19 A  Yes. I think a supervisor needs to lead
20 by example. Again, I don't work right next to Mike
21 but what I've been told by other supervisors in the
22 shop, that he hasn't really stepped up to take the

Page 107

1  lead in his current work leader position and --
2  Q  Let me stop you there and ask you, what
3  supervisors have told you that?
4  A  I believe Mr. Stewart has told me that.
5  Primarily I think Mr. Stewart has told me that.
6  Q  Did he tell you that in the course of
7  this selection process?
8  A  I think it came out as a matter -- well,
9  I can't say because I don't remember the
10 conversation.
11    MS. MOMENI: If you don't know, you don't
12 know; if you don't remember, you don't remember,
13 whatever.
14    THE WITNESS: I don't remember what we
15 had when we got together to do the scoring.
16 BY MR. ALDERMAN:
17 Q  Do you remember a specific conversation
18 with Steve Stewart when he told you that he didn't
19 think that Michael Graham had the requisite work
20 ethic to be a supervisor?
21 A  I do.
22 Q  Do you remember when that conversation

Page 108

1  occurred?
2  A  I don't remember the exact date.
3  Q  Was it closing time to the selection at
4  issue in this complaint?
5  A  I don't know.
6  Q  Jumping down to the last paragraph in
7  Response to No. 3, that paragraph reads, quote,
8  Plaintiff's work performance as a work leader and
9  employee reflected that he would not perform as
10 required for a supervisor, end quote.
11    Can you explain that statement?
12 A  Yes. That, again, is similar to the
13 previous statement insofar as Mr. Graham's work
14 performance hadn't been up to par at least that's
15 what I've been told.
16 Q  According to your earlier testimony, it
17 was Steve Stewart that told you that?
18 A  Yes.
19 Q  Now, continuing with that sentence, quote
20 Plaintiff's work performance as work leader and
21 employee did not reflect that Plaintiff met the
22 qualifications to be a supervisor, end quote,

Page 109

1  correct?
2  A  Correct.
3  Q  Can you explain that statement?
4  A  I think that again goes back to work
5  ethic and leading by example. Again, it was felt
6  that, because of Mr. Graham's performance, he just
7  wasn't setting the example, which is what is
8  required of a supervisor.
9  Q  Is that based on your conversations with
10 Mr. Stewart?
11 A  That is correct. Like I said, you know,
12 I don't work next to Mike.
13 Q  Now, do you know Mr. Smith's work
14 performance?
15 A  I don't work next to Mr. Smith either but
16 I do know of his work performance.
17 Q  How do you know of his work performance?
18 A  Again, I've had supervisors -- actually
19 in Mr. Smith's case, I've not only had supervisors
20 in the electric shop talk to me about Mr. Smith's
21 work performance, but I've also had a person from
22 the Fire Marshal's division, who works closely with

28 (Pages 106 to 109)