Capital Reporting Company

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF COLUMBIA
 3      ------------------------------x
 4      MICHAEL GRAHAM,                :
 5               Plaintiff,            :
 6      vs.                            :   Civil Action No.
 7      THE ARCHITECT OF THE           :   05-1340 (JR)
 8      CAPITOL,                       :
 9               Defendant.            :
10      ------------------------------x
11                                         Washington, D.C.
12                                         Thursday, May 25, 2006
13      Deposition of:
14                      STEPHEN STEWART
15      called for oral examination by counsel for
16      Plaintiff, pursuant to notice, at the Ford House
17      Office, Second and D Street, Southwest, Room 480,
18      Washington, D.C., before Gercha Richards White of
19      Capital Reporting, a Notary Public in and for the
20      State of Maryland, beginning at 1:49 p.m., when were
21      present on behalf of the respective parties:
22
```

Capital Reporting Company

Page 2

1      APPEARANCES
2
3  FOR THE PLAINTIFF:
4  ALDERSON & DEVORSETZ, PLLC
5  BY: Leslie D. Alderman, III, Esq.
6  The Blake Building
7  1025 Connecticut Avenue, Northwest, Suite 1000
8  Washington, D.C. 20036
9  (202) 969-8220
10
11 FOR THE DEFENDANT:
12 BY: Mercedeh Momeni, Esq.
13 Assistant United States Attorney
14 555 Fourth Street, Northwest, Civil Division
15 Washington, D.C. 20530
16 (202) 305-4851
17
18
19
20
21
22

Page 3

1      INDEX
2  WITNESS: STEPHEN STEWART
3  EXAMINATION                    PAGE
4  Mr. Alderman                   4
5
6      EXHIBITS
7  NUMBER   DESCRIPTION           PAGE
8  1    Review Candidates         45
9  2    Electrician Assistant Supervisor  54
10 3    First Set of Interrogatories  103
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1      PROCEEDINGS
2           ---
3           STEPHEN STEWART,
4  having been first duly sworn, was examined and
5  testified as follows:
6           ---
7           DIRECT-EXAMINATION CONDUCTED
8  BY MR. ALDERMAN:
9     Q. Good afternoon. My name is Les Alderman.
10 I represent Michael Graham in a lawsuit brought in
11 the Federal District Court for the District of
12 Columbia against the Architect of the Capitol.
13        For the record, would you please give me
14 your full name and your office address?
15    A. Okay. Stephen James Stewart.
16       Shall I spell it?
17    Q. Yeah.
18    A. Stephen, with a p-h, James, S-t-e-w-a-r-t.
19    Q. And your work address?
20    A. It's SB-305 Rayburn House Office Building,
21 Washington, D.C.
22    Q. Just a couple of ground rules for the

Page 5

1  deposition. Because Gercha's going to writing
2  everything down that we say, it makes her life a
3  whole lot easier if we let each other finish our
4  sentences, without before jumping in with an answer
5  or before jumping in with a follow-up question. It
6  just makes the record a lot more clearer.
7        Also, all of your responses should be yes
8  or no, full verbal responses. Gercha can't pick up
9  of nod of the head. And if you say uh-huh, it
10 sounds yes to me, but when you read it, it looks
11 real similar to uh-uh. So you can't tell if that's
12 a yes or a no. So just try to have clear, verbal
13 responses.
14       And if you don't understand any of my
15 questions, let me know that you don't understand
16 them and I'll do my best to rephrase them, get it so
17 that you understand what I'm talking about. If I
18 understand, if you answer my questions, the record
19 will make it look as if you understood what my
20 question was. So get any clarification that you
21 need before responding.
22       It's okay to not know an answer, but it's a

Capital Reporting Company

Page 10

1   agree to call them elephant and --
2   A. Right.
3   Q. -- and it will be fine.
4       So since you've been the general
5   supervisor, have you sat on any interview panels?
6   A. Yes, I have.
7   Q. Can you recall the interview panels for
8   assistant supervisor and above positions that you
9   have sat on?
10  A. Well, in general, I've sat on every one.
11  To be specific --
12      MS. MOMENI: Everyone -- I'm sorry. I need
13  some clarification. Everyone for the entire
14  house?
15      THE WITNESS: No.
16      MS. MOMENI: Okay.
17      THE WITNESS: Everyone that's in the
18  Rayburn electric shop. Because I, you know, I
19  have a say, you know, I need to know who's
20  going to be promoted at those important
21  positions.
22      BY MR. ALDERMAN:

Page 11

1   Q. Why is that?
2   A. Because I'm the general supervisor.
3   Q. Is that because you would be their
4   supervisor?
5   A. I am their supervisor.
6   Q. Does the Architect of the Capitol have a
7   policy that the supervisor would be on the selection
8   panel?
