Capital Reporting Company

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3    ------------------------------x
 4    MICHAEL GRAHAM,               :
 5              Plaintiff,          :
 6                   v.             : CA No.: 05-1340 (JR)
 7    ARCHITECT OF THE CAPITOL,     :
 8              Defendant.          :
 9    ------------------------------x
```

ORIGINAL

10                              Washington, D.C.

11                              Wednesday, May 24, 2006

12

13   Deposition of:

14                    EDWIN LOPEZ

15       called for examination by counsel for Plaintiff,

16   pursuant to notice, at the Architect of the Capitol, Ford

17   House Building, Southwest, Room 340, Washington, D.C.,

18   before Gervel A. Watts of Capital Reporting, a Notary

19   Public in and for the District of Columbia, beginning at

20   2:17 p.m., when were present on behalf of the respective

21   parties:

22

Capital Reporting Company

Page 2

APPEARANCES

On behalf of the Plaintiff:
LESLIE D. ALDERMAN, III, ESQUIRE
Alderman & Devorsetz, PLLC
1025 Connecticut Avenue, Northwest
Suite 1000
Washington, D.C. 20036
(202) 969-8220

On behalf of Defendant:
MERCEDEH MOMENI, ESQUIRE
USAO
Civil Division
555 4th Street, Northwest
Washington, D.C. 20530
(202) 305-4851
* * * * *

Page 3

CONTENTS
EXAMINATION BY:           PAGE
Counsel for Plaintiff       4
Counsel for Defendant      66
Counsel for Plaintiff      68

LOPEZ DEPOSITION EXHIBITS*         PAGE
1  4/11/01 E-mail Chabo to Lopez    13
2  4/2/01 Memo                      20
3  Lopez Declaration Statement      35
4  Congressional Response Letter    67

(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS
WHEREUPON,
EDWIN LOPEZ
called as a witness, having been first duly sworn, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. ALDERMAN:
Q  Good afternoon. My name is Leslie Alderman and I represent Michael Graham in a lawsuit he has brought against the Architect of the Capitol. Would you give me your full name and work address for the record please?
A  My full name and my work address?
Q  Yes, sir.
A  Edwin Francisco Lopez and I work here in the Ford House office building in Room H2106 in Washington, D.C. 20515.
Q  Can I get a home address please?
       MS. MOMENI: Is that necessary?
Q  In case we need to -- actually, if I could ask you to provide counsel with your home address so that if there is ever a need, I could get it.

Page 5

Could you tell me your current position?
A  My current position Equal Employment Opportunity and Conciliation Program Specialist.
Q  Who's your employer?
A  The Architect of the Capitol.
Q  How long have you been employed by the Architect?
A  Since December of 1994.
Q  Have you maintained the same position for the entire tenor of your employment at the Architect?
       MS. MOMENI: Is that tenor or ten years?
Q  Tenor.
A  Yes, with the exception of whenever they changed the name over the years, my title has kind of changed a little bit too. In other words, I was a mediation specialist first when the office was first opened and then we became EEO and Conciliation programs office. I do both; I do EEO plus mediation or conciliation, however you want to call it.
Q  Aside from the addition of conciliation duties, have your duties changed over the course of your tenor at the Architect of the Capitol?

2 (Pages 2 to 5)

(866) 448 - DEPO
www.CapitalReportingCompany.com

## Capital Reporting Company

Page 14

1  please give me an explanation as to what that rope
2  signified.
3    Q   In the third paragraph where he says a
4  picture was taken at either a Christmas party or
5  retirement party of Gordon Tolson with a rope around his
6  neck and Keith Sullivan standing next to him with a white
7  rag around his head.
8         This picture was taken about six or seven
9  years ago. Do you now recall someone discussing
10 photographs taken of that?
11   A   I wasn't part of the Architect then. If he's
12 talking six or seven years ago, he's probably talking six
13 or seven years from 2001.
14        MS. MOMENI:  Counsel, maybe we should
15 identify the document for the record.
16        MR. ALDERMAN:   I did.
17        MS. MOMENI:  You haven't said what it is.
18        MR. ALDERMAN:   Sure. For the record,
19 exhibit one is an e-mail from John Chabo to Ed Lopez,
20 dated April 11, 2001, 2:16 p.m. with the subject line,
21 EEO memo.
22 BY MR. ALDERMAN:

Page 15

1    Q   So it is correct to say while you may not
2  have seen with your own eyes the picture of people posing
3  with that rope, you had been told of pictures of people
4  posing with that rope?
5    A   This e-mail was sent to me in response to my
6  request of Mr. Chabo to please explain why the rope was
7  hanging over the vent when I went to check it out and
8  this is his response to my inquiry.
9    Q   So Mr. Chabo told you about a --
10   A   Mr. Chabo wrote about a picture.
11   Q   And he wrote to you about a picture.
12   A   Right.
13   Q   I'm sorry. So that we're not mincing words,
14 when I say did someone tell you about that something,
15 that's did someone communicate to you, which can be
16 written, oral or in way shape or form someone can tell
17 you things, you know, with a note, with an e-mail, with a
18 letter, with a carrier pigeon.
19   A   I understand.
20   Q   This is like pulling teeth, but Mr. Chabo
21 communicate to you that there were photographs taken of
22 people posing with this rope?

Page 16

1    A   Yes. It's written in his document here.
2  That's when I first learned about it.
3    Q   Did anyone else discuss with you photographs
4  of people posing with this rope?
5    A   It may have been raised by the two
6  electricians who came to see Ms. Olson, but I don't
7  really know exactly that they did.
