# COPY

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3   - - - - - - - - - - - - - - - x

 4   MICHAEL GRAHAM,                  :

 5              Plaintiff,            :

 6   vs.                             : Case No. 1:05CV01340

 7   THE ARCHITECT OF THE CAPITOL, :

 8              Defendant.           :

 9   - - - - - - - - - - - - - - - x

10

11                        Washington, D.C.

12                        Wednesday, January 18, 2006

13

14

15   Deposition of:

16                   MICHAEL GRAHAM,

17   the Plaintiff, called for examination by counsel for the

18   Defendant, pursuant to notice and agreement as to time and

19   place, at 501 Third Street, N.W., Washington, D.C., before

20   Deborah Rinaldo, RPR, Notary Public in and for the District

21   of Columbia.

22

23

24

25
```

2

```
 1  APPEARANCES:

 2            On Behalf of the Plaintiff:

 3            LESLIE D. ALDERMAN, III, ESQUIRE

 4            Alderman & Devorsetz, PLLC

 5            The Blake Building

 6            1025 Connecticut Avenue, N.W.

 7            Suite 1000

 8            Washington, D.C.  20036

 9            (202) 969-8220

10

11            On Behalf of the Defendant:

12            MERCEDEH MOMENI, ESQUIRE

13            Assistant United States Attorney's Office

14            501 Third Street, N.W.

15            4th Floor

16            Washington, D.C.  20530

17            (202) 305-4857

18

19            ALSO PRESENT:

20            STEVE STEWART

21

22

23

24

25
```

3

```
 1                        I N D E X
 2   WITNESS:           EXAMINATION:              PAGE:
 3   Michael Graham     Direct - Ms. Momeni         4
 4                      Cross - Mr. Alderman       190
 5                      Redirect - Ms. Momeni      193
 6
 7                      E X H I B I T S
 8   EXHIBIT NO:         DESCRIPTION:              PAGE:
 9   No. 1              Avue Job Application         61
10   No. 2              Notice of Mediation        140
11   No. 3              Handwritten Organization Chart   144
12   No. 4              Plaintiff's Complaint      149
13
14
15
16
17
18
19
20
21
22
23
24
25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1        A.    I'm treated as all the other grade 10s.  With some

2   exception on some days.  But for general purposes, I'm

3   assigned things just like they are, go relamp the garage or go

4   by and check on this particular job or I need you to go do

5   this job.

6            Sometimes I'm by myself.  Sometimes they, depending

7   on what the job is, they may assign somebody to go with me.

8   So it's not -- it's kind of played by ear from day-to-day.

9        Q.    And I'm not following you.  Is this good or bad that

10  you are treated the same as the rest of the grade 10s?

11       A.    Well, that's bad.

12       Q.    Why is that, sir?

13       A.    Well, it's bad in the sense that if I'm treated like

14  all the other grade 10s, and my work duties, I'm doing pretty

15  much of the grade 10s, and I'm not performing 50 percent of

16  what I'm supposed to be doing, then when it comes time for

17  promotion or when we apply, my application is not going to

18  look any different from the other grade 10s.

19            That's the first thing in the back of my mind.

20  Because I'm not able to put down -- I'm not going to lie.  So

21  I'm not able to put down that -- maybe I've done it once or

22  twice, but on a consistent basis to where I'm familiarized

23  with it, just as I am electrician, to go out and just do my

24  job, because I'm real familiarized.

25            When I'm put in 50 percent of my other duties, I'm

1    not familiarized with it.  I'm not familiarized with it

2    because I don't have the liberty of signing on the computer,

3    like my predecessors have done, to be able to go and pull down

4    leave slips and do all that.  I'm not comfortable with that.

5        Q.   You are talking about the administrative functions

6    of your job?

7        A.   I'm talking about the administrative functions.  So

8    therefore, if we go to apply for a position that's on the

9    board, my application is not going to look any different from

10   my other colleagues.

11       Q.   That are not work leaders?

12       A.   That are not work leaders.  And it should.

13       Q.   And what do you attribute that to?

14       A.   I'm thinking how to answer that.  The only

15   difference I see is race.

