Capital Reporting Company

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3    -------------------------------x
 4    MICHAEL GRAHAM,                 :
 5              Plaintiff,            :
 6    vs.                             :   Civil Action No.
 7    THE ARCHITECT OF THE            :   05-1340 (JR)
 8    CAPITOL,                        :
 9              Defendant.            :
10    -------------------------------x
11                              Washington, D.C.
12                              Thursday, May 25, 2006
13    Deposition of:
14              KEVIN ANDRE BANKS
15    called for oral examination by counsel for
16    Plaintiff, pursuant to notice, at the Ford House
17    Office, Second and D Street, Southwest, Room 480,
18    Washington, D.C., before Gercha Richards White of
19    Capital Reporting, a Notary Public in and for the
20    District of Columbia, beginning at 9 a.m., when were
21    present on behalf of the respective parties:
22
```

Capital Reporting Company

Page 2

1  APPEARANCES
2
3  FOR THE PLAINTIFF:
4  ALDERSON & DEVORSETZ, PLLC
5  BY: Leslie D. Alderman, III, Esq.
6  The Blake Building
7  1025 Connecticut Avenue, Northwest, Suite 1000
8  Washington, D.C. 20036
9  (202) 969-8220
10
11 FOR THE DEFENDANT:
12 BY: Mercedeh Momeni, Esq.
13 Assistant United States Attorney
14 555 Fourth Street, Northwest, Civil Division
15 Washington, D.C. 20530
16 (202) 305-4851
17
18
19
20
21
22

Page 3

1           INDEX
2  WITNESS: KEVIN ANDRE BANKS
3  EXAMINATION              PAGE
4  Mr. Alderman             4, 143
5  Ms. Momeni               86, 144
6
7          EXHIBITS
8  NUMBER    DESCRIPTION    PAGE
9
10           (NONE)
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1          PROCEEDINGS
2             ---
3         KEVIN ANDRE BANKS,
4  having been first duly sworn, was examined and
5  testified as follows:
6             ---
7       DIRECT-EXAMINATION CONDUCTED
8       BY MR. ALDERMAN:
9       Q. Good morning. My name is Les Alderman. I
10 represent Michael Graham, who is the plaintiff in
11 the Civil Action against the Architect of the
12 Capitol, and it is in that Civil Action that your
13 deposition of today has been called. So thank you
14 for coming.
15      First, can I ask you to give me your
16 complete name and work address for the record?
17      A. Kevin Andre Banks. Address is here.
18      MS. MOMENI: Your work whatever, U.S.
19 Capitol.
20      THE WITNESS: U.S. Capitol, yeah.
21      BY MR. ALDERMAN:
22      Q. Which office building?

Page 5

1      A. House Office Building is my location,
2  SB-305.
3      Q. Okay. Which building?
4      A. Rayburn.
5      Q. Okay. Mr. Banks, I'm just going to go over
6  a couple of the ground rules for depositions.
7  First, Gercha is going to be writing down every
8  single thing that we say, and so it will make her
9  life a lot easier if we let each other finish our
10 sentences and don't interrupt each other; otherwise
11 she's trying to type that all down and it's
12 difficult. So I'll let you finish your answers, if
13 you'll let me finish my questions, and then Gercha's
14 life will be much easier.
15      Second, because Gercha is going to be
16 writing everything down, it's very important that
17 you make sure that you understand what my questions
18 are. If you don't understand my question, ask me to
19 rephrase it, tell me you don't understand it, give
20 me hand singles, I will rephrase the question. If
21 you answer my question, then because Gercha's
22 writing everything down, it will look as if you

2 (Pages 2 to 5)

Page 30

1  hard to explain, but he ended up with the wrong
2  people in place at the wrong time.
3      Q. What do you mean by that: the wrong people
4  in place at the wrong time?
5      A. Well, you ended up with technically with
6  two assistants on one shift and no foreman, on
7  paper.
8      Q. And is that because you were the acting
9  supervisor?
10     A. Because I was acting on evenings, but
11 technically the assistant on midnights and, see,
12 they were working off assumptions because and -- and
13 basically that's what happened. Because I applied
14 for the evening shift position, supervisor position.
