Capital Reporting Company

Page 1

```
 1           SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                  FOR THE DISTRICT OF COLUMBIA

 3    _ _ _ _ _ _ _ _ _ _ _

 4    MICHAEL GRAHAM,            )

 5             Plaintiff,        )

 6    Vs.                        )    Case No.

 7    THE ARCHITECT OF THE       )    1:05CV01340

 8    CAPITOL,                   )

 9             Defendants.       )

10    _ _ _ _ _ _ _ _ _ _ _ _ )

11

12                                      Washington, D.C.

13                                      Wednesday, April 5th, 2006

14    Deposition of:

15                  FRANK TISCIONE

16    Called for oral examination by counsel for

17    Plaintiff, pursuant to Notice, at the Ford House

18    Offices, 2nd and D Street, S.W., Room B39, Washington,

19    D.C., before Christine Fox, a Notary Public, beginning

20    at 2:00 p.m. when were present on behalf of the

21    respective parties:

22
```

Capital Reporting Company

## Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4      LESLIE D. ALDERMAN, III, ESQUIRE
        The Blake Building
5       1025 Connecticut Avenue, N.W.
        Suite 1000
6       Washington, D.C. 20036
        (202) 969.8220
7
   On behalf of the Defendant:
8
        MERCEDEH MOMENI, ESQUIRE
9       Assistant United States Attorney
        United States Department of Justice
10      555 4th Street, N.W.
        Washington, D.C. 20530
11      (202) 305.4851
12 ALSO PRESENT:
        MICHAEL GRAHAM
13
14
15
16
17
18
19
20
21
22

## Page 3

1           CONTENTS
2  EXAMINATION BY:                    PAGE
3  Counsel for Plaintiff         4
4  Counsel for Defendant        42
5
6
7  FRANK TISCIONE EXHIBITS:            PAGE
8
9      (NONE MARKED)
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 4

1              PROCEEDINGS
2  WHEREUPON,
3              FRANK TISCONE
4  Called as a witness, and having been first duly
5  Sworn, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFF:
7  BY MR. ALDERMAN:
8       Q.  Good afternoon. My name is Les Alderman --
9  Leslie David Alderman, III. I am Michael Graham's
10 attorney. Michael Graham, as I think you know, has
11 filed a civil action against The Architect of the
12 Capitol and that is why we are here today to take your
13 deposition in that case.
14      A.  Okay.
15      Q.  I'll go over a few ground rules after you
16 introduce yourself for the record. If.
17          You can just give me your complete name,
18 title, and work address?
19      A.  Frank John Tiscione, superintendent for the
20 House Office Building, Room B341, Rayburn House Office
21 Building.
22      Q.  Is there a zip on that, zip code?

## Page 5

1       A.  20515, Washington D.C. 20515.
2       Q.  Quick ground rules are we should let each
3  other finish our questions, answers, so that we can
4  create a clear record.
5           Your responses should be in -- should be made
6  orally rather than a nod of the head or shake of the
7  head or auh-auh or um-hmmm, because you can't tell what
8  auh-auh means when you read it. It could be yes or it
9  could be no.
10      A.  Okay.
11      Q.  If you don't understand any of my questions,
12 please ask me to repeat them, and I'll be happy to do
13 so.
14          If you don't get my phraseology, I'm happy to
15 rephrase any question. But if you do answer my
16 question, the record will make it appear as if you
17 understood my question.
18          So it's very important you get any
19 clarification you need of any of my questions.
20          And I have to ask you, are you taking any
21 medication that would hinder your ability to testify
22 truthfully today?

# Capital Reporting Company

Page 18

1 selections.
2     He also indicated that he reviews the
3 procedure by which the selection was made to make sure
4 it's consistent with those practices and policies.
5 Therefore, he certainly has established the foundation
6 that he can describe to me what practices and policies
7 are in place and are not in place.
8     MS. MOMENI: Well, your question is based on
9 certain assumptions about the panelist not knowing the
10 answers. What kinds of people sit on the panel, not
11 going to pull somebody out of the air, somebody that
12 knows nothing about the business at hand.
13 BY MR. ALDERMAN:
14   Q. Say, for example, someone that works in HVAC.
15 Is it customary in an electrician selection to have an
16 HVAC -- so HVAC is heating, ventilation --
17   A. Air conditioning, um-hmm.
18   Q. -- mechanic on the interview panel?
19     MS. MOMENI: For what?
20 BY MR. ALDERMAN:
21   Q. For an electrician?
22   A. They do have a working hand knowledge of it.

Page 19

1 I guess in this particular case though we're not
2 talking about an electrician. We're talking about a
3 supervisor. It may be a practice where you'd have a
4 supervisor from another organization participate on the
5 panel because it's a supervisor position.
6   Q. Is there a preference policy or practice to
7 have the individual who will be supervising the
8 assistant supervisor on the interview panel for -- let
9 me kind of clarify that.
10     In a selection process, for an assistant
11 supervisor position, is there a practice of including
12 the supervisor who will be directly over that assistant
13 supervisor on the interview panel?
14   A. Is it a practice, is that what you're asking
15 or policy?
16   Q. Practice, policy, or preference?
17   A. I would say it would be a preference to do
18 that, yes.
19   Q. When you reviewed the materials you used to
20 make the selection in the case at issue in this
21 complaint, did you have any concerns over procedures
22 that were used in making the selection?

