UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL GRAHAM, )<br>)<br>Plaintiff, )<br>) ECF<br>v. ) Civil Action No. 05-1340 (JR)<br>THE ARCHITECT OF THE CAPITOL, )<br>)<br>Defendant. )<br>) | |

### DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION
### TO DISMISS AND FOR SUMMARY JUDGMENT

The Office of the Architect of the Capitol ("AOC" or "Defendant"), respectfully submits the following Reply in Support of its Motion to Dismiss and for Summary Judgment ("MSJ"). Plaintiff has not exhausted his administrative remedies and cannot establish a *prima facie* case of race discrimination or retaliation, nor can he rebut, as pretextual, the AOC's reasons for his non-promotion to the position of assistant supervisor of the midnight shift for the Electric Division in the House Superintendent's Office for the Architect of the Capitol.

### FACTUAL BACKGROUND

Preliminarily, it should be noted that Plaintiffs' Opposition does not comply with Local Civil Rule 7(h) and 56.1, failing to respond to Defendant's Statement of Material Facts Not in Dispute (SMF), as required. Defendant's SMF consisted of 40 paragraphs. Although Plaintiff cites to ten of these paragraphs in his Statement of Genuine Issues ("SGI"), he fails to deny the facts offered by the AOC, even in those ten paragraphs.[1] (See Pl.'s SGI, ¶¶ 1, 2, 3, 32, 52, 57,

---

[1] In Paragraph 59 of Plaintiff's SGI, the only place where he seems to make an objection to any of the material facts offered by Defendant, Plaintiff states that he "disputes any assertion

1

58, 59,and 61.)  Plaintiff does not dispute, for example, facts presented in paragraph 34 of

Defendant's SMF wherein he made critical admissions against his interest as follows:

> Plaintiff believed that he had done "average" at answering questions during his interview.  Ex. 1, Pl.'s Dep. Tr. 108:4-9.  He also admits that there are periods during the day where he is able to walk away from a project to attend to his other needs, and that he has, indeed, walked away from projects to go see friends in a different building.  *Id.* at 121:8-14, 122:7-15; Ex. 2, Stewart Dep. Tr. 95:5-22.

Accordingly, all factual assertions in Defendant's SMF should be deemed admitted.  *Cf. Twist v. Meese*, 854 F.2d 1421 (D.C. Cir 1988), *cert. denied* 490 U.S. 1066 (1989).

Plaintiff's brief is also riddled with unsupported or inflammatory allegations.[2]  Some examples are as follows:

- In his SGI, paragraph 8, Plaintiff refers to one of his colleagues as an "admitted racist" with no proof of any such admission by this person.  In the same paragraph, Plaintiff states that he complained about the Bartlett promotion to Mr. Stewart, but offers no proof of such conversation.

- In paragraph 16 of his SGI, Plaintiff claims that it is AOC policy to "only" use a

---

that any computerized system, including the AVUE system, is infallible", in response to SMF ¶ 12.  A review of Defendant's SMF ¶ 12 reveals that Defendant made no such claim.

[2]  There is a need to pay particularly close attention to the manner in which the testimony offered in this matter is presented.  It is may well be that the persons whose deposition transcripts have been offered as exhibits may not have been clear about certain critical distinguishing facts, for various reasons.  Although Plaintiff here contests his non-promotion to the assistant foreman position for the midnight shift, only a short time after his non-promotion for that position, he also applied for the evening shift assistant supervisor position.  *See* Civil Action 06-0492.  The order of the selection processes for these two positions was, at times, left unclear for the witnesses in their depositions, or may have inadvertently been confused by them.  Also, the electrical shop was experiencing transitions in staffing and management during the relevant times.  Mr. Banks, for instance, could not recall the exact time line.  *See* Banks Depo. Tr. 31:5 - 33:20-22 ( Ex. A).

- interview panelist from another shop, trade or work area if there is no individual from the same shop available to participate in the interview process. This assertion is incorrect and misleading. Even if one refers to Defendant's response to interrogatory number 2, as cited by Plaintiff, no such definitive statement was made. Indeed, the response paragraph in question does not contain the word "only", and instead refers to the "typical" and "usual" practice. Pl. Opp. Ex. 2 at 4.