9   A. That, I'm not sure. But it's the way it's
10  been with us so far.
11  Q. Okay.
12  A. I don't know what the policy is with that.
13  Q. But that's the practice?
14  A. That is practice, yes.
15  Q. Okay. And we'll take as much time as you
16  need on this, there is no rush. But if you can,
17  just list for me the assistant supervisor and above
18  selections that you have sat on?
19  A. Okay. And if I miss one or two, bear with
20  me here.
21  Q. Yeah, that'll be fine.
22  A. Kevin Banks when he was promoted to

Page 12

1   assistant supervisor. Let's stick with him, Kevin
2   Banks when he was promoted to supervisor.
3   Q. Okay.
4   A. I'll go shift by shift. Dave Smith, when
5   he was promoted to assistant supervisor; Keith
6   Bartlett, when he was promoted to supervisor; Johnny
7   Houston, when he was promoted to assistant
8   supervisor.
9   Q. Was that supervisor or assistant
10  supervisor?
11  A. Johnny Houston -- John Houston was
12  assistant supervisor.
13  Q. Okay.
14  A. And let's see, Bill Sanders was promoted to
15  assistant supervisor. George Hammett was promoted
16  to a supervisor. Let's see, if I have all of them.
17     Do you want leaders or no leaders?
18  Q. Leaders is fine.
19  A. Michael Graham was promoted to WL leader --
20  WL-10 leader.
21  Q. Is that the only leader?
22  A. Yeah. I think that covers them all.

Page 13

1   Q. Okay. Let's start bottom up: Bill
2   Sanders. Can you recall who was on the interview
3   panel with you?
4   A. This is going to be tough. I don't recall.
5   Q. Do you remember what shift that was from?
6   A. Day shift.
7   Q. Do you remember when that was?
8   A. I don't -- I don't remember. See, as I've
9   been getting older, my memory's getting better.
10  Q. Who is the assistant supervisor day shift
11  now?
12  A. That is Bill Sanders.
13  Q. How long do you think he's been --
14  A. He's been approximately three years.
15  Again, as a guess. I'd have to look at the record.
16  Q. That's fine.
17     Three years ago, who would have been the
18  day shift supervisor?
19  A. Again, it could have been Ken Kallenbach.
20  Q. Do you remember if Pete Aitcheson was on
21  the interview panel for Bill Sanders?
22  A. Yes. In fact, he -- okay. He was on all

4 (Pages 10 to 13)

Capital Reporting Company

Page 22

1  division, which made the selection for the
2  supervisor.
3      So among the panelists, was there a
4  controversy over who would get selected between
5  Kevin Banks and Mr. Bartlett?
6      A. I don't recall any controversy.
7      Q. Do you remember George Hammett lobbying any
8  members of the panel for the Bartlett selection to
9  hire Mr. Bartlett?
10     A. No. No.
11     Q. Not at all?
12     A. No.
13     Q. Did Mr. Aitcheson tell you at any time that
14  George Hammett had argued for selecting Keith
15  Bartlett for the supervisor position?
16     A. Okay. Could you repeat that?
17     Q. Sure.
18     Did Mr. Aitcheson tell you that anyone, and
19  specifically George Hammett, had come into argue
20  that Keith Bartlett should be selected for the
21  evening shift supervisor?
22     A. I don't recall that.

Page 23

1      Q. Did Mr. Aitcheson assemble that panel for
2  the Keith Bartlett?
3      A. Yes. Yes.
4      Q. Sorry. I know it's repetitive.
5      Did you believe that Kevin Banks should
6  have been promoted instead of Keith Bartlett for the
7  evening shift supervisor position?
8      A. It's awhile ago. Keith was selected
9  obviously. There's reasons for those selections and
10  I don't, you know, I have to look at the interview
11  questions and review that before I fully answer
12  that.
13     Q. So you don't have a recollection of whether
14  you preferred Mr. Banks to Mr. Bartlett for that
15  selection?
16     A. I would say I probably selected Bartlett.
17     Q. Do you recall why you selected Bartlett
18  over Banks?
19     A. I'd have to review what we did to really
20  give you a concrete answer.
21     Q. Okay. David Smith. Getting to the
22  selection that we're talking about in this

Page 24

1  complaint, as Merc smiles. Do you remember who was
2  on the panel for the David Smith selection?
3      A. I don't, Les. I don't recall.
4      Q. Do you remember if Kenny Masters was on
5  that?
6      A. Huh, he was. Now that you say, yes, he
7  was. I need a little spark.
8      Q. A little help.
9      Do you know how Kenny Masters came to be on
10  that panel?
11     A. Pete, he selects the other panel member.
12     Q. So you don't know how Kenny Masters came to
13  be on the panel?