8    Q   Did you communicate with anyone else about
9  the facts surrounding the rope and people's use of the
10 rope?
11   A   I recollect that I was instructed by the
12 director at the time, Ms. Olson, to let Herb Franklin,
13 who was then the administrative assistant of the
14 Architect, to also have him verify that that rope was
15 hanging from the vent. Herb Franklin was her immediate
16 supervisor.
17   Q   Who is that?
18   A   His title was administrative assistant to the
19 Architect of the Capitol.
20   Q   And at that time was that Mr. Hantman?
21   A   I don't think it was Mr. Hantman, I think it
22 was Mr. Ensign. We were in a transition period then in

Page 17

1  2001. I'm sorry; I take that back, it was Mr. Hantman
2  because he came in '97. So I'm sorry; I take that back.
3    Q   Did you then go to the Rayburn electrician
4  shop with Mr. Franklin?
5    A   He met me at the Rayburn and together we went
6  and looked at it.
7    Q   Did anyone else go with you?
8    A   No.
9    Q   Was that the only time that you went to
10 inspect that shop?
11   A   Aside from the time I went and Mr. Chabo was
12 there. Aside from the first time I went, so it was the
13 second time I'd gone.
14   Q   What did you and Mr. Franklin talk about?
15   A   He just wanted to evidence it for himself.
16   Q   And what did he say?
17   A   He sent us -- we went back to his office and
18 then he sent Ms. Olson -- it was a coincidence that
19 around that time the Wall Street Journal came out with an
20 article about noose kind of situation and he sent a copy
21 of that article to Ms. Olson and so he was saying, "I
22 think this is a very serious issue considering me reading

5 (Pages 14 to 17)

## Capital Reporting Company

Page 18

1 this article and what I saw at the electric shop."
2  Q   You saw a copy of his note to Ms. Olson?
3  A   No, it was just a Wall Street Journal
4 article.
5  Q   You just indicated that Mr. Franklin
6 communicated to Ms. Olson that this was a very serious
7 issue as witnessed by this article.
8  A   He sent her a copy of the article and he
9 probably put a note on it but it was to her, I didn't get
10 a chance to see it.
11  Q   When you just said that Mr. Franklin
12 communicated that this was an important issue to Ms.
13 Olson, how were you aware that he communicated that to
14 Ms. Olson?
15  A   Because after she received it, I xeroxed a
16 copy of the article for myself.
17  Q   Did that article have any handwritten notes
18 on it?
19  A   No, not that I recollect.
20  Q   Do you still have a copy of the article?
21  A   I don't believe it does. I can tell you that
22 it came out around the same time that this e-mail came

Page 19

1 out, so sometime in 2001.
2  Q   Could you go through your records or wherever
3 you may have kept that article, and if you find it, would
4 you please provide it to Ms. Momeni?
5  A   Absolutely.
6  Q   What else did you in furtherance of the
7 inquiry that you were making about the rope?
8  A   Well, I wasn't really making an inquiry; I
9 was really just verifying that what the employees
10 depicted to her in that meeting was actually true.
11  Q   So did you go back and communicate your
12 finding with Ms. Olson?
13  A   Correct. She asked me to summarize our notes
14 of our meeting with the two individuals and I believe I
15 did. And that was certainly my interpretation of the way
16 I heard the conversation. She was there too and I'm sure
17 she took her own notes, but --
18  Q   Did you see her take notes?
19  A   She's an attorney.
20  Q   No, well, do attorneys take notes?
21  A   I'm sorry, no. I did not see her take notes.
22      MS. MOMENI: Just testify about things you

Page 20

1 have first-hand knowledge of. Don't guess or speculate.
2 Counsel should have given those instructions earlier. We
3 don't want you guessing.
4  Q   You are absolutely right and let's go ahead
5 and make that up right now. If I ask you a question that
6 you don't understand, please ask me to restate the
7 question, otherwise, GeGe's going to take down everything
8 that we say and if you answer my question, the record
9 will reflect that you understood my question and that you
10 are answering the question that I was asking.
11  A   Okay.
12  Q   We'll mark this as exhibit two.
13      (Lopez Exhibit Number 2 was
14      marked for identification.)
15  Q   Mr. Lopez, I'm handing you what's been marked
16 as Lopez Exhibit 2 and you'll also see on the bottom
17 right-hand corner of each of the four pages that go along
18 with this exhibit, you'll see the page numbers 1612,
19 1613, 1614 and 1615. Do you have each of those pages in
20 front of you?
21  A   Yes, I do.
22  Q   Just to identify this exhibit for the record.

Page 21

1 This is a memorandum dated April 2, 2001 from Ed Lopez,
2 which is you, to Valerie Olson. Subject: Notes from
3 March 16, 2001 meeting with house office building
4 electricians, and then there are some handwritten notes
5 in the top-left corner. Do you recognize those
6 handwritten notes?
7  A   I do.
8  Q   Is that your handwriting?
9  A   No, it is not.
10  Q   Could you tell me whose handwriting it is?
11  A   That's Ms. Olson's handwriting.
12  Q   Can you read her writing?
13  A   Yes.
14  Q   Can you read that note to me?
15  A   "Meeting with Herb, 4/2/01, checked with
16 Tolson, how is he?" I can't read the third word,
17 something "of Herb Franklin. Shift decision?" And then
18 it says, "SC".
19  Q   Would that be Supreme Court?
20  A   Correct. "Transfer out SC for library,"
21 which would be the Library of Congress. "OC option,"
22 means that he has the option to go to the Office of

6 (Pages 18 to 21)