16       Q.   Between you and whom?

17       A.   Ken Kaldenbach who is the foreman leader and George

18   Hammett.  They are both white.

19       Q.   Are you saying that they were both permitted to

20   perform administrative functions and --

21       A.   Oh, I was there.

22       Q.   And you are not?

23       A.   Yes, they did.

24       Q.   And when you say, "I was there," what do you mean?

25       A.   Me and Ken Kaldenbach were on the same shift.  So we

1  always had a lot of interaction and debates or whatever.  But

2  I was there.

3      Q.   How about with George Hammett?

4      A.   George Hammett spent most of his time on the evening

5  shift.

6      Q.   So you are not sure what he did?  What he did and

7  didn't do?

8      A.   As far as me actually being there witnessing it, no,

9  I was not.  But as far as talking to the foreman, Karl, who

10  was his boss on 4 to 12, we always had conversations and

11  talked and he shared things with me.

12      Q.   I'm a little confused.  Please help me because I'm

13  not there on a day-to-day basis.  I think you just testified

14  that in the absence of your supervisors, you sign off on leave

15  slips and things of that nature.  When your immediate

16  supervisor is not there, you are permitted to do that,

17  correct?

18      A.   No, not permitted to, because I cannot formally

19  sign.  But let's say I'm in charge and the guy --

20      Q.   As acting?

21      A.   As acting.  A guy had to leave for an emergency

22  reason, I can take a leave slip from him, but I don't have the

23  authority to sign it and approve it.  What I would do, wait

24  until the next morning, give it to my boss and say, Hey, this

25  particular employee left at this time.  Here is the leave

46

1  slip.

2      Q.    How is that different from your predecessors?  Were

3  they allowed to sign?

4      A.    No.

5      Q.    So I don't understand what it is that they were able

6  to do and you are not.

7      A.    Well, the same position that they held and that I

8  now hold, as far as my duties, my duties are pretty much

9  gutted from that position because 50 percent of the managerial

10 side, I don't do at all, with the exception of maybe, I'm

11 thinking the last year and a half or whatever, that maybe Bill

12 Sanders, who is the assistant foreman, and George Hammett who

13 is the foreman, have gone on vacation.

14         Steve Stewart was there.  And I used his password,

15 he gave me his password to sign on to the computer to be able

16 to do what I was able to do for that entire week.  Well, my

17 predecessors had their own sign on.  They didn't have to use

18 somebody else's password.

19     Q.    Have you ever asked for your own password?

20     A.    I haven't asked, but I was present when Steve

21 Stewart told George Hammett that -- I was right in their

22 presence when he told them what he wanted me to do and how he

23 wanted to use me.  That hasn't happened.

24     Q.    So what did Mr. Stewart tell your immediate

25 supervisors that he wanted you to do?

1    A.    That they wanted me to be able to get a password

2 from upstairs.  That was his exact words.  For whoever handled

3 that from the superintendent's office to be able to get me

4 started on the computer, have my own password.

5    Whether he's there, George or Bill or whoever, I'm

6 supposed to be able to go to the computer, pull up this

7 information, print out time sheets if I need them or whatever

8 I need to do as far as listing who is there, who called in

9 sick, keep records.  That whole thing.  I don't do that.

10    Q.    And so you are saying that one of your two immediate

11 supervisors failed to get you your password?  Do I understand

12 you correctly?

13    A.    For me to say whose responsibility that is, I would

14 have to go to George Hammett, but I'm only guessing because

15 he's my supervisor.

16    Q.    Did you ask him why you don't have a password? I'm

17 not following you.  You've testified that the direction came

18 from above.  Mr. Stewart told these folks to get you your own

19 password.  You heard it.  He said it.  It hasn't been done in

20 the past year.  So have you spoken up about it?

21    A.    Let me say two things.  I have asked.  But the first

22 and foremost, it should have sent a signal to Steve Stewart,

23 is when they went on vacation and he asked me -- I had to use

24 his password.  That should have said to him that somebody

25 didn't do what he asked.

48

1          Now, I have asked twice since then.  I've asked

2     George Hammett.  He made a little note.  Yeah, you are right.

3     Your supposed to get it.  That hasn't happened.  I personally

4     got on the phone and called Linda Corbus, who, it was brought

5     to my attention that she was the one that handled this from

6     above my management in the superintendent's office.  I got on

7     the phone and called her personally and asked her about it.