15 In my opinion, I was wrongly not given that
16 position. And because I was -- I didn't want to
17 work with this person on that shift after being
18 passed over, after running that shift and did not
19 give in that position, I went back to midnights.
20     Well, that kind of threw a monkey wrench
21 into every thing. Because now they had -- they
22 ended up with two assistants on midnight. Because

Page 31

1  now at this point I'm there. Ken is retired. So
2  I'm running the shift as an assistant, because I had
3  the experience, and then there's a new assistant
4  there.
5      Q. At the time that the new assistant
6  supervisor on the midnight shift was selected, where
7  were you? In terms of what position were you
8  residing in?
9      A. When he was selected, I think I was still
10 on evening. But it happened so quickly that before
11 he came on board as an assistant, I was back on
12 midnights, and Ken was gone or Ken was leaving.
13     Me and Ken didn't work very long together
14 before it was time for him to retire the second
15 time, which was when I went back. And I may even
16 actually be off on that time line. He may not have
17 been selected until after I was there. Because I
18 know me and Ken worked together. I don't think he
19 was. Actually, I think Ken was gone before they --
20 when they did that assistant's position.
21     Q. Were you asked to participate in the
22 selection for the assistant supervisor on the

Page 32

1  midnight shift?
2      A. No.
3      Q. And just so I'm clear, when we talk about
4  this, this selection, the selection that we've just
5  been talking about for the assistant supervisor for
6  the midnight shift, is that is selection by which
7  David Smith was promoted to assistant supervisor on
8  the midnight shift?
9      A. Yes. Yes, it is.
10     Q. Now, earlier you indicated that you -- that
11 you may have initiated your own move from the
12 evening shift back to the midnight shift. Is that
13 accurate?
14     In other words, did you request to be moved
15 from the evening shift to the midnight shift?
16     A. Let me be clear on this. This is --
17     Q. After you were denied the supervisor -- the
18 evening shift supervisor position --
19     A. Yes.
20     Q. -- after you were passed over for that
21 position, did you then request to be shifted to the
22 midnight shift?

Page 33

1      A. Not exactly. I -- it was my plan to go
2  back to, to midnight shift and -- but another series
3  of events happened even before I got to institute
4  that.
5      Q. Can you tell me about that series of
6  events?
7      A. Okay. This series of events was they --
8  give me a minute to think about this. Because like
9  I said, all this happened --
10     Q. Please, take your time. Take your time.
11     MS. MOMENI: Is this a good time to take a
12 quick break?
13     MR. ALDERMAN: Yeah. If you want to think
14 in pace. There's a question pending.
15     MS. MOMENI: Pending. I'm not going to,
16 no, I'm not going to speak with the witness.
17     Off the record, please.
18     (Off the record.)
19     (Record read.)
20     THE WITNESS: And I'm still not sure about
21 that time line, but yes, it -- well, it was my
22 plan to go back to midnights because I didn't

9 (Pages 30 to 33)

**Capital Reporting Company**

Page 38

1  back and run the shift.
2      Q. The guys on the midnight shift asked Steve
3  Stewart to have you back?
4      A. Yes. Yeah. They went to his office. They
5  didn't come to me. They talked to him.
6      Q. And this is what Mr. Stewart told you in
7  this conversation that occurred within a week or ten
8  days of Bartlett being installed as the evening
9  shift supervisor?
10     A. Yes.
11     Q. Did he say which employees on the midnight
12 shift had come to him? Did Steve Stewart say which
13 employees on the midnight shift had come to him.
14     A. I don't believe he told me. I later found
15 out, you know, because after I got back to the shift
16 some of the guys then approached me.
17     Q. And which guys approached you?
18     A. Rob Gallagher and Dave Craiger, I can
19 remember right off the top the two most outspoken.
20     Q. What were their problems with Mr. Smith?
21     A. He's not much of a people person. He --
22 his, his -- he has quite a few clashes with them.

Page 39

1      Q. Arguments?
2      A. There have been some between, especially
3  him and Rob, but it's more his -- it's just more his
4  tile. Well, give you an example. He's ex-military.