Page 20

1   A. I can't recall.
2   Q. Would you have any notation?
3   A. No.
4   Q. Any memorandum or any explanation that
5 supports your concurrence with the recommendations to
6 you?
7   A. Other than the actual concurrence in AVUE,
8 which I put a -- normally I concur with the selection,
9 and that's the extent of it.
10   Q. But there's no explanation, no justification
11 -- no justification, no extra materials that you
12 include?
13   A. No.
14   Q. I'm going to show you a document that has
15 already been marked as exhibit.
16     MR. ALDERMAN: Let's go off the record right
17 quick.
18     (Recess taken.)
19 BY MR. ALDERMAN:
20   Q. I'm going to hand you a document that has
21 already been marked Exhibit 6. It is marked RT
22 Exhibit 6, it's got today's date, 4/5/06. I just ask

Page 21

1 you to take a look at that document briefly, it is a
2 three-page document, I think.
3     MS. MOMENI: Um-hmm.
4   A. Okay.
5 BY MR. ALDERMAN:
6   Q. Can you explain to me what this document is?
7   A. It is rating matrix that is used by the panel
8 in their interview to rate the individuals that are
9 being interviewed by the panel.
10   Q. Do you know where this document comes from
11 and who generated it?
12   A. No. This particular document, no.
13   Q. Are there any instructions provided to the
14 selection panel for using this to be --
15     MS. MOMENI: You're talking in general --
16 BY MR. ALDERMAN:
17   Q. General terms, general procedure policy?
18   A. Written instructions?
19   Q. Yes.
20   A. No.
21   Q. Are there any oral instructions given about
22 use of this matrix?

## Capital Reporting Company

Page 38

1  A. Yes.
2  Q. Is that your wife?
3  A. Yes.
4  Q. Have there ever been times when you've had --
5  either of you have had to recuse yourself from official
6  decision making processes to avoid conflicts of
7  interest?
8  A. I have not had to recuse myself, she's had to
9  recuse herself.
10  Q. Under what circumstances has she had to
11  recuse herself?
12  A. In issues of pay, when it comes to me, as an
13  example.
14  Q. Any other examples?
15  A. You'd probably have to ask her more. She's
16  the one that -- it has never been -- it's always been
17  her so you'd have to ask her, but I know pay has been
18  an issue.
19       MR. ALDERMAN: Let's take a quick break. I
20  think we'll be wrapping it up.
21       (Recess taken.)
22       MR. ALDERMAN: I just have a couple more

Page 39

1  questions for you.
2  BY MR. ALDERMAN:
3  Q. They go back to my favorite subject, the
4  rope, the settlement and your involvement therein.
5       You indicated that you were involved in
6  settling Mr. Graham's case?
7  A. Yes.
8  Q. Did you review any report, investigation
9  notes, briefings, that related to the facts of
10  Mr. Graham's previous complaint?
11  A. I can't recollect. I know I was involved
12  with many discussions with counsel, with Eddie Martinez
13  in that case.
14       What documents I reviewed, I did review
15  documents, and I just can't remember specifically what
16  they were at the time.
17  Q. Do you remember reviewing any documents
18  generated by Mr. Miley? Was he your predecessor?
19  A. Yes, he was. And, no, I don't remember.
20  Q. Do you remember any specifics documents you
21  might have received from the EEOCP?
22  A. No.

Page 40

1  Q. Do you remember reviewing any photographs?
2  A. No.
3  Q. Do you remember reviewing, seeing any other
4  evidence related to that event, the rope, the pictures?
5  A. No.
6  Q. On what did you base your decision to concur
7  with the settlement?
8  A. Counsel, recommendation from counsel, Eddie
9  Martinez, discussion about the incident and what was
10  discovered during that, and I reviewed documents.
11  Again, I can't specifically remember which documents I
12  reviewed that got me to -- into that determination.
13  Q. Who did you talk to besides counsel?
14  A. Pete Aicheson was a part of that discussion.
15  Q. And what did you two talk about?
16  A. The issues surrounding that particular case.
17  Q. Did you talk about the facts surrounding that
18  case?
19  A. Again, Pete was not there. We can only go by
20  discussions with counsel and what evidence at that time
21  he was showing us. I can't remember exactly what we --
22       MS. MOMENI: Discussion with counsel would be

Page 41

1  privileged.
2  BY MR. ALDERMAN:
3  Q. I'm not asking about discussions with
4  counsel, I'm talking about discussions with Pete
5  Aicheson.
6       Did you have conversations with anybody else?
7  A. No.
8  Q. Just Pete Aicheson?
9  A. Well, and Bob Gleich who was there during
10  that time.
11  Q. Was he -- what was his position during that
12  time?
13  A. Deputy.
14  Q. Had he been deputy during the time that the
15  rope had been discovered?
16  A. Yes.
17       MR. ALDERMAN: Okay. Thank you, that's all I
18  have.
19       MS. MOMENI: Just a couple question for you,
20  sir.
21       EXAMINATION BY COUNSEL FOR THE DEFENDANT:
22  BY MS. MOMENI:

11 (Pages 38 to 41)