- Plaintiff's SGI, paragraph 19, seems to suggest that Mr. Aitcheson testified that Mr. Banks was not asked to participate on the interview panel, by inviting the Court to only consider Aitcheson Dep. at 43:2-5 (Def. Ex. 2). However, if one simply continues from Aitcheson Dep. at 43:2-5 to line 10, where the answer is completed, it clearly indicates that Mr. Aitcheson said that he did not recall who may have been asked. Aitcheson Dep. at 43:2-10 (Def. Ex. 2). Paragraph 22 of Plaintiff's SGI follows in the same vein.

- The assertion, in Plaintiff's SGI, paragraph 26, that Mr. Banks testified that Michael Graham would have been a better supervisor is misleading. Although Mr. Banks testified that the selectee and Mr. Graham both had their "good and bad" qualities, (Banks Depo. Tr. 70:3-13, and 39:2-7 (Def. Ex. 10) and Ex. A, Banks Depo. Tr. 120:14-121:17), he also stated that the selectee helps to balance out his management style and that he had been told of Plaintiff's work ethic issues. *Id.*

In sum, Plaintiff's incomplete and misleading assertions should therefore be disregarded.

Moreover, now, after the close of discovery, Plaintiff belatedly attempts to introduce a new "protected activity," in which he allegedly engaged, just weeks before his interview for the position in question. *See* SGI ¶ 8 and Opposition at p. 28. This alleged event is nowhere to be

found in Plaintiff's Complaint or discovery responses.  (*See* Compl. generally and Ex. B, Pl. Discovery Responses).  The Plaintiff did not even mention this alleged conversation with Mr. Stewart in his opposition to Defendant's pre-discovery Motion to Dismiss his retaliation claim, a perfect opportunity to alert the Court to the existence of this event.  *See* USDC Pacer Dkt. No. 13.  Moreover, his alleged actions do not amount to a protected activity, as explained in the Argument section II *infra*.  He cannot claim that he learned about *his own actions* during discovery and offer same as evidence of retaliation, especially without any proof.  It is clear that in order to avoid rejection of his retaliation claim, which has, all along, been based on his law suit filed in December 2002 and settled in June 2003 (*see* Compl. at ¶¶ 1 and 27) and never exhausted administratively, Plaintiff now attempts to broaden the scope of his alleged protected activity.  This attempt to salvage the retaliation count should fail for reasons more fully explained in sections II and III, *infra*.

## ARGUMENT

In opposition to Defendant's MSJ, Plaintiff offers the Court a baroque conspiracy theory, in which a wide-range of Defendant's employees allegedly participated, in order to keep Plaintiff from obtaining an assistant foreman position on the midnight shift in the Defendant's electrical shop.  The scheme Plaintiff proposes is so elaborate that it defies logic.  Defendant's legitimate business reasons, which have remained consistent throughout this process, on the other hand, are grounded in fact and supported by the law as non-discriminatory and non-retaliatory.  The fact remains that the decision to promote the selectee, and not the other two interviewees, was made by a panel of interviewers, none of whom had a reason to discriminate or retaliate against Plaintiff, including interviewers, who actually had supported and promoted Plaintiff along the

way. The panel's decision was approved by Frank Tiscione, the House Superintendent. Mr. Tiscione was not implicated in Plaintiff's 2002 law suit.

I.  **The Selection Process was Conducted According to AOC Practice and Policy.**

The selection process at issue produced a selectee that management believed was the best candidate for the position: David Smith, a person who knew fire alarm equipment and maintenance, with previous supervisory experience in the military. Mr. Smith also balanced out the midnight shift supervisor's more finessed management style. It remains undisputed that the Plaintiff performed poorly during the interview–earning him the ranking of third out of three–and Mr. Stewart had become disillusioned with Plaintiff's work ethic since he promoted Plaintiff to the position of team leader. All other subtle, and not-so-subtle, suggestions otherwise offered by Plaintiff in his Opposition ("Pl. Opp.") are simply an attempt to confuse the issues.

A. The Alleged Manipulation of the Selection Process

Plaintiff claims that the AOC manipulated the selection process to keep him from being promoted to the midnight shift assistant foreman position. First, the decisions in question were not made by a headless entity, but rather by three panel members, all of whom ranked Plaintiff last because of his poor performance during the interview. Second, no policies were violated or deviated from in this case.