14     A. No.
15     Q. At the time that Dave Smith was selected to
16  be the supervisor on the midnight shift, do you
17  remember who the supervisor on the midnight shift
18  was?
19     A. Kevin Banks.
20     Q. Do you know if Mr. Banks had any
21  involvement in the process by which that position
22  was filled?

Page 25

1      A. No.
2      Q. Did Mr. Banks tell you that he wanted to be
3  involved in making that selection?
4      A. No.
5      Q. After the selection, did he tell you that
6  he would have liked to be involved in that
7  selection?
8      A. I don't think he did.
9      Q. Okay. How about the Graham leader
10  position? Do you remember who else was on the
11  panel?
12     A. I don't recall.
13     Q. How about the Banks assistant supervisor
14  position?
15     A. Again, I have to check our records. I
16  don't recall.
17     Q. When Mr. Banks was selected for an
18  assistant supervisor position, do you know what
19  shift he was to be working on?
20     A. I believe it was the evening shift.
21     Q. Would you have a record of that anywhere?
22     A. Yeah. Yes, we should have record.

7 (Pages 22 to 25)

**Capital Reporting Company**

Page 58

1  interview questions.
2      Q. But do you have a specific recollection
3  that Mr. Masters asked some questions about the
4  answers?
5      A. I think he did ask a couple of questions,
6  yeah. Specifics, I can't -- I don't remember.
7      Q. Did Mr. Aitcheson -- before the interview
8  process itself, did Mr. Aitcheson go over the
9  answers? Did he do anything to ensure that you and
10 Mr. Masters knew the answers to these questions?
11     A. I don't recall doing that though. He did,
12 you know. We looked at the questions. We always do
13 that before they'd come in.
14     Q. Just looking at question number seven on
15 this list, the question number seven reads: Can a
16 photoelectric, ionization and heat detector be
17 installed on the same four wire indicating circuit?
18         Do you know what the correct answer to that
19 question is, without looking?
20     A. Yeah, I do know the answer.
21     Q. And how do you know that answer?
22     A. Just from experience in the trade.

Page 59

1      Q. And what's the answer?
2      A. Yes.
3      Q. And how about number eight: What
4  indicating devices are required in the presence of
5  sprinkler heads in an elevator shaft?
6         Did you know the answer to that question at
7  the time of this interview?
8      A. Yes.
9      Q. And what's the answer?
10     A. Actually, we did this one. It's actually
11 two things. It's heat detectors and smoke
12 detectors.
13     Q. How about number 12: Maximum number of
14 smoke detectors allowed on an indicating circuit?
15     A. He said 30. I think it's 36.
16     Q. Where does that answer come from?
17     A. It's -- there's an NFPA code that is
18 followed. It's like the national electric code that
19 electricians follow and when you're involved in fire
20 alarm and life safety issues that it's -- it's a
21 national -- it's a nation-wide code that's out, an
22 NFPA.

Page 60

1      Q. Okay. How about 13? How would you
2  troubleshoot a grounded indicating circuit?
3      A. Get all kind of answers to this one.
4      Q. What's the right answer?
5      A. The right answer is in order -- the fire
6  alarm system is pretty complicated and there's a lot
7  of different areas. There's operating -- OCP, which
8  is operating control panel, that's like the brains
9  of symptom. And if there's a ground fault
10 detection, you start there. First, you have to
11 start there. You have to find out what exit loop at
12 exit loop.
13         Do you want me to get into all these
14 details?
15     Q. Yes.
16     A. Okay.
17         MS. MOMENI: Let me just say for the
18 record, relevance; but go ahead and answer.
19         THE WITNESS: Okay. It depends on the size
20 of the building. Let's say, this building --
21         BY MR. ALDERMAN:
22     Q. Actually, let me just -- if I could correct

Page 61

1  the whole relevance first.
2         Did you score people on how well they
3  answered these questions in the interview process?
4      A. Yes.
5      Q. Go ahead and continue.
6      A. Okay. Well, let me -- instead of going on,
7  I'll get to the gist of it. When you look at a
8  problem like this, it's basically a process of
9  elimination, okay. And the board will indicate what
10 area of the building the trouble is in. And exit
11 loop are different -- those are loops of wires going
12 around which feeds like different quadrants.
13     Q. Okay.
14     A. Okay. And you can specific where the
15 problem area is. And what you do find out what exit
16 loop is on, you find out what zone net point is on.
17 There are many many multiple zones. This is not
18 addressable -- these systems are pretty obsolete
19 really. Capitol Hill, you do think differently, but
20 that's coming in the future. But these are not
21 addressable systems. These smoke detectors are not
22 addressable, they're on zones. They're, like I

16 (Pages 58 to 61)

**Capital Reporting Company**

Page 70

1  Q. I'd ask you to look at the first page, the
2  page marked 51, on Exhibit 2.