8     Nothing still has happened.

9          Q.   When was that first conversation with Mr. Hammett?

10         A.   I don't remember.

11         Q.   Was it right after you started or was it sometime

12    closer to now?

13         A.   It's probably closer to right after -- I would be

14    only guessing.  I don't want to guess.

15         Q.   That's okay.  So sometime after you started you

16    asked Mr. Hammett.  He said, Yes, we'll get to it.

17         A.   After it did not happen.  I asked -- and we can get

18    the time frame as far as when all this transpired.  The week

19    that they went on vacation and he allowed me to use his

20    password, the following week when George came back off

21    vacation, I would have to say that was a year ago.  Just

22    guessing off the top of my head.  I'm using the wrong word

23    "guess," but I know he went on vacation about a year ago.

24    So...

25         Q.   Well, when Mr. Hammett failed to get you your

1  password and Linda?

2      A.   Corbus.

3      Q.   She failed to get you a password, how come you

4  didn't let Mr. Stewart know?

5      A.   Because Mr. Stewart would have known when I had

6  to use his password.

7      Q.   But my question to you is something else.  Why

8  didn't you raise this complaint, if it's something that's

9  important to you, with Mr. Stewart?

10      A.   Because I would become a menace if I went into their

11  office and complained or asked about every time something was

12  not done or the way something affected me or when my white

13  counterpart was allowed to do something and I'm not.  I would

14  be in there probably every week or every other week.

15      Q.   Who is your white counterpart?

16      A.   The leaders.  My predecessors.

17      Q.   Your predecessors.  Not your current counterparts?

18      A.   Right.  If I went in and said, I'm not doing this, I

19  would be in -- I can't recall any job where one of those

20  leaders was assigned to a job to go out and relamp the garage

21  and given a helper.  Now, a helper, mind you, has no

22  experience.  So who is to do the work?  You think he don't

23  know this?  So it's things like that that I would be in your

24  office, What's going on?

25          So I don't take that approach.  My approach is, and

50

1    I'm not saying it's right, I come in and do my job.  If you

2    assign me to it, I go do it.  And if it's bothering me to the

3    point, then I will go in and say something.

4        Q.    Sir, it's bothered you enough to bring a complaint.

5    So I'm asking you, why you didn't see Mr. Stewart?

6            MR. ALDERMAN:  I think it's asked and answered.  At

7    this point, it's argumentative.  He's given you his response.

8            BY MS. MOMENI:

9        Q.    How would you describe your relationship with

10   Mr. Stewart?

11       A.    Good.

12       Q.    Would you agree with me that he as an open door

13   policy, that you can go in and see him when you need to talk

14   with him?

15       A.    Yes.

16       Q.    Any other way that you are treated differently than

17   your predecessors of previous work leaders?

18       A.    Not that I can think of at this point.

19       Q.    Let's talk about the job in question.  And when I

20   say the job in question, sir, let's make sure that we both

21   understand that we're talking about the midnight shift

22   assistant supervisor position for which you applied in 2004.

23            I think that's vacancy announcement WS-2805-08, HOB

24   2004 173; is that correct?  Forget the numbers.  The vacancy

25   announcement, would you agree, that's a midnight assistant

52

1  shift supervisors did?

2      A.    Yes.   The same as day shift supervisor does.

3      Q.    And how did you acquire that understanding?

4      A.    Well, you manage people against the work.

5      Q.    Do you know if they specialized in any one

6  particular area or they spent a significant portion of their

7  time in one particular area?

8      A.    I don't think there is no specialty.   However, on

9  the day shift we may do more of one function than say,

10  midnight and vice versa.   But in terms of specialty, no.

11      Q.    Had you spoken with any of the previous midnight

12  shift supervisors to understand what they did on a nightly

13  basis?

14      A.    Have I spoken to any of the supervisors?   Was that

15  your question?

16      Q.    About what they did on a regular basis?

17      A.    No.

18      Q.    So you based your understanding on what they did on

19  what?

20      A.    On what I saw and discussing with the employees who

21  actually do the work.

22      Q.    On the midnight shift?

23      A.    On the midnight shift.

24      Q.    You spoke with employees on the midnight shift?

25      A.    Yes.

1    Q.    With whom did you speak?

2    A.    Gordon Tolson, Bob Moore, there's a whole host of

3  guys.