5  So he has that -- he's more of a shouting orders
6  type of person than whereas I'm more of a finesse
7  type of person. I'm more politically correct.
8      Q. And Rob Gallagher and Dave Craiger, who are
9  they? What's their position?
10     A. They're what we call Davis-Bacon
11 electricians. They're electricians. They're under
12 the --
13     Q. The Davis-Bacon Act?
14     A. The Davis-Bacon Act, yes.
15     Q. So that means that they are temporaries?
16     A. Temporaries, yeah.
17     Q. And so I don't want to cut you off here,
18 the reason that you understood that there was a
19 problem on the midnight shift related to Dave Smith
20 was personality conflicts between Mr. Smith and the
21 other people on that shift?
22     A. Yes, that's what my understanding was.

Page 40

1      Q. Due to his less than political or finessed
2  style?
3      A. Yes.
4      Q. Were there any other problems with
5  mister -- that the other electricians had with
6  Mr. Smith?
7      A. Since I've been on this shift?
8      Q. No.
9      A. Or initially?
10     Q. At that time that Mr. Stewart was
11 explaining to you that you were going to be going
12 back?
13     A. Not that I know of. That was basically all
14 he said at that point.
15     Q. Believe it or not, talking about your
16 career progression, we're not even at the spot where
17 you've been selected to the supervisor position.
18     A. No.
19     Q. Okay. So you move from acting supervisor
20 of the evening shift to acting supervisor of the
21 midnight shift?
22     A. Yes.

Page 41

1      Q. And you think that was about a year or so
2  after you were originally promoted to assistant
3  supervisor?
4      A. Yes.
5      Q. And in terms of your career progress, what
6  happened after that, after you moved back to the
7  midnight shift but as the acting supervisor?
8      A. Okay. After Kallenbach was gone, that was
9  off the books and all, they was able to put that job
10 back out again. I applied for that job and was
11 selected for which now made me the actual supervisor
12 on the shift.
13     Q. Were you interviewed during the course of
14 that selection?
15     A. Yes.
16     Q. Do you remember who was on the interview
17 panel?
18     A. The same: Pete, Steve, and George. I'm
19 pretty sure was on that one, too.
20     Q. And was Mr. Hammett still the daytime --
21     A. Yes.
22     Q. -- supervisor?

11 (Pages 38 to 41)

Capital Reporting Company

Page 58

1  A. Yes. Right now in the books and there was
2  talk of a total of six fire alarm technicians when
3  we were talking about it.
4  Q. When you were talking about having another
5  shop?
6  A. Requesting, yeah. Well, even, even if
7  there wasn't one but yes. Even if it didn't get to
8  the point where it was actual separate shop, you
9  know. There were still talk of hiring more fire
10 alarm technicians.
11 Q. So there was talk about having for
12 electricians and six fire alarm technicians?
13 A. Yes.
14 Q. But on the books in terms of staffing
15 plan --
16 A. Right now what we have is two fire alarm
17 technicians and four electricians.
18 Q. When you were -- when you were passed over
19 for the position of evening shift supervisor, your
20 testimony was that you thought that you were wrongly
21 passed over for the evening shift supervisor
22 position?

Page 59

1  A. Yes.
2  Q. Why did you say that?
3  A. Basically, because I had been running the
4  position. I'd run the -- I'd run that shift, had no
5  complaints from anybody, for anything that was done
6  on the shift. Everything was being done correctly,
7  everything was done in a timely manner. So, you
8  know, just really didn't see a reason why I
9  shouldn't have been selected for the position.
10     And considering who was selected, I guess
11 that's really the -- what makes me feel that way.
12 If they had selected somebody that was -- there was
13 a foreman that had done the same thing I done, then
14 I can say okay, well, maybe he did a better job than
15 I did. But they selected somebody who had no
16 management experience out of the shop that was just
17 an electrician and put him in that position.
18 Q. And so the record is clear, was that George
19 Hammett?
20 A. No. This was Keith Bartlett.
21 Q. Keith Bartlett?
22 A. Yeah.

Page 60

1  Q. And is Mr. Bartlett white or black, or
2  what's his race?