Plaintiff states that "The AOC policy is that a panelist from another shop will *only* be used 'if there is no individual from the same shop, trade, or work area [available] to be a member of the interview panel.[']" SGI ¶ 16. Plaintiff frames his statement thus, in order to lead the Court to believe that the selection officials deviated from the normal selection process. A glance

5

at Defendant's response to plaintiff's interrogatory number 2, will prove the Plaintiff's statement is wholly incorrect, because while it may be "typical" or "usual" for the other panel members to be a part of the potential employee's shop, it is not a requirement. (*See* Pl. Opp. Ex. 1, at p. 4)

Here, Plaintiff claims that Mr. Banks should have been the third panel member because he was the midnight shift supervisor and the only African-American to hold such a position. Pl. SGI ¶¶ 17, 19 and Opp. at 34. Mr. Banks testified that he was *not the supervisor* when the selection at issue took place, but rather the acting supervisor. Banks Dep. Tr. at 111. In fact, the third panelist, Kenny Masters, an assistant foreman from the HVAC shop, was asked to participate, and his background and qualifications complied with the necessary criteria for panelists in that he was positioned at the same grade as the would-be selectee. *Id*. and SMF ¶31. Indeed, a person who did not work with the candidates on a regular basis brought a balance to the panel that others from the shop may not have been able to offer.

Plaintiff's reference to *Salazar v. WMATA,* 401 F.3d 504 (D.C. Cir. March 2005), is also misplaced. Plaintiff cites to this case for the proposition that the inconsistent application of hiring practices and policies demonstrates that the proffered reasons are pretexts for discrimination. Opp. at 31. Not necessarily so. The *Salazar* court held that an employer must administer the selection process fairly, not that inconsistencies are to be deemed false and pretextual reasons for discriminatory intent in employment practices. *Salazar* 401 F.3d 508-509. In *Salazar*, Buddy Jaggie, a close friend of another manager suspected of harboring animus against the plaintiff was brought into a selection process as a fourth panelist, (on an interview panel which generally called for three panelists), *and* chaired the interview panel. *Id.* at 506. Furthermore, Mr. Jaggie, worked in the same area as the plaintiff and had previously

administered tests that plaintiff had failed. *Id.*

In this case, there is no evidence of any such manipulation. Plaintiff does not, because he cannot, dispute the legitimacy of Messrs. Stewart and Aitcheson's participation as panel members. Instead, he complains that Mr. Banks should have been the third panel member. As higher ranking supervisors, Messrs. Stewart and Aitcheson have consistently sat on interview panels, as a matter of practice, for positions that fall under their supervision. It should be noted that unlike the alleged discriminating official in *Salazar*, both Mr. Stewart and Aitcheson had promoted both Mr. Banks and Plaintiff to their respective positions as assistant foreman and team leader. As noted above, it was not necessary for Mr. Banks to be included. Despite Plaintiff's protestations, Mr. Banks was not the shift supervisor and would not necessarily have chosen Plaintiff rather than Mr. Smith, as noted in Mr. Banks' testimony. *See* Exh. A at 120. Accordingly, there is no evidence of a deviation from the House Superintendent's policy or practice here and *Salazar* is inapplicable.

### B. Alleged Manipulation of Selection Criteria

It is undisputed that the staff in the Electrical Division know well that the majority of the work on the midnight shift centers on fire alarm equipment repair, maintenance and installation. *See* SMF ¶¶ 24 - 26. Plaintiff claims, that Mr. Aitcheson intentionally "overloaded" the interview questions with fire alarm-related questions to ensure his exclusion and "put the two Caucasian interviewees . . . at an advantage." Pl. Opp. at 35-36. Again, a glance at the interview questions reveals that the set of questions posed were made up of seven supervisory-related questions, seven fire alarm-related questions and two general electrical work -related questions. SMF ¶ 22. Given that the vast majority of the work performed on the midnight shift was fire

7

alarm related, it is logical that such questions should be asked. Further, Mr. Banks, an African-American, was asked fire alarm related questions when he had applied to supervise the midnight shift as well, and was promoted to the position. (SMF ¶ 23.)