3  A. Right.
4  Q. Under the column, marked ability to
5  supervise and assign work and to follow through with
6  several work assignments at the same time. I
7  note -- I notice that you marked Mr. Graham with a
8  three, Mr. Rupprecht with a four, and Mr. Smith with
9  a four.
10      Can you tell me why you marked Mr. Graham
11 lower than both Mr. Smith and Mr. Rupprecht for that
12 category?
13  A. Okay. Let me think. Well, just from
14 observing these guys, can have their work ethic, how
15 they handle themselves, how they've been given
16 assignments. Mike hasn't done as well a job as the
17 other two.
18  Q. So that's based on your personal
19 observation of them in supervisory --
20  A. Pretty much, yeah.
21  Q. -- situations.
22      What supervisory situations did you see

Page 71

1  Mr. Rupprecht operating in?
2  A. He has, in fact, I don't have his resume.
3  I think if I recall he has -- don't quote me on
4  this, but I have to check it. I thought he had some
5  supervisory experience before, so did Dave Smith.
6  Q. Was that supervisory experience that you
7  had witnessed?
8  A. No.
9  Q. Now, in the column marked knowledge and
10 ability to plan, lay out and install electric
11 installations using tools and materials of electric
12 trade. I noticed that Mr. Smith received a score
13 five and you gave Mr. Rupprecht and Mr. Graham
14 scores of four.
15      On what did you base that score?
16  A. Again, what I observed over the years, Phil
17 and Mike, you know, did an adequate job from what
18 I've seen them do and what the supervisors have told
19 me and Dave has done a better job. He just -- he
20 just exhibits better qualities in that, in that
21 category.
22  Q. Were you basing that on their responses to

Page 72

1  the interview questions in part?
2  A. I think -- now, this by what they're
3  saying, what the column is saying.
4  Q. So their responses to the interview did
5  not --
6  A. No. No. No. Let me tell you what
7  happened. It's has something to do with it. It's
8  all, all around.
9  Q. Okay. So it's what you've witnessed?
10  A. Right.
11  Q. What their supervisors have told you?
12  A. Well, in certain cases. When I grade these
13 things, I look at -- like in this case, in all three
14 of these gentlemen, and I've seen them work, I've
15 seen their results, I've seen their work ethic, I've
16 seen how they present themselves and that has a lot
17 to do with my selection, my grading these guys. You
18 know, what their knowledge is in all these
19 categories, their interview questions. And with
20 that, what I have seen with how they work over the
21 years, you know, how they conduct themselves, how
22 they work in the electrical field, the whole broad

Page 73

1  picture.
2      And when I went, when we promote
3  supervisors, I want somebody that exhibits that, you
4  know. I mean it's just, you know, to make the shop
5  run better just over all, you know. It's just -- I
6  think it's a fair way of doing it and a logical way
7  of doing it.
8  Q. What opportunity have you had to see David
9  Smith's knowledge and ability to plan and layout and
10 install electric installations?
11  A. I've seen a lot. I've seen all three of
12 these guys in difficult facets.
13  Q. But with regard to Dave?
14  A. Okay. Dave pretty much on a daily basis
15 I -- like since he's had this position, I meet with
16 the supervisors every morning.
17  Q. No. No. No. I'm sorry, if I wasn't
18 clear.
19  A. Okay.
20  Q. Before the selection, when you were making
21 this is score --
22  A. Sure.

19 (Pages 70 to 73)

Capital Reporting Company

Page 74

1  Q. -- what opportunity did you have to witness
2  those elements with regard to Dave Smith?
3  A. Okay. As far as witnessing being there,
4  I'm not on the shift.
5  Q. Okay.
6  A. But I do, I do lay out and direct the whole
7  shop, what the jobs are, and what projects, the
8  maintenance, the whole gambit.
9      So from that, I can tell if something's
10 being done. I know, I've check with them who's
11 being, doing what on a daily basis, I meet with them
12 every morning, so I know if it's any of the
13 mechanics, any of the fire alarm technicians, which
14 Dave was at that time. What's being accomplished, I
15 need to report that because I have to report.
16     So with that said, there's certain jobs and
17 projects that all these gentlemen do, not only these
18 three, the whole shop and I just know from the
19 results, if it's done right, if it's done wrong, if
20 it was completed, if it was not completed.
21 Q. Well, do you know in particular on one of
22 these projects that Dave Smith did a good job?

Page 75

1  A. Well, the past, I know what projects he's
2  working on.