4    Q.    Gordon?

5    A.    Tolson.  Bob Moore.  Sean Cox.  And some of the

6  other names I just don't remember.

7    Q.    Well, let's just take these three gentlemen that you

8  mentioned one at a time, please.  What did Mr. Tolson tell you

9  that the shift worked on?

10    A.    I would rather go on what I say or what I knew as

11  opposed to what they say.  Now, I can go back to what they

12  say.  But I know they, for instance, I'm not guessing at this,

13  I know they did fire alarm work, the midnight shift was

14  composed of both Davis-Bacon and in-house employees.  In-house

15  employees mean permanent employees.

16    Q.    And Davis-Bacon is a contracting firm?

17    A.    More or less contracting.  They was hired to do

18  specialized work.

19    Q.    Who is "they"?

20    A.    The Davis-Bacon employees.  They did primary fire

21  alarm.  I knew that.  But in terms of our employees or

22  somebody that's brought in temporarily into our shop, they

23  could do a whole host of things.  Anything from fixing a

24  vacuum cleaner that needed to be fixed that particular night

25  or doing a project or pulling wire for the fire alarm if they

1              MS. MOMENI:  Again, we would like to ask for both

2    sets.  We'll be propounding discovery on those as well.

3              BY MS. MOMENI:

4         Q.   Let's move on to Mr. Stewart here.  How long have

5    you known Mr. Stewart?

6         A.   Since he came into the electrical division.

7         Q.   Do you recall how long ago that was approximately?

8         A.   How long, Steve?  15 years.

9         Q.   Well, he can't really testify.

10        A.   I would be guessing.  I'm thinking 10, 15 years.

11        Q.   And how would you describe your relationship with

12   Mr. Stewart?

13        A.   It's good.

14        Q.   Have there been any incidents where you found that

15   Mr. Stewart has not been truthful?

16        A.   Yes.

17        Q.   Tell me about that.

18        A.   Well, there's probably a few.  I may have them set

19   down in my records.  I'll give you one.  We had a gentleman

20   that was promoted to assistant foreman on the evening shift

21   and I knew his shady past.  He was a racist.  Me and him had

22   conversations where he admitted to me he was a racist.  I

23   think Mr. Stewart was aware of this, too.  But anyway, he was

24   promoted to assistant foreman.

25             Gordon Tolson and I, because of our past history,

1 went in and spoke to him about this.  And he told me he had

2 changed.

3      Q.   Who had changed?

4      A.   That this particular gentleman that was promoted to

5 assistant foreman, his name is Keith Bartlett, he told Gordon

6 and I that he had changed.  I mean we discussed a whole array

7 of things and how we felt, this and that.  But the bottom line

8 of what he said to us is that Keith Bartlett had changed.

9 That was a lie.

10     Q.   What do you base that on, that comment you just

11 made, that that's a lie?

12     A.   I don't know everything, if he would have came in

13 and said he was saved or he received Jesus Christ last night,

14 I might have gave him the benefit of the doubt.  But my

15 history of racists and racism, you don't change overnight.

16 They may change their little subtle ways of doing things or

17 whatever to achieve whatever they want.  But -- and maybe that

18 wasn't a lie from his point of view; from my point of view, it

19 was a lie.  Now, maybe he truly believed that.  But I didn't.

20     Q.   So it's not necessarily a lie from his point of

21 view?

22     A.   Might not.  But that would be one instance because I

23 know his views on him even before he promoted him.

24     Q.   So you would agree with me that people's points of

25 view can differ?

1    proof of that do you have, if anything?

2         A.    Nothing that I can think of other than the questions

3    is the proof.

4         Q.    The question that I put to you earlier is, how did

5    you feel after walking out of the interview?  I need to

6    rephrase it because I'm still not clear.  How did you feel

7    like you had done when you walked out of the interview?

8         A.    In terms of answering the questions or whatever,

9    I thought I had did, let's say, average.

10        Q.    Did you discuss the interview with anyone afterwards

11   other than you've already told us you spoke with Kenny Masters

12   in the hall.  Anyone else?

13        A.    Yes.  I went to Steve Stewart.

14        Q.    Okay.  Tell me when you did that, please.

15        A.    I don't remember.  We would have to look back and

16   see when the promotion was.  It was somewhere within that time

17   frame.  After the promotion was announced.