3  A. He's white.
4  Q. Did you file a complaint of discrimination
5  based on that nonselection?
6  A. Yes, I did.
7  Q. Can you tell me what the result of that,
8  your filing a complaint of discrimination was?
9  A. Before that case was -- well, during I
10 guess that case, I applied for the evening shift --
11 I'm sorry -- the midnight shift supervisor position
12 and was selected for -- my counsel at that time told
13 me that that was probably the most I could kind of,
14 you know, wish for. Anyhow was, you know, that's
15 what I was going for the position. And so we kind
16 of, I guess, just let, let it go. We didn't pursue
17 it any further after that.
18 Q. Jumping back, sorry. When you applied for
19 the assistant supervisor position, way back in the
20 beginning of this deposition you indicated that you
21 thought that you were asked fire alarm questions.
22 Do you remember that?

Page 61

1  A. Uh-huh.
2  Q. Do you remember saying that you thought
3  that you were asked fire alarm questions?
4  A. I really don't remember, but I'm pretty --
5  the way they -- so many interviews. Because
6  actually I left another job that I applied for out
7  while we were talking, so there was actually another
8  interview I was on that I didn't -- that we didn't
9  discuss.
10     I'm pretty sure there probably was fire
11 alarm questions on there just for the time, but I'm
12 not really a hundred percent sure, you know, for the
13 shifts because it could have been for midnight.
14 Q. At that time would you have known the
15 answers to those questions? Do you recall knowing
16 the answers to those questions?
17 A. No, I wouldn't have known.
18 Q. What was the other position that you
19 applied for?
20 A. That was day shift foreman.
21 Q. Was Hammett selected for that?
22 A. Hammett was selected for that one.

16 (Pages 58 to 61)

Page 62

1  Q. Who was on that -- I'm sorry.
2     Were you interviewed for that position?
3  A. Yes.
4  Q. And do you recall who was on the panel?
5  A. I know it was Pete Aitcheson and Steve
6  Stewart was there. That one I believe Bob Gleach
7  was also on that panel and an observer, too.
8  Q. Since the time that you were an assistant
9  supervisor or above, so that's you were an assistant
10 supervisor or you were acting supervisor or you were
11 full-fledged supervisor, have you sat on any
12 interview panels?
13 A. No.
14 Q. For the record, because the record doesn't
15 have pictures or anything, can you tell me what your
16 race is?
17 A. I'm black.
18 Q. Have you ever been asked to sit on an
19 interview panel?
20 A. No.
21 Q. During the time that you have been the
22 assistant supervisor or acting supervisor or

Page 63

1  supervisor on the midnight shift, when you were
2  actually located on the midnight shift, were there
3  any -- do you recall any selections for positions on
4  the midnight shift?
5  A. There were no selections, but there were
6  interviews.
7  Q. Can you tell me what interviews occurred?
8  A. There were fire alarm technicians'
9  positions.
10 Q. And did you sit on those interviews?
11 A. No.
12 Q. And I'm not sure how to get about this, but
13 was there one group of interviews or were there
14 several groups of interviews separated in time from
15 one another?
16    MS. MOMENI: I'm sorry. Counsel, you want
17 to clarify? For what position are you talking
18 about?
19    MR. ALDERMAN: For the fire alarm techs'
20 positions.
21    MS. MOMENI: Techs, okay.
22    THE WITNESS: There are actually several

Page 64

1  different interviews.
2     BY MR. ALDERMAN:
3  Q. Does that mean that there were several
4  different candidates or that there were several
5  different groups of candidates?
6     Do you understand my question?
7  A. No.
8  Q. What I'm trying to -- and maybe I can get
9  it about it like this. Were there different times
10 that fire alarm technician positions were being
11 filled or being attempted to be filled or was there
12 just one occasion when you were hiring fire alarm
13 technicians?
14 A. Actually, there were -- let me root this in
15 my words.
16 Q. Yes, please.
17 A. There was one position, but it was several
18 times that there was -- they were -- that this
19 position was announced and put out, because they
20 didn't get the people -- they didn't get anybody
21 they chose to pick.