Plaintiff also claims that the "vast majority of the assistant supervisor's time is spent supervising employees and not performing technical work." Pl. Opp. at 36. This assertion is immaterial, because for supervisory positions, an employer has a right to consider a broad range of subjective criteria when making hiring decisions. *Watson v. Fort Worth Bank & Trust*, 488 U.S. 977 (1988). Plaintiff does not take into account, for example, that Mr. Banks, the person who does not have in-depth knowledge of fire alarm systems and now occupies the supervisor position for the midnight shift, would be complimented by a person who is familiar with such issues. Plaintiff relies on hyperbole in his attempt to defeat AOC's Motion for Summary Judgment. Simply put, there is no evidence of any illegal activity by those involved in the selection process and defendant's legitimate business reasons cannot reasonably be deemed pretext for illegal discrimination or retaliation.[3]

**C. Answers Provided for the Interview Questions**

As evidence of yet another alleged detail in this purportedly well-planned scheme to keep him from a promotion, Plaintiff asserts that because the panel members were not provided with answers to the interview questions in advance, the Court should infer that the "actual answers

---

[3]Plaintiff also claims that the scoring/ranking system was arbitrary. Pl. Opp. at 37. Even if that was the case, which it is not, it would not be evidence of any unlawful motivation. The panelists were asked to rank the interviewees using a score of 1 to 5, with 5 as the highest possible score, and there is no evidence that any one panelist attempted to assert their preferences over the others, or even that a discussion was held about any candidate's race or any other inappropriate matter.

were irrelevant." Pl. Opp. at 38.  The difficulty with this proposition is multi-pronged.  First, by virtue of the supervisory position that each panelist held, they knew the answers to most, if not all of the questions.  Second, the panelists' deposition testimony confirms that they knew the answers to the questions prior to the interviews, with the exception of Mr. Masters, who knew most of the answers.  (Ex. C, *see e.g.* Masters Dep. Tr. at 50:18-51:13.)  Finally, if a panelist did not know the answer to a questions, as was the case with Kenny Masters, he simply asked the others, either during a break or at the end of the interview session.  *Id.*  Therefore, any answers that were required were indeed provided to the panelists. Accordingly, this assertion too should be disregarded.

### D. The Panelists

Preliminarily, *all three panelists* noted that in response to the first question "why are you interested in this job?" Plaintiff first answered "Retirement".  (*See* MSJ Exs. 17A, B and C).  At the time of the interview in 2004 Plaintiff was approximately five years away from retirement. (*See* MSJ Ex. 1, Pl. Dep. Tr. 33:-34:7).  A candidate's indication that he desires to be awarded a job to primarily enhance his retirement raises troublesome questions about the candidate's motivations and would not bode well for a candidate seeking a supervisory position.  It is undisputed that Plaintiff did not perform well during the interview.  Not only does Plaintiff admit that he did "average" (*see* SMF 34), Mr. Stewart also told him that Mr. Smith had performed better.  Plaintiff's attribution of race-based animus and conspiratorial motives to Mr. Aitcheson and other persons involved in the process is an attempt to distract the Court from the true reasons for Plaintiff's non-promotion, which have remained unrebutted by competent evidence.

Additionally, Plaintiff alleges that there were inconsistencies either within or between the

answers provided by each panelist. This assertion is incorrect. For example, Plaintiff points to Mr. Aitcheson's deposition testimony regarding his rationale for not choosing the Plaintiff, wherein Mr. Aitcheson provided more than one reason for Plaintiff's non-promotion. Pl. Opp. at 39. Mr. Aitcheson stated that Plaintiff's lower score was due to Plaintiff's performance as a team leader and his inability to address human resources issues. Clearly, there is no inconsistency therein, as a candidate's ratings are not always based on a single factor, but rather a multitude of items are taken into account.

### 1. Stephen Stewart

Mr. Stewart was the selecting official for the position in question. He and the Plaintiff have known each other for many years and have a good relationship to this day. MSJ Ex. 1, Pl. Dep. Tr. 87:21-25, 89:3-7. Both Messrs. Stewart and Aitcheson were involved in the Plaintiff's promotion to the position of team leader after he settled his case in June 2003. Plaintiff claims that it is "baseless" for Defendant to note that Mr. Stewart would not have retaliated against Plaintiff for having engaged in the same protected activity in which Mr. Stewart himself had engaged, *i.e.*, filing a complaint of discrimination. Pl. Opp. at p. 28, fn 7. However, Plaintiff has testified that he appreciated Mr. Stewart's sensitivity and concern for Plaintiff when they were both wage grade 10 electricians.