3  Q. Does he work alone?
4  A. Well, he -- back then he worked Tony --
5  Anthony Anderson. We call him Tony -- Tony
6  Anderson. They were teamed up because they're both
7  fire alarm technicians.
8  Q. Do they work with Davis-Bacon guys who do
9  fire alarm?
10 A. Occasionally, but generally they have their
11 own projects. We have them -- it depends on the
12 situation. Kevin will have them or Ken Kallenbach
13 back then, whoever the supervisor is, was or is now,
14 will have them -- they work on different calls. We
15 get call tickets come down, we give them. We have a
16 work order system. That's the way we generate work.
17 Q. I'm sorry. To short cut this answer, is it
18 the fact that sometimes the permanent electricians
19 and the permanent fire alarm technicians work with
20 the Davis-Bacon guys on fire alarm projects?
21 A. Yes.
22 Q. Okay. So how specifically do you know that

Page 76

1  Dave Smith did a good job on a particular job, that
2  was, you know, Dave's handiwork?
3  A. How do I know? Just like I said, from
4  previous jobs, over the years, been here a long
5  time. And what they the fire alarm technicians do
6  is this, it's -- like I said, it's kind of -- to be
7  trained in that area, not only electrical work, you
8  know, it's a trade; but like minutes before the
9  electrical trades very vast, there's different
10 areas.
11     But to be the fire alarm safety, life
12 safety areas to our -- well, it's kind of like
13 expertise area, too. Sometimes electricians, that's
14 all they do in their whole career. But my point in
15 saying this is, so the jobs they did were all the
16 jobs are important, but I do -- I don't recall
17 specific jobs. It's been so long, but they do so
18 many, the whole shop does so many day in and day
19 out; but he just has a track record of very
20 professional, good work.
21 Q. Now, is it Dave Smith in particular that
22 has that track record or is it the fire alarm

Page 77

1  technicians who work on the midnight shift, in
2  general, have a reputation for doing good work?
3  A. Some do, some don't, you know. I mean
4  there always, you're going to have some guys betting
5  on this and in the law practice, too. It's just the
6  way it is.
7      A lot of times, let's say, you and I work
8  together, we're electricians. You're the better
9  electrician, you're great, you do good work and I'm
10 not so good, it rises me up, you know, it lifts me
11 up. I'll do better work. If I work with someone
12 who's not so good, sometimes it drops.
13     Do you know what I mean?
14 Q. I understand.
15     What I'm asking you is that you indicated
16 that in part and a large part, your scores were
17 based on your personal observations of these
18 people's knowledge, skills and abilities, right,
19 with regard to this, this particular column?
20 MS. MOMENI: Objection. That
21 mischaracterization.
22 BY MR. ALDERMAN:

20 (Pages 74 to 77)

Capital Reporting Company

Page 94

1  A. I can tell you what, he is a great guy,
2  he's an old friend of mine, good heart. But what he
3  was lacking is the -- the reason he got the leader
4  job -- let me back up. The reason that he got the
5  leader job, this is the progression to what I'm
6  talking about.
7  Q. Okay.
8  A. Is he's really start showing a more of an
9  interest in his work, his work ethic, you know.
10 Overall he was just -- and I even told him. I said,
11 you know, you're heading in the right direction,
12 Mike, you know. I said, who knows what's in the
13 future for you, you know. I mean he was just -- and
14 even the day supervisor and the assistant supervisor
15 were commenting to me about how he was really
16 picking it up and just, you know, becoming more
17 motivated and doing great. And that position came
18 open and he was selected and rightfully so. He
19 deserved that job, that position.
20      But since that time, it kind of declined.
21 He kind of went back, you know. He wasn't
22 continuing on the path that he was. Again, Mike's a

Page 95

1  great guy. I have a lot of respect for the guy, but
2  his work ethic has something to be said for. He can
3  put out, when he wants to, he can do it. He has
4  showed me.
5       I mean, you know, everybody on the sidewalk
6  where he's done great, but he would admit to me,
7  he's admit to me multiple times. He's admit to me
8  two days ago, you know, Mike Graham is Mike Graham.
9  This is what comes out his mouth. If he's going to
10 take long breaks, take long breaks. If he's going
11 to talk to a friend down at the Ford Building for an
12 hour, he's going to do that, you know. He's, you
13 know, he says he's not going to change in that way.
14 And I'm disappointed in that. I've expressed that
15 to him.
16      You know, it's just not -- but everybody's
17 got their own way of doing things and that's what he
18 feels he should run, conduct himself at work. And
19 again, but at times he will do a great job, but
20 there are times when he will just drift off or not
21 be on a job or whatever, and he'll admit he's doing
22 this. And to promote at that time, at that time,

Page 96

1  you know, I was really disappointed, personally. I
2  didn't express. You know, I wish he would have
3  continued the way he was going because he -- he has
4  a potential of being a good supervisor. And -- but
5  at that time it just, you know, you look at the
6  other candidate, you know, Dave Smith, he's just not
7  a, you know, he wasn't the candidate for the job at
8  the time.