18        Q.    I see.

19        A.    Somewhere within that time frame I went to

20   Mr. Stewart and asked him where was I lacking or how did I

21   get edged out.  And his response was, he thinks Dave Smith did

22   a little bit better on the fire alarm questions than I did.

23        Q.    What was your response?

24        A.    I just took it at his word.

25        Q.    Speaking of your conversations with Mr. Stewart, you

1    A.    My coworkers, Bill Sanders, George Hammett, because

2  I would think they would do like they did all the other

3  leaders, take me under their wing and show me what they know

4  or what they think I need to know or what indeed I do need to

5  know because they are in a better position to know that.

6          The training.  And I was on the day shift when Ken

7  went to -- whether it was a management class.  I don't know

8  what the title was.  I know George Hammett went.  I asked him.

9  I asked leaders in the other division.  They all went.  I

10 haven't gone.

11   Q.    Have you asked?

12   A.    No, I didn't ask because remember I explained

13 earlier how I would be in their office all the time pointing

14 out little things.

15   Q.    Well, is training something that is important to

16 you?

17   A.    It would have made a difference on my application.

18   Q.    So you feel like you are unable to approach

19 management for more training?

20   A.    No.  I don't think I should have to address every

21 little thing to get what is standard procedure for the white

22 employees.  So some of it is I'm just so frustrated I'm not

23 going to go and ask you this because I shouldn't have to.  Am

24 I saying that that's right?  No, I'm not.

25          I'm just telling you about my frustration and my

1 know in the back of my mind that if I'm called into question,

2 I got to be on my toes.

3     Q.   Does that happen often?

4     A.   Does it happen often?  It may happen every day this

5 week, might not happen for the next four weeks.  But there are

6 times when it happens.

7     Q.   Do you have the flexibility to just walk away from a

8 project you are working on to go see friends in another

9 building or in another building elsewhere?

10     A.   No employee has that flexibility.

11     Q.   You've never done it?

12     A.   I didn't say that.  You asked me about flexibility.

13 So I was just answering your question.

14     Q.   So have you done it?

15     A.   Yes.

16     Q.   Can you do it pretty much whenever you want?

17     A.   No.

18     Q.   How often have you done it in the past year?

19     A.   I don't know.

20     Q.   Once a week?

21     A.   No.  It wouldn't be that often.

22     Q.   How often would it be?  We're both smiling here.

23     A.   We're both smiling because you are dealing with

24 a slippery slope.  Let me say --

25     Q.   I just want the facts.

1    A.   I'm going to give you the facts.  I don't know of

2  not one employee, including management, that don't go see

3  people from time to time.

4        So what are we talking about?  I don't want to be

5  casting this light or this situation to say or assume that

6  Michael Graham does things that other employees don't do.

7  That's what I want you to understand.  When you asked me the

8  question, Have I done it?

9        Yes.

10    Q.   So how often do you do it?

11        MR. ALDERMAN:  I'm going to object on the relevance

12  of this.  If we're talking about anything that happened in the

13  last year, then it has absolutely no relevance to the position

14  and selection that we're talking about today.  And it's

15  completely irrelevant.  It's argumentative.

16        MS. MOMENI:  Counsel, I heard you.  I'm sorry.

17  You are right.

18        BY MS. MOMENI:

19    Q.   In 2004, how often did you walk away from your job

20  to go meet and greet?

21        MR. ALDERMAN:  Are we talking about before August

22  2004 or are we talking about after August 2004?

23        MS. MOMENI:  In 2004.  I think that's fair.  I just

24  want to get a general flavor.

25        MR. ALDERMAN:  There is a significant amount of the

1  year that falls after the selection at issue.  So if he can

2  remember specifically, prior to August 2004.

3           MS. MOMENI:  Counsel, I think the speaking objection

4  is heard very loudly by everyone in the room.   Let me

5  rephrase my question just to move things along.

6           BY MS. MOMENI:

7      Q.   Sir, you have been with the Architect over 30 years,

8  correct?  Architect of the Capitol?

9      A.   Yes.

10     Q.   You know a lot of people in the buildings, correct?

11     A.   Yes.

12     Q.   You're a fairly popular guy; isn't it true?

13     A.   Yes.

14     Q.   And would it be correct to say that you have the

15 luxury of walking away from your projects.  And in fact, you

16 have walked away from your projects to go see friends and

17 acquaintances?