22 Q. That makes sense, okay.

Page 65

1     Do you recall how many times that position
2  was put out or announced?
3  A. At least three.
4  Q. Wow. Did you ever asked to be on -- I'm
5  sorry. For each of those three or at least three,
6  were interviews conducted?
7  A. For at least two of them.
8  Q. Was that while you were supervisor or
9  acting supervisor or assistant supervisor?
10 A. Supervisor.
11 Q. Full-fledged?
12 A. Yes.
13 Q. Did you want to be on the interview panel?
14 A. Yes, actually I did.
15 Q. Did you tell anybody that you wanted to be
16 on the interview panel?
17 A. The first time -- the first interview that
18 they had, I didn't even know there was an interview.
19 And after -- after I found out about the interview
20 and I found out who was on it, I wanted to know why
21 somebody would be select -- potentially somebody
22 would be selected for my shift that I would have to

17 (Pages 62 to 65)

Page 66

1  work with and I didn't have any input.
2      Q. And who did you ask that question?
3      A. I asked Steve that question. And his
4  answer was because I'm working midnights, they
5  were -- and interviews were during the day, they
6  couldn't very well bring the person in to interview
7  at midnight. And my answer to that was, well, one
8  of two things could have happened: He's going to be
9  working midnights, we could have interviewed him at
10 midnight. He would have been getting used to what
11 he was going to be up against. Or, which would have
12 made more sense, I, like the foreman's in the past,
13 would come in for the interview.
14     Q. You said the foreman's in the past?
15     A. When they interviewed -- when Kallenbach
16 was on midnight shift and there was an interview for
17 his shift, he would come in for the interview. They
18 would actually -- they would set up the interview,
19 they would try to set up the interviews to start
20 around eight o'clock in the morning. We get off at
21 eight o'clock in the morning, so it's just a matter
22 of you staying over, you know, for that interview.

Page 67

1      Q. Do you know what particular selections
2  Mr. Kallenbach stayed over for?
3      A. Actually, yes. It was for Dave Smith and
4  Tony Anderson when they got the fire alarm
5  electricians' jobs.
6      Q. Do you know if any --
7      A. That's two that I know of for sure. I
8  don't know what -- how many others it may have been.
9      Q. With regard to the selection in which Dave
10 Smith was promoted to assistant supervisor, did you
11 want to be on that selection panel?
12     A. I questioned it, but their answer to that
13 was at that point I was just an assistant.
14     Q. Who did you ask?
15     A. I asked Steve about that one, too.
16     Q. Did you ask beforehand or afterwards?
17     A. That was afterwards. I didn't know that
18 was -- that interview was happening either.
19     Q. You didn't even know the interviews were
20 being conducted?
21     A. Not for that position. I knew they were
22 coming up, but I didn't know their actual time

Page 68

1  frame.
2      (Pause)
3      MS. MOMENI: While counsel's looking over
4  his questions, can we take a quick?
5      MR. ALDREMAN: Oh, yes.
6      (A break was taken.)
7      BY MR. ALDERMAN:
8      Q. Mr. Banks, with regard to the selection for
9  the assistant supervisor on the midnight shift, did
10 you -- did you have any involvement whatsoever in
11 developing the vacancy announcement or the position
12 description or defining what KSA's, the selectee
13 would need to compete for the position?
14     A. Not at all.
15     Q. At the time of the interviews for that
16 position, the assistant supervisor position, would
17 you have been available to sit on the panel?
18     A. Yes, I would have.
19     Q. Did anyone discuss with you who was going
20 to be recommended for selection to the assistant
21 supervisor position on the midnight shift?
22     A. No.

Page 69

1      Q. How did you find out about who was
2  selected?
3      A. I'm not a hundred percent sure. I'm pretty
4  sure Steve told me who they selected.
5      Q. Do you remember having a conversation with
6  him about it?
7      A. No.
8      Q. Do you know who Michael Graham is?
9      A. Yes.
10     Q. Are you familiar with Michael Graham as an
11 employee of the Architect of the Capitol?
12     A. Yes.
13     Q. How are you familiar with him as an
14 employee?