> Q. Well, why were you going to the EEO counseling?
> A. I was going to EEO for racist stuff and discrimination.
> Q. And Mr. Stewart came with you, did he not?
> A. Yes.
> Q. What did he tell you he was coming for?
> A. But when he went and filed his formal complaint, he went alone. And because of the problem that I was having or some of the things that or had transpired, he and I both was in the Ford building and he came to me, I guess he was being sensitive and let me know he is fed up with it. He's going up to EEO

>   and filing a formal complaint –
>   Q. On whose behalf?
>   A. Well, I think from his own behalf. But the nature of our conversation was he was concerned about what they were going to think because everybody pretty much at that time knew the action of -- not necessarily of what I was doing, but knew that I had had problems and had filed a complaint. And Steve and I discussion was that, They are going to think it's you.
>   Q. Who?
>   A. That when he went and filed his formal complaint, that they were so closely related, that when the managers find out or when he gets back to John Chabot, that everybody is going to think that this was Michael Graham that filed this complaint about name-calling and all this stuff.
>        And I'm not going to say he was right. We was right because I kind of agreed with him. But I said, I can deal with it.
>        As it related to that, I didn't care what they think. He did. Truly, that's what happened.
>        Now, the foreman at that time made the statement publicly, I'm going to get whoever did this.
>        Well, who do you think he thought done it? It didn't come out later that people found out that it was him that filed that complaint.
>   Q. It did not come out later?
>   A. It came out later.
>   Q. So you appreciated the support Mr. Stewart was giving you at that time?
>   A. Well, I don't know if it was support.
>        MR. ALDERMAN: Objecting to the form of the question.
>        BY MS. MOMENI:
>   Q. You said that he was being sensitive and he expressed concern to you that this might be hurtful to you in the future; is that correct?
>   A. Not in the future. It might affect me as opposed to what people were going to think.
>   Q. Did you appreciate the fact that he was concerned?
>   A. Yes.
>   Q. Did you appreciate the fact that he was being sensitive?
>   A. Yes, I did.

Pl. Dep. Tr. at 85:23-87-25. When confronted with the question of whether he believed that Mr. Stewart, as a manager, would retaliate against him for filing a discrimination complaint Plaintiff did not respond with a definitive answer. Instead he testified as follows:

>   Q. He would have retaliated against you?
>   A. Probably so.

>    Q. Because you went and filed an EEO complaint?
>    A. Not an EEO complaint.
>    Q. A complaint of discrimination. He would have retaliated against you for filing a complaint of discrimination. Is that your testimony, sir?
>    A. I don't want you to box me in to say Steve Stewart, Pete Acheson and Frank Tiscione all work together. So if you want me to pick out one person, that's probably not going to happen here today. If you want to talk about the AoC and what they might have done, yes.

*Id.* at 152:8-19.

Plaintiff failed to explain how an amorphous entity could engage in illegal conduct, while persons such as Mr. Stewart or the other panelists who conducted the hiring process did not. Plaintiff claims that since Mr. Stewart became the general foreman of the electrical division he has changed so much that he would promote a "racist" person. Pl. Opp. at 28. He bases his opinion on unsupported allegations and his feelings, but no competent evidence to support such a claim. Pl. Dep. Tr. 82:14-83:19 and SGI at 8. The Complaint cannot stand on such weak assertions.

### 2. Peter Aitcheson

Mr. Aitcheson also played a substantial role in the interview and decision making process for the position in question. Plaintiff disregards the fact that Mr. Aitcheson was not employed by the AOC at the time when Plaintiff filed his request for counseling in November 2001 (which then became the basis of his 2002 formal complaint), and therefore not implicated in that complaint. He suggest that because Mr. Aitcheson became a manager when Plaintiff's previous law suit was settled in June 2003, he would harbor resentment against Plaintiff. Pl. SGI ¶ 7. One would have to then infer that because of this unexplained and illogical resentment, Mr. Aitcheson would, *some sixteen months later,* design and implement an illegal plot to ensure that Plaintiff

would not receive a promotion.  Again, it is counter-intuitive to believe that Messrs. Aitcheson and Stewart, who were both involved in promoting Plaintiff to the position of team leader subsequent to his settlement, would participate in an illegal scheme to keep him from the assistant foreman position on the midnight shift.

### 3. Kenny Masters

Mr. Masters is an assistant foreman in the HVAC shop in the House Superintendent's Office.  He too was not implicated in Plaintiff's 2002 law suit.  Plaintiff states that "Mr. Masters' choices and scoring are irrelevant in this case since he recommended Phillip Rupprecht for the position, but was outvoted by Mr. Stewart and Mr. Aitcheson." Pl. Opp. at 42.  To the contrary, Mr. Master's scoring plays an important part in this process because it shows that Plaintiff's interview performance left the panelists unimpressed on more than one level.  For instance, Mr. Masters was unfamiliar with the Plaintiff's work ethic issues.  Nonetheless, like the other panelists, he rated Plaintiff last because of Plaintiff's over all poor performance during the interview. (*See* MSJ Exs. 14 and 17C).  Mr. Masters gave Mr. Rupprecht a score of 15, the selectee a score of 14, and the Plaintiff a score of 11.