9  Q. And that was because of his work ethic,
10 Mike Graham's work ethic?
11 A. Yes.
12 Q. And evidenced by him taking long breaks,
13 not being on the job?
14 A. Well, not all the time, but it's just you
15 don't -- we're paid to do electrical work here, you
16 know, and we're paid pretty well. And it's just --
17 sure everybody wants to take a break now and then
18 and it's understandable and we do give them breaks.
19 There's a set pattern, you know, a morning break,
20 afternoon break, hour lunch hour. You know, I
21 understand, you know, sometimes you need to go get a
22 candy bar, this and that. But that's generally what

Page 97

1  he had -- again, like I said, during this time he
2  very well could be the candidate -- he could have
3  been the assistant foreman, if he were to continued
4  and I wish he would have; but he was exhibiting not
5  the right qualities at the time.
6  Q. Do you do anything with Michael Graham's
7  evaluations?
8  A. Yes. You know, everybody gets an
9  evaluation. Michael gets one, too.
10 Q. And do you have any input into his
11 evaluations?
12 A. Personally, no. Each supervisor of each
13 shift evaluates each of his shift's employees.
14 Q. Do you see Mr. Graham's evaluations?
15 A. No. Not unless there's a big problem with
16 an employee, I don't have to, you know, I don't have
17 to see them.
18 Q. Would you expect these work ethic issues to
19 be exhibited in his evaluations?
20 A. I believe he was counseled on his work,
21 work habits ethics.
22 Q. Who counseled him?

25 (Pages 94 to 97)

Page 106

1  with? Do you agree that, in other words, do you
2  agree that he lacked the skills for the position?
3     A. Yes, I do.
4     Q. What skills did he lack for the position?
5     A. Mike -- I'd like to elaborate, but to
6  answer the question, he could have done all of this,
7  if he worked harder. But the skills -- what skills
8  he lacked -- see, this ties in, in my viewpoint
9  with, again, pushing yourself and learning and
10 getting ahead. You know, he didn't have -- he
11 doesn't have the supervisory skills, which can be
12 learned, but at the time he didn't. That's the
13 biggest thing.
14    Q. But did his position as a leader include
15 any supervisory duties?
16    A. Yes. Yes.
17    Q. Was he failing in those supervisory duties?
18    A. I wouldn't say failing, but me didn't show
19 or portray at times the leadership qualities that
20 she should have.
21    Q. How did he not do that?
22    A. He was assigned to jobs that a leader is

Page 107

1  supposed to take the lead, you know. He's supposed
2  to run the show, the whole thing. And a lot of the
3  jobs have deadlines that we need to get done. I
4  can't quote you any jobs specifically right off the
5  top of my head, but they were over, way over, you
6  know, they're overdo. I mean they're late. We had
7  to rush to get men over there to finish up what
8  should have been done on time, that happened a few
9  times.
10    Q. Now you say if that happened a few times,
11 you should be able to tell me what projects that
12 happened on?
13    A. I can't remember. I think we have a
14 document back in the shop.
15    Q. You do? You have documents that --
16    A. Or just -- his supervisor, George, keeps
17 track of everybody, you know, when they do right,
18 when they do wrong. I encourage that to all of the
19 supervisors. So when it comes time for the
20 performance evaluations that they can evaluate
21 correctly.
22    Q. So George would have had a file on Michael

Page 108

1  Graham and his performance as a leader?
2     A. Well, certain circumstances that the jobs
3  weren't done on time, I believe. I recall reading
4  that there few jobs on his sheet. They didn't get
5  done on time.
6     Q. So you have seen documents that Mr. Hammett
7  has that referred to --
8     A. I believe I have.
9     Q. -- Michael Graham not getting jobs assigned
10 to him done on time?
11    A. I believe I have.
12    Q. Okay. Is that, that's the skill that
13 you're referring to that he lacked, the supervisory
14 skill?
15    A. Yes.
16    Q. How about knowledge? What knowledge did he
17 lack?
18    A. Knowledge he lacked, the midnight shift.
19 Like I said before, the majority of their duties are
20 fire alarm systems. Not that he couldn't learn it
21 or take time, but at the time his knowledge was
22 lacking in that area during this selection process.

Page 109

1  I say that's the biggest areas he was lacking.
2     Q. Okay. And then how about abilities? What
3  abilities did he lack?
4     A. I refer that to just at times his work
5  ethic.
6     Q. Okay. Next sentence says -- well, it's
7  what you were just referring to, the position
8  required knowledge of fire alarm systems, among
9  other qualifications.