18           MR. ALDERMAN:  Asked and answered.  Objection.

19           BY MS. MOMENI:

20     Q.   Go ahead and answer it, please.

21     A.   Based on the way that you are asking it, I would

22 have to say no.  As I said, not Michael Graham or anybody else

23 has that luxury just to walk away from their job.   That would

24 be like saying I come in and sign in, I can do whatever I want

25 to.  I can't do that.

125

1     Q.    Have you done it?

2           MR. ALDERMAN:  Asked and answered.

3           THE WITNESS:  Come in, sign in and do anything I

4     want to?

5           BY MS. MOMENI:

6     Q.    Walk away from a project and go see friends?

7     A.    I may have walked away from a project to look at

8     something else somebody is working on or help them out with

9     something.  So what are we talking about?  You are asking me,

10    did I just walk away from this job and, let's say, come around

11    to your office and shoot the breeze for a while and have a cup

12    of coffee?  No.

13    Q.    You've never done that?

14    A.    I ain't going to say never.  I'm not your perfect

15    employee.  I'm not going to say never on that.   But I'm not

16    going to put myself in this box and say that this is so often

17    with Michael Graham.  No, it's not.

18    Q.    It's not that often?

19    A.    No, it's not.

20    Q.    All right.  Anything else about your job that you

21    find particularly stressful?

22    A.    Nothing that I can -- well, it's stressful -- let me

23    add this because we get back to me saying I can remember

24    things and some of the things I'm going to remember after I

25    leave this deposition while you are asking me these questions

136

1          (Graham Deposition Exhibit Number 3 was marked

2    for identification.)

3          BY MS. MOMENI:

4     Q.   Just so that we're working off the same frame of

5    reference, what is your understanding of how promotions are

6    usually made within the division based on the document that

7    we've marked as D3?

8     A.   You want me to explain how these promotions are

9    made?  The criteria for them?

10    Q.   I'm sorry.  I'm not being very clear.  Is it your

11   understanding, for example, that you have to be an electrical

12   leader -- an electrician leader before you can become an

13   assistant supervisor?

14    A.   Not 100 percent of the time.

15    Q.   And are you aware of instances that people have been

16   brought in as assistant supervisors without having served as

17   electrical leaders first?

18    A.   Yes, but that's not the norm.

19    Q.   But it has happened?

20    A.   Once.  But there were some extenuating

21   circumstances, things happening when that did occur.

22    Q.   Tell me about that particular situation.  First of

23   all, tell me to whom are you referring, the person that was

24   put in the assistant supervisor position.

25    A.   Not necessarily the assistant supervisor.  Steve

144

1  filed that prior EEO complaint?

2      A.   I have no way of knowing that.

3      Q.   Well, didn't he go to the EEO office with you?

4          MR. ALDERMAN:  I'm going to object, because it's

5  putting in evidence that's not on the record.  It's been asked

6  and answered and it's now taking --

7          MS. MOMENI:  This is a completely different

8  question.

9          MR. ALDERMAN:  -- an argumentative tone.

10         MS. MOMENI:  No, no, no.

11         (The reporter read the record as requested.)

12         BY MS. MOMENI:

13     Q.   Let me rephrase the question.  Your testimony has

14  been that Mr. Stewart went to the EEO office with you about

15  the 2002 complaint, correct?

16     A.   I want to distinguish the difference between the

17  reason Mr. Stewart went and the reason I went.  He went

18  because of name-calling and some of the name-calling was

19  offensive.

20         I was there solely based on racism and racism

21  practiced at the Architect of the Capitol.

22         Now, did he support me in that?  I'm sure he

23  understood.  But the reason he went to EEO office was separate

24  than what I was fighting for.  I had been fighting that battle

25  prior to him going down there.