15     A. When I worked day shift, he worked day
16 shift as an electrician. We had the opportunity to
17 work together, sometime he was never my immediate --
18 we were partnered up and he was never my immediate
19 partner, but there were projects to be worked on
20 together.
21     Q. Do you know of any reason that Mr. Graham
22 would not make an acceptable assistant supervisor?

18 (Pages 66 to 69)

## Capital Reporting Company

Page 70

1  A. I don't know of any reason why he shouldn't
2  have been or couldn't have been.
3  Q. Comparing Mr. Graham to David Smith, do you
4  have an opinion as to who would make a better
5  assistant supervisor?
6  A. I guess they both have their good and bad
7  faults. The problem that I had with Dave that I was
8  telling you earlier as far as his personality and
9  the conflicts that he creates with the employees, I
10 know that Mr. Graham's personality is not like that.
11 His, his closer to my whereas those types of
12 conflicts wouldn't have been something that would
13 have been happening.
14 Q. Do you have any reason to believe that
15 Mr. Graham was passed over for the selection to
16 assistant supervisor because of his race?
17 A. For my own personal experience, that's
18 highly possible.
19 Q. Do you have any specific information about
20 Mr. Graham or the selection process that leads you
21 to believe that he was passed over because of his
22 race?

Page 71

1  A. Not that I really recall right now.
2  Q. What made you say because of the way that
3  that you were treated that it was highly possible
4  that Mr. Graham was passed over because of his race?
5  A. Well, in my personal experience I feel that
6  a lot of things that happen to me was racially
7  motivated. And since Mr. Graham is a black male,
8  too, I'm sure he would be up against the same
9  obstacles that I felt I was up against.
10 Q. And who did you think was putting those
11 obstacles in your way as a result of your race?
12 A. Upper management. Immediately, I would say
13 Steve Stewart and Pete Aitcheson, since they were
14 the closest to me as for as in-line supervision.
15 And anybody above those two, I don't really have any
16 interactions with so I don't know, you know,
17 necessarily what they're doing for me or against me.
18 Q. Okay. Now, are there any specifics that
19 you can tell me about that lead you to believe that
20 Mr. Stewart or Mr. Aitcheson would discriminate
21 against an employee because of their race?
22 A. Going back to me again, the two positions I

Page 72

1  put in for, the day shift foreman's position. Here
2  again, similar to what happened to me on the evening
3  shift: On day shift, there was -- I was the second
4  person to be promoted to an assistant. George
5  Hammett came after me as far as being an assistant,
6  which gave me more experience in the shop than him,
7  gave me more experience supervising than him.
8  My past experience as far as, you know,
9  before I even care here in, in supervision, but yet
10 he was still selected and -- and then, you know,
11 different comments that were made those, of course,
12 were hearsay, so, you know, they were made to me.
13 Q. What comments?
14 MS. MOMENI: Objection, hearsay.
15 MR. ALDERMAN: That's fine.
16 BY MR. ALDERMAN:
17 Q. But you can answer.
18 MS. MOMENI: You can go ahead and answer
19 what you have heard other people say about
20 other people's conversations. It's hearsay.
21 MR. ALDERMAN: Well, it may be hearsay, it
22 may not be.

Page 73

1  MS. MOMENI: You just said it was. Go
2  ahead.
3  THE WITNESS: Well, one of the comments
4  that was made, was made to Gordon Tolson was
5  from Steve Stewart. When he, he asked them
6  why -- when this is for the evening shift
7  position I put in for. Like I said, it was
8  everybody's opinion that I would get that
9  position because I've been working in it and
10 running it efficiently.
11 When I didn't get the position, Gordon
12 approached Steve and asked him, you know,
13 what's up? Why didn't I get the position? And
14 he said that he didn't feel that I would ever
15 be anything more than an assistant in this
16 organization.
17 BY MR. ALDERMAN:
18 Q. Was there any explanation for Mr. Stewart's
19 belief that you would never be more than an
20 assistant in this organization?
21 A. One of the things he told Gordon was that
22 basically I was too nice. I was a nice guy and that

19 (Pages 70 to 73)

(866) 448 - DEPO
www.CapitalReportingCompany.com