Plaintiff makes much ado about the fact that Mr. Masters may not have known the answers to three of the interview questions.  Pl. Opp. at 42.  Mr. Masters was asked to recall whether he knew the answers to the technical/fire-alarm interview questions at the time of the interview.  He admitted that he was unfamiliar with some questions but asked Messrs. Stewart and Aitcheson for the correct answers at appropriate times.  (See Ex. C Masters Dep. Tr. at p.50). In the final analysis Mr. Masters' overall impression of Plaintiff's ability to answer the questions, which Mr. Masters independently calculated, is particularly telling and no inference of

13

discrimination could be drawn from Mr. Master's participation in the selection process. (*See* MSJ Exs. 14 and 17C.)

## II. **Plaintiff's Retaliation Count Must Fail.**

The AOC has offered three reasons why Plaintiff's retaliation claim cannot stand: first, he failed to exhaust his administrative remedies; second, the lack of temporal proximity between the initiation of the protected activity in November 2001 (or the filing of the formal complaint in 2002) and the non-promotion in October 2004; and third, the gap in logic in Plaintiff's theory that Mr. Stewart would retaliate against him for engaging in the same conduct in which Mr. Stewart had also engaged.  Now, at the eleventh hour, after the close of discovery, Plaintiff alleges that he engaged in some other protected activity that appears nowhere in his Complaint, responses to discovery requests, or anywhere else for that matter.  (See Compl. and  Exh. B, Pl. Disc. Responses).  If he truly believed that his alleged conversation with Mr. Stewart in August 2004, regarding Mr. Bartlett's selection to a supervisory position, was a protected activity, why is there no mention of it anywhere, prior to his filing of his opposition?  Indeed, the "protected activity" is not protected activity under the law.

Generally, retaliation in employment is prohibited because an employee has opposed any practice made unlawful by anti-discrimination laws, or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under anti-discrimination laws. *See e.g.*, CAA Section 207, codified at 2 U.S.C. §1317, which prohibits retaliation for opposing practices made unlawful by the CAA.  The law prohibits retaliation against active opposition to alleged discriminatory practices, not against general complaints on matters unrelated to alleged discriminatory practices.  *See, Broderick v.*

*Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (in finding no protected activity the court noted that "while no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."); *Schmidt v. Chao*, 2006 WL 1663389, at * 7 (June 13, 2006 D.D.C.) (in finding no protected activity the court held that neither "informal complaints about inappropriate matters in the workplace" nor a "threat to file a union grievance" suffice as opposition to an unlawful employment practice).

Here, for proof of an alleged conversation with Mr. Stewart Plaintiff relies on his own deposition testimony:

> Q. Have there been any incidents where you found that Mr. Stewart has not been truthful?
> A. Yes.
> Q. Tell me about that.
> A. Well, there's probably a few. I may have them set down in my records. I'll give you one. We had a gentleman that was promoted to assistant foreman on the evening shift and I knew his shady past. He was a racist. Me and him had conversations where he admitted to me he was a racist. I think Mr. Stewart was aware of this, too. But anyway, he was promoted to assistant foreman.
> Gordon Tolson and I, because of our past history, went in and spoke to him about this. And he told me he had changed.
> Q. Who had changed?
> A. That this particular gentleman that was promoted to assistant foreman, his name is Keith Bartlett, he told Gordon and I that he had changed. I mean we discussed a whole array of things and how we felt, this and that. But the bottom line of what he said to us is that Keith Bartlett had changed. That was a lie.
> Q. What do you base that on, that comment you just made, that that's a lie?
> A. I don't know everything, if he would have came in and said he was saved or he received Jesus Christ last night, I might have gave him the benefit of the doubt. But my history of racists and racism, you don't change overnight. They may change their little subtle ways of doing things or whatever to achieve whatever they want. But -- and maybe that wasn't a lie from his point of view; from my point of view, it was a lie. Now, maybe he truly believed that. But I didn't.