10    Do you agree with that statement?
11    A. Yes.
12    Q. Do you recall a time on the day shift, the
13 day shift had a rotating assistant supervisor
14 position?
15    A. Yes, I do.
16    Q. When was that?
17    A. Why, it was a long time ago. Years.
18    Q. Was it a 2000, 2001 time frame?
19    A. I can't recall. I think it might have been
20 before that.
21    Q. Do you know if Mike Graham was -- that
22 before you were an assistant supervisor?

**Capital Reporting Company**

Page 110

1  A. Yes.
2  Q. Did you participate in that rotating?
3  A. Yes, I did. Not everybody did it.
4  Q. Did Michael Graham participate in it?
5  A. Did he? I can't remember if he did. He
6  might have. Not everybody did. Some guys selected
7  not to, you know.
8  Q. Before the -- focussing on the night shift,
9  the midnight shift. Before the selection for
10  Davis --
11  A. Dave Smith.
12  Q. Dave Smith. Before Dave Smith's selection,
13  can you remember the last competitive selection for
14  the midnight shift assistant supervisor?
15  A. It must have been Charlie Gardener.
16  Q. Do you know when that was?
17  A. I think that was before my time here.
18  Q. Okay.
19  A. I think. I don't recall.
20  Q. Can you tell me what the normal functions
21  of a leader on a day shift would be, leader
22  functions?

Page 111

1  A. Okay. Their functions are -- they're
2  assigned jobs. Their functions, which requires
3  planning, scheduling, reviewing the prints. Our
4  blueprints are, a lot of times you get small prints
5  for a particular room that might be renovated.
6  Gathering material, reviewing it with the men that
7  are assigned to the job with the leader,
8  coordinating work with the other trades, that's we
9  have to common place. Generally, running the job
10  from start to finish, you know.
11  Q. Does Michael Graham get an opportunity to
12  do all those things as a leader in the day shift?
13  A. I believe he does, yeah.
14  Q. Does he do all of those things adequately?
15  A. I don't see day-to-day operations with the
16  guys in the position, unless it's deemed necessary
17  to cover, unless it's necessary. If one of my
18  supervisors was off then I'll come to you.
19  Q. So specifically with Graham, do you know if
20  he does all of those things adequately?
21  A. I would say he's lacking in some areas.
22  Q. Okay. Now, you've -- what areas does he

Page 112

1  lack in?
2  A. It goes back to his work ethic, you know,
3  and someone in that position has to be on top of the
4  whole job.
5  Q. What specific things does he, is he not
6  doing as a leader, and how do you know?
7  A. Okay. Well, I don't know per se because --
8  but the end result I do know. I mean if the job is
9  not done on time and it's, you know, when we go look
10  at the jobs we know pretty much from start to finish
11  how much this takes and what's involved just from
12  our experience and working them ourselves at one
13  time or another. And if you're not doing that
14  leader's job correctly in those situations, they're
15  not going to get done on time. They're not, you
16  know, things are going to be lacking.
17  Q. Okay. But you're talking about
18  hypothetically how you could determine that a
19  hypothetical leader wasn't doing his job.
20  I'm asking you what do you know about
21  Michael Graham's performance that leads you to say
22  that he lacks some of those skills?

Page 113

1  A. All I know, Les, is from what -- like I
2  mentioned before, was a few jobs that he has not
3  completed. I mean not completed, but hasn't been up
4  to par on what he should have done. I haven't seen
5  the specifics, so I'm not on the job.
6  Q. So you don't know?
7  A. No, I don't know about the specifics.
8  Q. Do you know that if he's done, if he has
9  led jobs that were completed on time?
10  A. Yes, he has. Yes, he has.
11  Q. Okay. Do you have an opinion as to whether
12  more of his jobs get completed on time than those
13  that don't get completed on time?
14  A. I would say more get completed on time.
15  Q. And the only thing that you know is what
16  his supervisor would tell you?
17  A. Yes.
18  Q. Correct?
19  A. (Nodding.)
20  Q. And you indicated that you thought you were
21  reading some documents that related to Mr. Graham's
22  performance as a leader; is that correct?

29 (Pages 110 to 113)

### Page 130

1  appointment with Mr. Franklin, went to the Capitol,
2  we felt good about the whole thing. And he said,
3  we -- we told him our story, what was going on and
4  he was -- he appeared to be astonished and upset and
5  he said, he had Bob Miley who was the assistant --
6  I'm sorry -- the superintendent, Frank Tiscione's
7  predecessor, in his office within two weeks
8  explaining why this behavior and if he knew about
9  it, he was going to find out if Bob and -- and start
10 the process of maybe disciplinary action. I don't
11 know.