147

```
 1        A.    I don't think so.

 2        Q.    So you are saying that what Mr. Stewart did was not

 3   supportive of your concerns?

 4              MR. ALDERMAN:  Objection to the characterization of

 5   his testimony.

 6              BY MS. MOMENI:

 7        Q.    I'm asking you.  Did it support your cause or not?

 8        A.    If I got to say yes or no, I'm going to say no.

 9        Q.    Because?

10        A.    Because along the way of every step that I made in

11   terms of fighting racism and what I went through legally,

12   nothing that he ever said was mentioned, was ever brought up.

13   And the people that he told his story to, it didn't go outside

14   of their office of EEO.

15              When I went to Office of Compliance, I was on my

16   own.  I'm on my own in terms of the information and everything

17   that I provided to them as to what I was dealing with and what

18   I was going through.

19              There was never nothing brought up about

20   name-calling, this and that.  And the only thing that EEO

21   does, I'm sure they probably do other things that I don't know

22   of, but they serve as a mediator.  You follow what I'm saying?

23              So they would mediate between John Chabot, Pete

24   Acheson or whoever the superintendent was at that particular

25   time about what was going on and how are we going to handle
```

1          What Steve Stewart did is separate from what I did.

2     You asked me if it helped.  Yes, it helped in the context of

3     him going --

4          BY MS. MOMENI:

5          Q.    It helped, you mean?

6          A.    What?  No, going to the EEO office.

7          Q.    Did you say it hoped or it helped?

8          A.    It helped in terms of the EEO Office of Compliance

9     and letting management know what was going on.  But in terms

10    of actually helping me in my endeavor, in my fight, no, it did

11    not.

12         Q.    Do you think that Mr. Stewart would have denied you

13    the promotion in 2003 because you had filed an EEO complaint

14    in 2002?

15         A.    Let me truly understand this.  You are asking me do

16    I think Mr. Stewart would have denied me promotion?

17         Q.    In 2003 because you filed a complaint in 2002?

18         A.    If you are looking for a yes or no answer, I don't

19    know exactly what Mr. Stewart would have done anymore, because

20    he's changed that much, as far as I'm concerned.  I explained

21    to you how if I'm in charge, if I'm the -- hold his division

22    in the electrical division, I wouldn't have promoted David

23    Duke.  I wouldn't have promoted Farrakhan, because I know the

24    adverse effect of doing that.

25             This is a man when he was a grade 10 would not have

152

1    promoted Keith Bartlett.  So now you are asking me to separate

2    this and was he that person at this interval as opposed to

3    now.  I don't know what he would have done.

4         So now when you ask me back to this qualification as

5    far as the retaliation, would he have done that based on back

6    then, no.  If you are asking me now to answer that, I'm going

7    the say yes.

8         Q.    He would have retaliated against you?

9         A.    Probably so.

10        Q.    Because you went and filed an EEO complaint?

11        A.    Not an EEO complaint.

12        Q.    A complaint of discrimination.  He would have

13   retaliated against you for filing a complaint of

14   discrimination.  Is that your testimony, sir?

15        A.    I don't want you to box me in to say Steve Stewart,

16   Pete Acheson and Frank Tiscione all work together.  So if you

17   want me to pick out one person, that's probably not going to

18   happen here today.  If you want to talk about the AoC and what

19   they might have done, yes.

20        Q.    Also, are you saying that Keith Bartlett is the

21   equivalent of David Duke?

22        A.    I'm saying he is a racist.

23        Q.    Paragraph 8 of your complaint, the page before this,

24   you say, The plaintiff has been employed with AoC as an

25   electrician since 1975; is that correct?  I'm sorry.  With the

1  if Michael Graham understands what "on information and belief"

2  means, which is a legal term which I wrote when I wrote this

3  complaint.

4           MS. MOMENI:  Right.  Counsel, I assume you have your

5  clients look at complaints before you submit them to the

6  Court.

7           MR. ALDERMAN:  Of course.  But I'll also assume that

8  you will understand that my client doesn't know everything I

9  do and that he doesn't understand all of my legal theories and

10  he can't be expected to.

11           MS. MOMENI:  I'm talking about what information he's

12  basing his claim on that the AoC intentionally manipulates the

13  selection process.  That's all.

14           BY MS. MOMENI:

15      Q.   I just want to know what you mean by that?

16      A.   Well, I gave you one specific reason or how that's

17  happened.  Mr. Stewart can call down and get me an interview.

18  Not only me.  Probably any other employee.  That's a

19  manipulation of the system.

20      Q.   And again, was that a bad thing in this instance?

21      A.   It's a bad thing when you are selling me that

22  everything is going to be fair and above water and that's the

23  reason we're installing Avue.  That's not supposed to happen.

24      Q.   Installing?

25      A.   Avue.