> Q. So it's not necessarily a lie from his point of view?
> A. Might not. But that would be one instance because I know his views on him even before he promoted him.
> Q. So you would agree with me that people's points of view can differ?
> A. They can differ, but see, that's a slippery slope. I know that's a lie. How do I convey or articulate that to you in words? It's hard for me to sit here and do. But that was a lie.

Pl. Dep. Tr. 82:14-83:19. It should be noted, first, Plaintiff did not offer the above testimony in the context of his retaliation claim, but rather when he was asked about his knowledge of and thoughts on Mr. Stewart's veracity. Second, he does not indicate that he thought that Mr. Stewart, by being involved in Mr. Bartlett's promotion, made his decision based on racial animus toward Mr. Banks. Indeed, Plaintiff offers no evidence of any conversations between him and Mr. Stewart that indicates that Plaintiff protested Mr. Banks' non-promotion because of alleged discrimination or retaliation, but simply that Mr. Bartlett was viewed as an inappropriate candidate. (*See* SGI ¶ 8 and Pl. Opposition at p. 28.) Accordingly, Plaintiff's alleged conversation with Mr. Stewart does not constitute protected activity as a matter of law.

### III.   Plaintiff's Failure to Exhaust Administrative Remedies Bars His Retaliation Claim.

Plaintiff's claim that the AOC engaged in retaliatory employment practices when it promoted Mr. Smith to the assistant foreman position in October 2004, should be dismissed because Plaintiff failed to exhaust his administrative remedies. Prior to seeking relief in Federal court for alleged employment discrimination or retaliation, an employee of Congress must timely exhaust all available administrative remedies. *Reynolds v. U.S. Capital Police Board*, 357 F.Supp. 2d 2 (D.D.C. 2004). *See also generally*, *Kizas v. Webster*, 707 F.2d 524, 544 & n.99

(D.C. Cir. 1983); *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995), *cert denied*, 519 U.S. 811 (1996) (Requiring that a person complaining of a violation of employment discrimination laws, file an administrative charge with the EEOC and allow the agency time to act on the charge.)

      These procedural requirements governing a plaintiff's right to bring an employment discrimination or retaliation claim in court are not unimportant. "It is part and parcel of the Congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining nondiscrimination in employment." *Kizas*, 707 F.2d at 544. "Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d 8, 13-14 (D.C. Cir. 1985) ("A plaintiff who fails to comply, to the letter, with administrative deadlines ordinarily will be denied a judicial audience.").

      The AOC renewed its motion to dismiss count II of Plaintiff's Complaint, for failure to exhaust, as it had previously been dismissed without prejudice. After the U.S. Supreme Court decision in *Burlington Northern v. White*, 584 U.S. ___, 126 S. Ct. 2405 (2006), Defendant believed it appropriate to renew said motion. All materials from Defendant's pre-discovery Motion to Dismiss are therefore incorporated by reference.[4]

      Because the AOC was never provided with an opportunity to address allegations of retaliation in the Office of Compliance or otherwise internally, Plaintiff is barred from bringing

---

[4] Defendant mistakenly offered a document from the 2002 complaint, inadvertently misreading the date thereon. (*See* MSJ Ex. 4).

this claim before the Court now. *Cf. Morgan v. AMTRAK*, 536 U.S. 101, 125 (2002) (confirming need to administratively exhaust claims of discrimination and retaliation).

### IV. CONCLUSION

Because Plaintiff has failed to produce any evidence, direct or otherwise, of any discriminatory or retaliatory animus or actions by the persons involved in the selection process, and cannot rebut, as pretextual, Defendant's legitimate, non-retaliatory reasons outlined in sections I and II, *supra*, the AOC is entitled to judgement as a matter of law on both counts of Plaintiff's Complaint. In the alternative, Count II of Plaintiff's Complaint should be dismissed for failure to exhaust administrative remedies.

Dated: August 31, 2006.

Respectfully submitted,

KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

MERCEDEH MOMENI
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C.  20530
(202) 305-4851

Of Counsel:
Edgar Martinez, Esq.
Architect of the Capitol
Office of Employment Counsel
2nd and D Streets, S.W.
Washington, D.C. 20515

## CERTIFICATE OF SERVICE

_____I HEREBY CERTIFY that, this 31st day of August 2006, I caused the foregoing Reply and the attached proposed order, to be served on opposing counsel via electronic mail.

/s/
_____
MERCEDEH MOMENI
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 305-4851