12     Q. When you talked to Mr. Franklin with Mike
13 Graham --
14     A. Yes.
15     Q. -- did you discuss the rope that was in the
16 Rayburn?
17     A. Les, I can't remember. Believe me, we had
18 a lot to discuss, we had a lot written down. It
19 could have been. I can't remember specifically.
20     Q. Okay. And did -- so Franklin told you that
21 he was going to have Miley in his office?
22     A. Right.

### Page 131

1      Q. And then he was going to have some answers
2  and if there needed to be discipline, then
3  discipline would happen?
4      A. Right.
5      Q. Do you know if anything actually happened?
6      A. Not to any knowledge, which was
7  disappointing.
8      Q. Did you think that that inaction had any
9  long-term effect on the Architect?
10        MS. MOMENI: Objection, calls for
11 speculation.
12        THE WITNESS: Could you repeat the
13 question?
14     BY MR. ALDERMAN:
15     Q. Do you think that their failure to act that
16 Franklin's an the architect's failure to act, that
17 Franklin's and the Architect's failure to act, had
18 any repercussions down the road?
19     A. No, I don't.
20     Q. Do you think that things are better now?
21     A. Yes.
22     Q. Why do you think they're better now?

### Page 132

1      A. Oh, there's no question. Because that
2  whole regime is gone, that that -- John's gone. Ken
3  Kallenbach is gone. It's definitely, definitely
4  better.
5      Q. Do you have any reason to believe that
6  anybody, among the supervisory level, held or holds
7  Mr. Graham's complaints of discrimination against
8  him?
9      A. No.
10     Q. Have you heard anybody talk about
11 Mr. Graham filing complaints of discrimination?
12     A. Not at all.
13     Q. Have you heard people talk about
14 Mr. Graham's settling his first case of
15 discrimination?
16     A. I have heard people.
17     Q. What have you heard?
18     A. Not a whole lot, but I've just heard it was
19 settled.
20     Q. That's it, just say Mike Graham settled his
21 case?
22     A. Pretty much. To be honest with you, I

### Page 133

1  don't want to know anything.
2      Q. Have you had any conversations with anybody
3  about whether or not Kevin Banks should be included
4  on interview panels?
5      A. No.
6      Q. Do you know if Mr. Banks since he's been an
7  assistant supervisor has ever been included on that
8  interview panel?
9      A. Has he? I'm not sure. I have to check.
10     Q. Would you say that -- who's the evening
11 shift supervisor?
12     A. Keith Bartlett.
13     Q. Keith Bartlett.
14        Has Mr. Bartlett been included on interview
15 panels?
16     A. I think, yes, he has.
17     Q. Who's the day shift supervisor?
18     A. George Hammett.
19     Q. And has he been included on interview
20 panels?
21     A. Yes.
22     Q. Who's the day shift assistant supervisor?

**Capital Reporting Company**

Page 134

1  A. Bill Sanders.
2  Q. Do you know if Bill Sanders have been
3  included on the interview panels?
4  A. Yeah.
5     MS. MOMENI: Objection to this whole line.
6     BY MR. ALDERMAN:
7  Q. That's fine.
8     Who's the evening shift assistant
9  supervisor?
10 A. Johnny Houston.
11 Q. Has he been included on any interview
12 panels?
13 A. Yes.
14 Q. Okay. What's Mr. Houston's race?
15 A. Caucasian.
16 Q. What's Mr. Sander's race?
17 A. Caucasian.
18 Q. Each of those assistant supervisors are
19 supervisors that we just discussed for the day shift
20 and the evening shift, are they all Caucasian?
21 A. Yes.
22 Q. Okay. I think that's all I've got for you.

Page 135

1  Thank you very much.
2  A. You're welcome.
3     MS. MOMENI: I have nothing either. Thank
4  you for your time, sir.
5     THE WITNESS: You're welcome.
6
7     (Ending time: 4:39 p.m.)

Page 136

1  UNITED STATES OF AMERICA )
2                           ss:
3  DISTRICT OF COLUMBIA    )
4     I, GERCHA RICHARDS WHITE, a Notary Public
5  within and for the District of Columbia, do hereby
6  certify that the witness whose deposition is
7  hereinbefore set forth was duly sworn and that the
8  within transcript is a true record of the testimony
9  given by such witness.
10    I further certify that I am not related to
11 any of the parties to this action by blood or
12 marriage and that I am in no way interested in the
13 outcome of this matter.
14    IN WITNESS WHEREOF, I have hereunto set my
15 hand this 31st day of May, 2006.
16
17
18
19    _____
20    GERCHA RICHARDS WHITE
21 My Commission Expires:
22 September 1, 2010

35 (Pages 134 to 136)